# U.S. EX REL. [SEALED] V. [SEALED]

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,                )
the States of California,                )
Delaware, Florida, Hawaii,               )
Illinois, Indiana, Iowa, Maryland,       )
Massachusetts, Minnesota, Montana,       )
Nevada, New Jersey, New Mexico,          )
New York, North Carolina, Rhode Island,  )
Tennessee, Vermont, Virginia,            )
and the District of Columbia             )
ex rel. Michael Breitenstein            )
                                         )
                                         )   Civil Action No. _____
                                         )
                                         )   **FILED IN CAMERA AND**
                                         )   **UNDER SEAL**
                                         )
                                         )   Jury Trial Requested
                                         )
                                         )
Plaintiffs-Relator,                      )
                                         )
     v.                                  )
                                         )
FEDEX CORPORATION,                       )
FEDERAL EXPRESS CORPORATION,             )
FEDEX OFFICE, FEDEX GROUND               )
PACKAGE SYSTEM, INC.,                    )
FEDEX FREIGHT, INC.,                     )
FEDEX CORPORATE SERVICES, INC.,          )
FEDEX LOGISTICS F/K/A                    )
FEDEX TRADE NETWORKS, INC.               )
                                         )
                                         )
Defendants.                              )

## **COMPLAINT**

I.      **STATEMENT OF THE CASE** ........................................................ 1

     A.   **The National Security Concerns Presented by this Case** ..................... 5

         1.   **Existing and Emerging Threats to Air Cargo Security** .............. 9

         2.   **Bomb Plots Involving Air Cargo** ........................................ 13

         3.   **Human Cargo Stowaways** .................................................... 16

         4.   **Bombings Involving Ground Shipments** .................................... 18

         5.   **Package Tampering by FedEx Employees** .................................. 19

     B.   **FedEx Public Statements Concerning Its Security Measures** ........... 21

II.     **LEGAL FRAMEWORK** ........................................................ 23

     A.   **Parties** ........................................................................... 23

     B.   **Jurisdiction and Venue** .................................................. 29

     C.   **Time Period** ................................................................. 30

     D.   **The Laws Violated** ........................................................ 30

         1.   **Federal False Claims Act** .................................................. 30

         2.   **State False Claims Acts** .................................................... 31

III.    **THE STATUTORY/REGULATORY SCHEME** ................................. 32

     A.   **Laws Establishing DHS/TSA Oversight Authority for National Security** ........................................................................... 32

     B.   **TSA Security Requirements for Air Carriers and Cargo Facilities, Operations and Transport** .................................................. 36

         1.   **TSA Security Requirements Generally** .................................. 36

         2.   **Full All-Cargo Aircraft Operator Standard Security Program (FACAOSSP)** ........................................................ 37

         3.   **Air Cargo Advance Screening (ACAS) Program** ...................... 41

         4.   **TSA 100 Percent Screening Requirement** ................................ 44

         5.   **TSA Certified Cargo Screening Facility (CCSF)** ...................... 45

         6.   **TSA Sanctions for TSA Security Violations by Cargo Carriers** 47

         7.   **TSA Chain of Custody Requirements** .................................... 48

             a.   **FedEx Chain of Custody** ............................................ 51

         8.   **TSA Requirements on Airport Access Control** .......................... 53

             a.   **SIDA Secure Areas** .................................................... 53

b.   SIDA Badge Clearance for Security Threat Assessment.... 57

c.   FedEx Access Control/SIDA Policies ................................... 59

9.   TSA Requirements on Screening and Inspecting Cargo .......... 62

a.   FedEx Screening/Inspection ................................................ 64

10.  TSA Seal and Lock Truck Cargo Hold Requirements ............. 69

a.   FedEx's Seal/Lock Policies ................................................. 70

IV.   FEDEX GOVERNMENT CONTRACTS ................................................... 73

A.   FedEx Contracts with the United States ........................................ 73

1.   FedEx-USPS $10.5 Billion Contract ........................................ 73

2.   FedEx-DOD (NGDS) $2.3 Billion Contract ............................. 82

3.   FedEx-DOD (CRAF) $7.9 Billion Contract ............................. 83

B.   FedEx Contracts with the States .................................................... 87

V.   FEDEX FRAUDULENT SCHEME ........................................................... 89

A.   Unauthorized Access to (SIDA) Secure Areas .............................. 94

1.   Examples of Unauthorized Individuals .................................... 110

B.   Unsecure Cargo ............................................................................. 119

1.   Examples of Unsecure Cargo Shipped to and from Military Bases .......................................................................................... 132

2.   Example of Unsecure Cargo Shipped on Passenger Flight ..... 137

3.   Examples of Unsecure Cargo Shipped from a FedEx TSA-Certified Cargo Screening Facility ........................................... 138

4.   Unsecure Cargo Carrying Radioactive Materials .................... 144

5.   Failure to Report Required Cargo Data Before Flight Onboarding .............................................................................. 145

C.   Truck Seal and Lock Violations .................................................... 146

1.   Examples of Truck Seal and Lock Violations ........................... 154

D.   Fraudulent Use of Security Delay Codes ...................................... 157

E.   Reports by FedEx Employees Corroborate Relator's Allegations .. 159

F.   FedEx Knew that Compliance with TSA Requirements Was Material to the Government's Decision to Pay Claims Under the Contracts. 165

VI.   UNLAWFUL RETALIATION ................................................................. 168

**VII.   COUNTS** ................................................................................................ **169**

This is a *qui tam* action by Plaintiff-Relator to recover treble damages and civil penalties arising under the Federal and State False Claims Acts from the actions of Defendants FedEx Corporation ("FedEx"), Federal Express Corporation ("FedEx Express"), FedEx Office, FedEx Ground Package System, Inc. ("FedEx Ground"), FedEx Freight, Inc. ("FedEx Freight"), FedEx Corporate Services, Inc. ("FedEx Services"), and FedEx Logistics f/k/a FedEx Trade Networks, Inc. ("FedEx Trade Networks") (collectively, "FedEx" or "Defendants").

The allegations in this case represent:

- o   a root cause of national security threats—the flouting of security measures designed to keep our country safe; and

- o   prioritizing expediency and financial gain over the safety of Americans.

## I.      STATEMENT OF THE CASE

1.      FedEx is a publicly owned company that provides shipping services for the delivery of cargo in the United States and internationally.  As of 2018, FedEx is the largest mail service and cargo transportation company in the world.

2.      FedEx has obtained billions of dollars in government contracts to screen, inspect, secure and transport cargo at U.S. and international airports and military bases on behalf of federal agencies, including the Department of Defense

($2.3B/5-year contract) and the United States Postal Service ($10B/11-year contract).

3.     FedEx is subject to both national security requirements and contractual requirements.

4.     Yet, for at least the past 10 years and continuing, FedEx has knowingly failed to ensure the secure and safe transport of cargo in violation of federal national security requirements and certain contractual provisions with federal agencies.

5.     Applicable legal requirements that apply to FedEx include:

- TSA requires "full all-cargo" aircraft operators like FedEx to adopt, implement, and comply with extensive security programs (Full All-Cargo Aircraft Operator Standard Security Program, i.e., FACAOSSP)

- Those air cargo carrier security programs must, among other requirements:

  - Include security measures "to prevent or deter the carriage of any unauthorized persons, and any unauthorized weapons, explosives, incendiaries, and other destructive devices, items or substances," 49 C.F.R. § 1544.202

  - Ensure cargo is screened and inspected for unauthorized persons or explosives, 49 C.F.R. § 1544.205(b)

  - Prevent unauthorized access to exclusive areas in loading docks and to cargo aircraft, 49 C.F.R. § 1544.225

2

- Ensure that all persons with contact and access to cargo "successfully complete" a security threat assessment, 49 C.F.R. § 1544.228

  o Air cargo carriers liked FedEx transporting international cargo inbound to the United States must meet additional security requirements, 19 C.F.R. § 122.48a(d)(1).

6.    Applicable contractual requirements to which FedEx must adhere include:

  o Compliance with "all laws, orders or regulations that may be applicable to the performance of [FedEx] services and [FedEx] shall obtain all licenses, permits and authorizations required."

  o FedEx certification that it "will provide all security measures to prevent unauthorized access to mail."

  o Numerous other contractual provisions set forth in this Complaint, including that "FedEx must meet all applicable FAA, and local airport authority requirements regarding airport security….be in compliance with rules, regulations or laws in effect or promulgated by the FAA, local airports or other agencies concerning airport aviation security."

7.    FedEx contractually guaranteed that it would adhere to national security requirements when transporting government cargo on trucks and planes— often to and from secure military facilities such as the Wright Patterson Air Force Base in Dayton, Ohio and Andrews Air Force Base in Prince George's County, Maryland.  Instead, FedEx routinely flouted and knowingly ignored national

3

security requirements, causing the United States to be (and continue to be) vulnerable to terrorist attacks.

8. FedEx's violations include:

o Knowingly allowing individuals (FedEx contractors, temporary employees, employees and managers) unauthorized access to SIDA (Security Identification Display Area) secure areas where cargo is stored. A SIDA secure area is a specially-designated security area under Federal Aviation Administration (FAA) regulations. In thousands of instances, unauthorized persons were free to roam SIDA secure areas at the Dayton International Airport.

o Knowingly allowing cargo to be placed on airplanes without proper inspection and/or securing—i.e., insufficient banding and without using locks or clamps. In thousands of instances, cargo flew uninspected and unsecured on flights to or from at least 45 states and 35 different countries;

o Knowingly failing to lock and seal vehicles, trucks, and ramp doors containing stored cargo in at least one thousand instances.

9. The violations were often committed with direct corporate/management knowledge, and FedEx acted (at least) with reckless disregard.

10. FedEx was trusted and well-funded by the United States to comply with national security requirements, which are fundamental to its contracts with the United States.

4

11. FedEx's conduct violates federal and state False Claims Acts, is a threat to national security and the safety of Americans, and is a disaster waiting to happen.

**A.    The National Security Concerns Presented by this Case**

12. FedEx is the world's largest air cargo carrier, handling the highest volume of air freight and operating the largest fleet of aircraft.

| Rank | +/- | Airline | 2017 | Y-o-Y % | 2016 | Y-o-Y % | 2015 | Y-o-Y % | 2014 |
|---|---|---|---|---|---|---|---|---|---|
| Top 25 Cargo Carriers 2017 - Scheduled FTK (m) | | | | | | | | | |
| 1 | 0 | Federal Express | 16,851 | 7.2 | 15,712 | -0.6 | 15,799 | -1.4 | 16,020 |
| 2 | 0 | Emirates | 12,715 | 3.6 | 12,270 | 0.9 | 12,157 | 8.2 | 11,240 |
| 3 | 0 | United Parcel Service | 11,940 | 6.0 | 11,264 | 4.2 | 10,807 | -1.2 | 10,936 |
| 4 | +1 | Qatar Airways | 10,999 | 19.3 | 9,221 | 20.4 | 7,660 | 27.7 | 5,997 |
| 5 | -1 | Cathay Pacific Airways | 10,722 | 7.8 | 9,947 | 0.1 | 9,935 | 5.0 | 9,464 |
| 6 | 0 | Korean Air | 8,015 | 4.5 | 7,666 | -1.2 | 7,761 | -3.9 | 8,079 |
| 7 | +1 | Cargolux | 7,322 | 6.4 | 6,878 | 9.0 | 6,309 | 9.7 | 5,753 |
| 8 | -1 | Lufthansa (1) | 7,317 | -0.9 | 7,384 | 7.2 | 6,888 | -2.4 | 7,054 |
| 9 | +1 | Air China | 6,701 | 10.0 | 6,089 | 6.5 | 5,718 | 16.5 | 4,910 |
| 10 | -1 | Singapore Airlines | 6,592 | 3.9 | 6,345 | 4.3 | 6,083 | 1.1 | 6,019 |
| 11 | 0 | China Southern Airlines (2) | 6,174 | 4.0 | 5,939 | 10.9 | 5,355 | 13.1 | 4,736 |
| 12 | 0 | China Airlines | 5,741 | 8.9 | 5,273 | -1.3 | 5,343 | 1.5 | 5,266 |
| 13 | +3 | AirBridgeCargo Airlines | 5,543 | 12.8 | 4,914 | 20.8 | 4,069 | 25.3 | 3,248 |
| 14 | +2 | All Nippon Airways (1) | 4,810 | 11.5 | 4,315 | 12.4 | 3,840 | -0.2 | 3,847 |
| 15 | +5 | Turkish Airlines (1) | 4,728 | 29.9 | 3,640 | n/a | n/a | n/a | 2,580 |

13. FedEx stands in the shoes of the United States, which has contractually assigned to FedEx the responsibility to guard against threats to national security, in the performance of the contracts. As illustrative, the 2003 USPS Annual Report states: "After the terrorist attacks on September 11, 2001 the Federal Aviation Administration placed additional restrictions on mail pieces weighing more than 16 ounces, which prohibited us from using commercial air carriers. We were thus forced to move virtually all Priority Mail to the FedEx network and our surface network, with a small volume of mail on expensive taxis.

5

Although the FedEx network is less expensive than our old dedicated network, it is more expensive than commercial air carriers. We are currently moving 51% of Priority Mail on our surface network and 48% on FedEx."

14. In a recent False Claims Act settlement with Northrop Grumman Systems Corporation involving false labor charges, the following quote from the U.S. Postal Service Office of Inspector General, demonstrates the significance of the Government's need to rely upon contractors like FedEx, including for the services at issue in this Complaint: "The U.S. Postal Service manages approximately 30,000 contract actions and spends more than $13 billion on contracted supplies and services each fiscal year."

15. Many of the security violations alleged in this Complaint involve cargo that has been transported by FedEx and loaded onto flights across the United States and around the world.

16. The prevention of a terrorist attack on cargo aircraft is a significant national priority for the Executive Branch, particularly for the U.S. Department of Homeland Security's ("DHS's") Transportation Security Administration ("TSA").

17. The protection of national security is also of paramount importance to the United States Attorney General. On the front page of its website, the United States Department of Justice identifies its three top priorities. The first is

"protecting national security" followed by "reducing violent crime and combatting the opioid crisis."

18. National security advisors, experts and officials have expressed heightened concern with the serious risks posed by air travel.

19. "[A]viation is still, for many reasons, one of the number one targets of interest for terrorist groups and individuals who are connected to them."

20. On March 7, 2018, TSA Chief David Pekoske gave a presentation at George Washington University on the "State of TSA." He warned that the U.S. "face[s] ambitious adversaries who are continuously looking for a point of attack and waiting for us to slip up." He further insisted, "[w]e can no longer focus only on preventing the bad guys from getting into the secure area of an airport. We must focus on both sides of the checkpoint and in the public areas where airport and surface transportation systems intersect."

21. The risk of a terrorist attack on both passenger and cargo aircraft remains high. Cargo planes are attractive to terrorists because of their potential to cause "significant economic loss, casualties on the ground resulting from falling aircraft debris, and international media coverage."

22. Mitigating and averting the risk of cargo aircraft being used to carry out terrorist attacks – and holding accountable those who fail to follow security

requirements designed to protect against these risks – thus, continues to be a top priority for the United States.

23.     In June 2017, then-Civil Division Acting Assistant Attorney General Chad Readler, the Justice Department's senior most official responsible for the False Claims Act, made clear that pursuing Government contractors for violating national security laws and regulations remains the highest priority:

> ***Defending the nation remains the highest priority of the Department.*** Although other parts of the Department have a more visible role in this effort, the actions of the Civil Division are no less vital to its success. Whether those actions entail the ***defense of national security laws and regulations***, litigating and defending of the U.S. Government's immigration actions, defending restrictions placed on assets and activities within the United States of individuals or entities tied to foreign terrorist organizations, or the litigation of habeas petitions brought by known or suspected terrorists, Division attorneys are dedicated to the protection of the American people.
>
> The Division's efforts in recent years to defend national security have taken a number of different forms, including … ***pursu[ing] affirmative claims against government contractors and others that failed to abide by national security related restrictions.***

(emphasis added).

24.     The allegations in this case involve matters that the U.S Department of Homeland Security, the U.S. Custom and Border Patrol, the Federal Bureau of

8

Investigation, Congress, and the White House all have identified as high national security priorities.

### 1. Existing and Emerging Threats to Air Cargo Security

25. "The international air cargo shipping process involves a complex network of business entities that include individual shippers, manufacturers, transportation companies, freight forwarders, warehouses, and air carriers."

26. Air carriers like FedEx are responsible for implementing TSA security requirements predominantly through TSA-approved security programs that describe the security policies, procedures, and systems the air carriers are required to implement and maintain in order to comply with TSA security requirements. These requirements include measures related to:

- o Acceptance, handling, and screening of cargo;

- o Training of employees in security and cargo screening procedures;

- o Testing employee proficiency in cargo screening; and

- o Access to cargo areas, aircraft, and vehicles.

49 C.F.R. §§ 1544.202, 1544.205(b), 1544.225, 1544.228.

27. In fiscal year 2017, "about 13 billion pounds of cargo was transported on aircraft to the United States – over 5 billion pounds was transported on passenger aircraft (e.g., Delta and United Airlines), and about 8 billion pounds was

transported on all-cargo aircraft (e.g., FedEx and United Parcel Service) – from over 300 foreign airports."

28.    In 2018, FedEx Express delivered a total average of 28.3 million pounds of freight each business day, up from 27.5 million pounds per day in 2017 and 11.3 million pounds per day in 2016.

29.    In terms of total annual freight tonne kilometers (FTKs), which measures actual freight traffic, FedEx has consistently led the market with 16 billion FTK carried in 2014; 15.8 billion FTK in 2015; 15.7 billion FTK in 2016; and 16.8 billion FTK in 2017.

30.    To secure cargo, supply chain entities like FedEx "must apply security measures accepted or required by the appropriate national authority, including measures to ensure the secure transport of cargo.  Upon arrival at the air carrier's sorting center, the air carrier or cargo handling agent must verify the known consignor/regulated agent status and that the cargo was transported securely before accepting it."

31.    The TSA and GAO reiterated to Congress in 2018 that "the security threat posed by terrorists introducing explosive devices in air cargo shipments remains significant."

10

32.    Various U.S. agencies and officials have issued sobering warnings regarding the vulnerability of the air cargo system to exploitation by both domestic and international terrorists.

33.    As recently as June 2018, the United States Department of Homeland Security ("DHS") reported that it had "received specific, classified intelligence that certain terrorist organizations seek to exploit vulnerabilities in international air cargo security to cause damage to infrastructure, injury, or loss of life in the United States or onboard aircraft."

34.    DHS further cautioned that "terrorists continue to seek out and develop innovative ways to thwart security measures" and that "[t]errorist threats to the aviation transportation system continue to represent a meaningful risk given the expressed intentions of terrorists, their persistent attempts to thwart security and target aviation, and the perceived fiscal and human consequences of a successful attack."

35.    According to DHS, global terrorist organizations "*aim to exploit any security vulnerability*."

36.    In an earlier bulletin released in November 2017, DHS warned that "terrorists continue to target commercial aviation and air cargo, including with concealed explosives" and that the U.S. "continue[s] to face one of the most challenging threat environments since 9/11, as foreign terrorist organizations

11

exploit the Internet to inspire, enable, or direct individuals already here in the homeland to commit terrorist acts." On June 28, 2017, former DHS Secretary and White House Chief of Staff John Kelly confirmed the grave reality of terrorist attacks on commercial aviation:

> Terrorists want to bring down aircraft to instill fear, disrupt economies, and undermine our way of life. And it works—which is why they still see aviation as the crown jewel target in their world. *The threat has not diminished. In fact, I am concerned that we are seeing renewed interest on the part of terrorist groups to go after the aviation sector—from bombing aircraft to attacking airports on the ground, as we saw in Brussels and Istanbul.* However, we are not standing on the sidelines while fanatics hatch new plots. *The U.S. government is focused on deterring, detecting, and disrupting these threats.*

(emphasis added).

37. In an earlier statement before the House Committee on Homeland Security, Subcommittee on Transportation Security, then-Deputy Assistant Director of the FBI's Counterterrorism Division Doug Perdue reminded Congress that:

> [w]e live in a time of acute and persistent terrorist and criminal threats to our national security, our economy, and to our communities. These diverse threats … make clear the importance of [the FBI's] partnerships, especially with the Transportation Security Administration, in reducing security vulnerabilities in our nation's transportation system [and in] … mitigate[ing] the threat posed to our nation's transportation

infrastructure and internal aviation security processes and systems.

### 2. Bomb Plots Involving Air Cargo

38. The threats to air cargo security described above are illustrated by several alarming examples of incidents involving the use of the air cargo system to carry out both international and domestic terrorist attacks. Yet, despite the heightened warnings of United States agencies responsible for national security and actual terror threats, FedEx—the world's largest air cargo carrier—has chosen not to take these risks as seriously as they are obligated to.

39. One example of the vulnerability of the air cargo system to terrorist attacks, which reinforces the need for compliance with federal and state regulations and contractual provisions by commercial cargo carriers like FedEx, is provided by a 2017 Australian bomb plot.

40. In July 2017, law enforcement authorities in Australia foiled a terror plot involving a senior ISIS commander's use of a cargo plane to ship partially assembled components of a bomb from Turkey to Australia. The plan was to place the explosive device on a passenger plane at an Australian airport and detonate it.

41. In response to this incident, TSA announced that it was reviewing its screening procedures for cargo flown into and within the United States because of concerns that potential security vulnerabilities could be exploited by terrorists, and that part of its review would include examining screening procedures for cargo

carried both by freight airlines and passenger planes. According to one U.S. official, "[a]nytime you have an aviation terror plot anywhere in the world, it forces TSA to look at whether that could happen here."

42.   TSA further indicated that it intended to "raise the baseline on transportation security domestically and internationally and cargo security is a part of that effort."

43.   A second example of the vulnerability of the air cargo system to terrorist attacks and that led to changes in national security requirements in the United States is provided by an earlier Yemen bomb plot in October 2010, which involved the terrorists' attempted use of UPS and FedEx as conduits.

44.   In October 2010, two parcels containing powerful explosive devices were concealed in packages shipped as air cargo bound for the United States as part of an Al Qaeda terrorist organization plot.  Fortunately, the bombs were discovered before detonating.  The cargo was slated to be shipped by UPS and FedEx.

45.   The first shipment received by UPS in Sana'a was scheduled to be transported on a United States-bound UPS cargo aircraft from Yemen through Philadelphia, Pennsylvania with a final destination of Chicago, Illinois.  The second shipment received by a FedEx office in Sana'a was scheduled to be

transported on a United States-bound FedEx all-cargo aircraft to its ultimate destination in Chicago, Illinois.

46.     The cargo in the care of FedEx was flown on two passenger flights to Qatar and then Dubai.  A tipster provided the FedEx tracking number of the cargo, which led to the discovery of the bomb at the Dubai airport before the cargo was shipped on the United States-bound FedEx all-cargo aircraft.

47.     These explosive devices transported as cargo on commercial carriers like FedEx and UPS "were expected to explode mid-air over the continental United States, which could have caused catastrophic damage to the aircraft, the passengers, crew, and persons and property on the ground."

48.     Notably, the Yemen plot signaled a shift to terrorists targeting cargo shipped on cargo carriers and not only on passenger flights.  Some U.S. officials speculated that the Yemen incident may have been "a test of cargo screening procedures and the reaction of security officials."

49.     Indeed, according to materials published by a terrorist organization shortly after the incident, the organization had decided to employ explosive devices on air cargo flights rather than passenger flights due to increased passenger screening that had been implemented after a Christmas Day 2009 bomb attempt, in which a man had smuggled a bomb in his underwear aboard a commercial passenger airliner.

50.    Almost immediately after this incident, a FedEx spokesman recognized FedEx's role in security:  FedEx is "continuing to work very closely with the authorities"… "[s]ecurity is always something that we focus on," and declined to disclose publicly FedEx's specific security processes and procedures.

51.    A FedEx spokeswoman acknowledged in response to the incident, FedEx's paramount role in securing cargo: "FedEx has extensive measures in place; we're always enhancing our capabilities, but our first priority must always be to focus on tactics that are effective."

52.    As Representative Ed Markey from Massachusetts commented at the time of 2010 Yemen bomb plot, "It is time for the shipping industry and the business community to accept the reality that more needs to be done to secure cargo planes so that they cannot be turned into a delivery systems [sic] for bombs targeting our country."

53.    Indeed, as was made clear by the October 2010 bomb plot, terrorist attempts to exploit weaknesses in the cargo flight security system are not a remote possibility but a very real and serious threat to national security.  If not guarded against, such plots could cause mass destruction and catastrophic human loss.

### 3.    Human Cargo Stowaways

54.    In addition to the threat to national security of explosive devices placed on cargo aircraft, there are also threats posed by individuals shipping

16

themselves on cargo aircraft.  TSA regulations also seek to protect the threat of stowaways, requiring security measures "***to prevent or deter the carriage of any unauthorized persons***, and any unauthorized weapons, explosives, incendiaries, and other destructive devices, items or substances" (emphasis added). 49 C.F.R. § 1544.202

55.    In 2003 and 2004, two individuals successfully stowed away aboard cargo aircraft, highlighting the responsibility of air cargo shippers like FedEx to prevent such events.

56.    In September 2003, a shipping clerk at a New York warehouse stowed away in a crate on a commercial airline cargo jet from New York to Texas.  He journeyed overnight about 1,500 miles by truck, plane and delivery van.  "The incident renewed debate over the air cargo system's vulnerability to terrorists.  Unlike the tight federal security for airline passengers, air cargo receives little federal scrutiny and is the responsibility of the shipper."

57.    In response to the incident, TSA stated that it had "made significant improvements in cargo security."  To that end, TSA teams examined cargo carriers and the airport facilities they use to load packages to determine strengths and weaknesses in cargo security, including evaluation of shipping vendors like FedEx that TSA largely relies upon to secure cargo.

17

58.     In August 2004, a Cuban woman seeking asylum in the United States successfully shipped herself in a crate on DHL Express (a commercial courier and mail shipping service like FedEx) from the Bahamas to Florida.  "She tucked herself into the DHL crate and remained in a fetal position for six hours, at times braving freezing temperatures."

### 4.     Bombings Involving Ground Shipments

59.     Attacks carried out through domestic ground shipment of cargo also pose serious threats to national security in the United States, and the thousands of security violations alleged in this Complaint pose similar threats.

60.     On October 5, 2007, the Department of Homeland Security issued to mail and package handling facilities like FedEx a guide to "Potential Indicators of Terrorist Activity, Common Vulnerabilities, and Protective Measures."  It noted that in targeting critical infrastructure, potential adversaries may use and have used shipping companies to deliver explosives and hazardous materials to other targets.

61.     Commercial shippers like FedEx remain vulnerable targets.  In March 2018, there were bombings in and around Austin, Texas, which demonstrate the vulnerability of ground transportation systems.  A serial bomber, after having killed two individuals, used FedEx Ground services to ship two additional packages that included explosive devices.  One of the packages exploded at a FedEx facility while on an automated conveyer belt, after having been sent to the

18

facility from a FedEx store.  The second package was located at FedEx before it detonated.

### 5.    Package Tampering by FedEx Employees

62.    There have also been incidents of package tampering involving FedEx employees. These incidents reinforce how critical it is that FedEx adequately screen its own employees and contractors and ensure that each individual has the proper security certifications discussed throughout this Complaint.

63.    On July 13, 2018, the Department of Justice announced that three Memphis FedEx employees were indicted for stealing and tampering with mail that passed through the Memphis FedEx hub—the largest FedEx Express hub in the world.  "Millions of packages go through Memphis every day, which helps fuel e-commerce around the world and makes it possible to order a package online, and have it delivered the very next day."

64.    The DOJ press release explained that "[t]he employees would search through mail, remove some of the contents contained therein and smuggle items off the premises."

65.    In September 2018, 11 former FedEx Express employees and two former contractors for the U.S. Postal Service were indicted on federal mail theft charges in Memphis, Tennessee.  "Theft of mail by employees or outside

19

contractors strikes at the very heart of the public's confidence in the sanctity and security of the U.S. mail."

66.    As recently as November 2018, FedEx Senior Security Specialist 5, who was responsible for 23 FedEx Ground and FedEx Express services buildings, remarked that he had to address recent theft issues at DAYA and DAYR, which are indicative of security breaches.

67.    DAYA is a FedEx facility in the Dayton International Airport (DAY). In general, the "A" at the end of an airport identifier like "DAY" denotes a FedEx "station" (A for station).  FedEx stations—like DAYA—handle small package freight and are under the Domestic Ground Operations (DGO) division of FedEx Express. In general, the "R" at the end of an airport identifier like "DAY" denotes a FedEx "ramp" (R for ramp) (DAYR).  FedEx ramps operate under the Air Ground and Freight Services (AGFS) division of FedEx Express.  An "RT" at the end of an airport identifier denotes a ramp that also does pickups and deliveries (i.e., DAYRT).  Access to both DAYA and DAYR are not automatically granted to all FedEx employees.  DAYA personnel typically do not have or need SIDA clearance and are not authorized to access DAYR unescorted.  To have unescorted access to DAYR, employees need to obtain a special security clearance (i.e., SIDA clearance), as discussed further in this Complaint.

20

**B.      FedEx Public Statements Concerning Its Security Measures**

68.      As noted, FedEx is the world's largest air cargo carrier, handling the highest volume of air freight and operating the largest fleet of aircraft.  As a result, FedEx's public statements regarding its safety measures and security record are material to the regulators and the public.

69.      In its SEC 10-K annual filings, FedEx has repeatedly acknowledged that "transportation infrastructure continues to be a target of terrorist activities," and reassured regulators and the public of its compliance with TSA's "strict security requirements."

70.      FedEx spokesman Maury Lane reassured regulators and the public over 10 years ago that each of the millions of packages it is responsible for shipping worldwide, "goes through some kind of security review … Our level of attention and detail was always high.  Clearly, we're more focused and will remain so for the foreseeable future."

71.      According to an interview with the *Wall Street Journal* as early as 2005, the then-FedEx CEO acknowledged FedEx's role in preventing terrorist attacks, with caveats about his view of the relative importance of the cost of providing that security, stating that:

> i.      "It is only by training and empowering our own employees that terrorism can be contained."

ii.     "All we are trying to do is to protect our assets and not have our assets be used for bad purposes."

iii.    "When the worry was terrorism, the company saw its entire system as vulnerable because trucks and planes have been the instrument of choice of extremists such as Timothy McVeigh as well as Islamist terrorists."

iv.     "FedEx is willing to cooperate with federal authorities up to and including the line on which we would be doing a disservice to our shareholders."

72.    Over the last several years, FedEx has made a number of other representations regarding its compliance with all regulations, which include national security requirements:

- o   2018:

  - "FedEx continuously enhances its security processes and procedures to ensure the safe acceptance, handling and transport of all shipments in its network.  This recent measure reflects our commitment to security and safety." Stacey Sullivan, FedEx Office spokeswoman.

- o   2017:

  - "FedEx has developed programs to comply with all applicable federal and state laws and regulations that apply to the services we offer."

  - "FedEx Express operates under the appropriate level of security and safety awareness and has taken necessary precautions to ensure the safety of our employees, equipment, packages and customers. FedEx Express is C-TPAT certified (certification no. 00407) and has a Transportation Security Administration (TSA) compliant security program. All aspects of our operation continue to comply with the guidelines set forth by government

22

agencies. In addition, FedEx Express has extensive safety and security programs that exceed regulatory requirements."

- "While FedEx is not in a position to provide copies of internal policies and procedures to our customers, FedEx Express' policies and procedures are designed to comply with all applicable laws and regulations."

  o   2016:

- FedEx has asserted in litigation that "it maintains a Security Department and complies with all FAA and TSA (Transportation Safety Administration) regulations."

  o   2015:

- In refusing to continue military shipments of anthrax, FedEx communications director Melissa Charbonneau responded, "While we understand the questions about public health, our internal investigation has found no indication of risk to our employees or the public, and we remain committed to the safety of our teams and the communities we serve."

73.    Despite FedEx's promises, it has failed to comply with national security requirements and its contractual promises.

## II.    LEGAL FRAMEWORK

### A.    Parties

74.    Relator alleges, based upon personal knowledge, relevant documents and information, and on information and belief, the facts set forth in this Complaint.

23

75.     Relator was an employee of FedEx during the period of time alleged in the Complaint.

76.     Relator has extensive knowledge of FedEx's policies and practices involving the transport of cargo by ground and air transport.

77.     Relator was retaliated against for raising, objecting to, and opposing fraudulent conduct alleged in this Complaint.

78.     Relator has standing to bring this action, pursuant to 31 U.S.C. § 3730(b)(1). Relator is the original source of these allegations as defined in 31 U.S.C. § 3730(e)(4)(B).   Prior to becoming aware of any known public disclosure under subsection (e)(4)(A) of 31 U.S.C. § 3730, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this claim are based; and Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions that may exist and has voluntarily provided the information to the Government before filing an action. Relator is either entitled to between 15-25 percent of the proceeds that results from this action or any settlement of the claims raised or identified herein, under 31 U.S.C. § 3730(d)(1); or between 25-30 percent of the proceeds, pursuant to 31 U.S.C. § 3730(d)(2).

79.     Defendants include FedEx Corporation ("FedEx Corp"), Federal Express Corporation ("FedEx Express"), FedEx Office, FedEx Ground Package

System, Inc. ("FedEx Ground"), FedEx Freight, Inc. ("FedEx Freight"), and FedEx Corporate Services, Inc. ("FedEx Services") (collectively, "FedEx" or "Defendants").

80. FedEx is the world's largest air cargo carrier, handling the highest volume of air freight and operating the largest fleet of aircraft.

81. FedEx Corporation ("FedEx Corp") was incorporated in Delaware in 1997 to serve as the parent holding company for, and provide strategic direction to, the FedEx portfolio of wholly-owned subsidiary companies through which FedEx Corp provides transportation, e-commerce, and business services. FedEx Corp's principal place of business is in Memphis, Tennessee.

82. The FedEx subsidiaries are organized into several business segments, all of which operate independently, but are managed collaboratively under the "FedEx" brand, with FedEx Corp providing general financial, legal, and business guidance. Each, including those organized in the same business segment, are separately incorporated.

83. FedEx Corp represents that it has numerous business operations in every state. In fiscal year 2018, FedEx reported GAAP revenue of $65.5 billion.

84. Federal Express Corporation ("FedEx Express") is a Delaware corporation with its principal place of business in Memphis, Tennessee. It exists as part of its own FedEx Express business segment.

25

85.     FedEx Express includes TNT Express B.V. ("TNT Express"), an international express transportation, small-package ground delivery and freight transportation company that FedEx acquired near the end of the 4th quarter of 2016.  While a majority of its shipments are between businesses, TNT Express also offers business-to-consumer services to select key customers. TNT Express provides road and air delivery services in Europe, the Middle East and Africa, Asia-Pacific and the Americas.

86.     FedEx Express, with a fleet of 670 aircraft and 90,000 vehicles, is the world's largest express transportation company, providing time-definite delivery of approximately 6 million packages and more than 27 million pounds of freight to more than 220 countries and territories.

87.     The FedEx Express segment also includes FedEx Trade Networks, Inc. ("FedEx Trade Networks"), which provides international trade services, specializing in customs brokerage and global ocean and air freight forwarding, and FedEx Cross Border, LLC ("FedEx Cross Border"), which provides e-commerce technologies that enable international transactions for retailers and consumers worldwide.

88.     It is primarily FedEx Express that has contracted to furnish services to United States agencies, such as:

      o     Department of Defense

- o   U.S. Air Force
- o   Department of Interior
- o   Department of Homeland Security
- o   Department of Transportation
- o   Department of Energy
- o   Department of Justice (including the Federal Bureau of Investigation)
- o   Department of Education
- o   Department of Health and Human Services
- o   General Services Administration
- o   Nuclear Regulatory Commission
- o   National Science Foundation
- o   National Aeronautical Science Administration
- o   Securities and Exchange Commission
- o   Veterans Administration
- o   Department of Agriculture

89.    FedEx Office is a Texas corporation with its principal place of business in Plano, Texas. It exists as part of the FedEx Services business segment.

90.    FedEx Ground Package System, Inc. ("FedEx Ground") is a Delaware corporation with its principal place of business in Moon Township, Pennsylvania. It exists as part of its own FedEx Ground business segment.

27

91.     FedEx Ground is a leading North American provider of small-package ground delivery services, providing low-cost, day-certain service to any business address in the U.S. and Canada, as well as residential delivery to 100% of U.S. residences through its FedEx Home Delivery service.  The FedEx Ground segment also includes FedEx Supply Chain, which provides integrated supply chain management solutions. FedEx Supply Chain, formerly known as GENCO Distribution Systems, Inc., is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

92.     FedEx Freight, Inc. ("FedEx Freight") is an Arkansas corporation with its principal place of business in Harrison, Arkansas.  It exists as part of its own FedEx Freight business segment and is a leading U.S. provider of less-than-truckload ("LTL") freight services across all lengths of haul (freight that is typically less than 150 pounds).  The FedEx Freight segment also offers freight delivery service to most points in Canada, Mexico, Puerto Rico and the U.S. Virgin Islands, and includes FedEx Custom Critical, a leading North American provider of time-specific, critical shipment services.  FedEx Custom Critical freight can be delivered by FedEx Freight and other FedEx components, including FedEx Express Heavyweight.  FedEx Custom Critical is an Ohio corporation with its principal place of business in Uniontown, Ohio.

93.     FedEx Corporate Services, Inc. ("FedEx Services") provides sales, marketing, information technology, communications, customer service, technical support, billing and collections services for U.S. customers of its major business units and certain back-office functions that support its other companies. The FedEx Services segment includes FedEx Office and Print Services, Inc., which provides document and business services and retail access to its package transportation businesses.

94.     FedEx Trade Networks, Inc. represented a realignment of several FedEx components, including FedEx Custom Critical, FedEx Trade Networks, FedEx Supply Chain and FedEx Cross Border, in 2018.  In 2019, FedEx Trade Networks will become FedEx Logistics, provider of comprehensive supply chain solutions, specialty transportation, cross border e-commerce technology services, customs brokerage, and trade management tools and data.

**B.     Jurisdiction and Venue**

95.     This Court has subject matter jurisdiction over the claims asserted in this Complaint, pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and 28 U.S.C. § 1331.

96.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because one or more defendants may be found, resides, and/or transacts business in this District, or because an act, proscribed by 31 U.S.C. § 3729,

occurred in this District.  These allegations are nationwide, as set forth in detail throughout this Complaint.

### C.    Time Period

97.    The time period for the fraudulent conduct alleged in this Complaint dates back at least 10 years and is continuing.

### D.    The Laws Violated

#### 1.    Federal False Claims Act

98.    The False Claims Act provides, in part: Liability for Certain Acts. — (1) In general.—[  ] any person who— (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [ ] (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, [  ] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104– 410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(A), (B), (G).

99.    Under the False Claims Act, scienter must be demonstrated: Definitions— For purposes of this section— (1) the terms "knowing" and "knowingly"— (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) the term "claim" — (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i)  is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; [] .  31 U.S.C. § 3729(b)(1)-(2).

### 2.    State False Claims Acts

100.   Violations of the False Claims Acts of 20 States and the District of Columbia, including the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Iowa, Maryland, Massachusetts, Minnesota, Montana, Nevada, New

Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, Vermont, and Virginia, are alleged in this Complaint.

## III.   THE STATUTORY/REGULATORY SCHEME

101.   In the face of terrorism in the twenty-first century, the United States Department of Homeland Security (DHS) and its agency, the Transportation Security Administration (TSA) were created.  Further, a number of statutory and regulatory requirements were enacted to apply to commercial air cargo carriers like FedEx involving the safe and secure transportation of cargo.  These are set forth in more detail below.

### A.   Laws Establishing DHS/TSA Oversight Authority for National Security

102.   On November 19, 2001, just two months after the September 11, 2001 terrorist attacks, Congress enacted the Aviation and Transportation Security Act of 2001 (ATSA), making security in all types of transportation, including aviation, rail, other surface transportation, and maritime, the direct responsibility of the Federal Government. Pub. L. No. 107-71, 115 Stat. 597 (Nov. 19, 2001), 49 U.S.C. § 114(d).

103.   To oversee and regulate civil aviation security specifically, the ATSA established the Transportation Security Administration (TSA) within the U.S. Department of Transportation (DOT).

104. Among other things, the ATSA vested TSA with authority to assess threats to transportation; make all plans to enhance transportation security; enforce security related regulations and requirements; maintain, inspect, and test security facilities, equipment, and systems; and ensure the adequacy of cargo transportation security. Pub. L. No. 107-71, § 114 (codified as 49 U.S.C. § 114).

105. TSA's broad authority under the ATSA to regulate civil aviation security has further included:

a. Security Measures: "ensur[ing] the adequacy of security measures for the transportation of cargo" (49 U.S.C. § 114(f)(10))

b. Inspections: putting in place a system "to screen, inspect, or otherwise ensure the security of all cargo that is to be transported in all-cargo aircraft in air transportation and intrastate air transportation as soon as practicable after the date of enactment of the Aviation and Transportation Security Act" (49 U.S.C. § 44901(f)).

c. Penalties: assessing and imposing penalties for a wide variety of aviation and surface security violations, including failing to comply with established security procedures (49 U.S.C. § 46301(a)(1) and (4) and 49 U.S.C. § 114(v)). Fines or penalties may be assessed against companies like FedEx that may "offer, accept, or transport cargo pursuant to a TSA-approved security program and/or subject to the requirements of the Transportation Security Regulations" for violations such as: (i) failure to comply with the TSA-approved security program; (ii) failure to control access to cargo by unauthorized persons; and (iii) failure to transport cargo in locked or closely-monitored vehicles; among many other requirements.

106.   In 2003, following passage of the Homeland Security Act of 2002 (HSA), 6 U.S.C. § 101 *et seq*, TSA was transferred from DOT to the newly created Department of Homeland Security (DHS), whose "primary mission … is to … prevent terrorist attacks within the United States; [and] … reduce the vulnerability of the United States to terrorism."  6 U.S.C. §§ 111(b)(1)(A), (B); 68 FR 49718 (Aug. 19, 2003).

107.   DHS most recently described its purpose: "to ensure aviation and security.  It is essential that DHS . . . address . . . terrorist threats since terrorists continue to seek out and develop innovative ways to thwart security measures. Global terrorist organizations such as Al Qaeda and the Islamic State of Iraq and the Levant (ISIL), as well as their offshoots and associates, remain committed to targeting international commercial airline operations in order to maximize the effects of their terror campaigns. *They aim to exploit any security vulnerability*." June 2018 U.S. Customs ACAS Interim Final Rule, 83 Fed. Reg. 27380.

108.   The transfer of TSA to DHS was in recognition of the inextricable link between the protection of national security/prevention of terrorist attacks and transportation security.

109.   During the immediate aftermath of the September 11, 2001 terrorist attacks, President George W. Bush created the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission").  In July 2004, the 9/11

Commission released a comprehensive report chronicling the circumstances leading up to the attacks, and listed core governmental reforms that must be made to protect the United States against terrorism.

110.   After the release of the report, Congress passed several acts to implement the reforms recommended by the 9/11 Commission.  The first was the Intelligence Reform and Terrorism Prevention Act of 2004.  50 U.S.C. § 401, *et seq*., Pub. L. No. 108-458, 118 Stat. 3643 (Dec. 17, 2004) (hereinafter "IRTPA").  The second, building on the IRTPA, was the Implementing the 9/11 Commission Recommendations Act of 2007 (hereinafter "9/11 Commission Act").  6 U.S.C. § 101, *et seq*., Pub. L. No. 110-53, 121 Stat. 266, § 1302 (Aug. 3, 2007).  The Act required DHS to "establish a system to screen 100 percent of cargo transported on passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation to ensure the security of all such passenger aircraft carrying cargo."  Pub. L. No. 110-53, 121 Stat. 478 at § 1602(a)(2)(1)(8-03-2007).

111.   Of top concern under both laws was transportation security and effective screening to protect against acts of terrorism. Together, they altered and expanded TSA's oversight of transportation security, mandating that the TSA implement certain security procedures while leaving the creation of additional security procedures to the sound discretion of TSA.  TSA is responsible for

35

protecting against security risks, threats and vulnerabilities in the nation's transportation system and contractually delegates certain responsibilities to other parties like FedEx, which is then expected to guarantee national security when transporting cargo.

**B.   TSA Security Requirements for Air Carriers and Cargo Facilities, Operations and Transport**

**1.   TSA Security Requirements Generally**

112.   As part of its mandate to ensure the security of the nation's transportation system, the TSA issues mandatory operational criteria to protect airport infrastructure and aircraft operations against security risks that are jointly identified by the Secretary of Homeland Security and the Secretary of Transportation in their National Strategy for Transportation Security.  Pub. L. No. 108-458, 118 Stat. 3643 (Dec. 17, 2004); 49 U.S.C. § 114(s).

113.   TSA's air cargo security requirements have focused on two critical risks: (1) The hostile takeover of an all-cargo aircraft leading to its use as a weapon; and (2) the use of cargo to introduce an explosive device onboard a passenger aircraft.  TSA Final Rule, Air Cargo Security Requirements, 49 C.F.R. § 1540, *et seq*., 71 Fed. Reg. 30478, 30479 (May 26, 2006).

114.   Current approaches to air cargo security, as articulated in the TSA final rule (49 C.F.R. § 1540, *et seq*.), are "multilayered" and incorporate "access controls, surveillance and physical security measures, physical screening of cargo

36

shipments, supply chain security measures (such as tamper-evident and tamper-resistant packaging), shipper vetting, and air cargo worker vetting."

115. Since issuing its final rule, most of TSA's protective measures implemented for all-cargo carriers have been developed with the primary goal of protecting against hostile takeovers. TSA Final Rule, Air Cargo Security Requirements, 49 C.F.R. § 1540, *et seq.*, 71 Fed. Reg. 30478, 30479 (May 26, 2006).

116. The TSA's Office of Intelligence reported in June 2008 "that transportation was the most threatened sector for terrorist activity, and aviation was a high-priority target."

### 2. Full All-Cargo Aircraft Operator Standard Security Program (FACAOSSP)

117. Regulations implementing the ATSA require "full all-cargo" aircraft operators, like FedEx, that operate any aircraft weighing roughly 100,000 pounds (45,000 kg) or more, to adopt and implement a security program known as a Full All-Cargo Aircraft Operator Standard Security Program ("FACAOSSP"). 49 C.F.R. §§ 1544.101(h), (i).

118. In general terms, the FACAOSSP must "[p]rovide for the safety of persons and property traveling on flights provided by the aircraft operator against acts of criminal violence and air piracy, and the introduction of explosives, incendiaries, or weapons aboard an aircraft." 49 C.F.R. § 1544.103(a).

119.   For aircraft operators operating under a FACAOSSP, the security

program must:

- o   "apply the security measures in its security program for persons who board the aircraft for transportation, and for their property, to prevent or deter the carriage of any unauthorized persons, and any unauthorized weapons, explosives, incendiaries, and other destructive devices, items or substances" 49 C.F.R. § 1544.202 (relating to persons and property onboard an all-cargo aircraft);

- o   "ensure that cargo is screened and inspected for any unauthorized person, and any unauthorized explosive, incendiary, and other destructive substance or item as provided in the aircraft operator's security program . . . before loading it on its aircraft."  49 C.F.R. § 1544.205(b)(relating to the acceptance and screening of cargo);

- o   "use the procedures in its security program to control cargo that it accepts for transport on an aircraft in a manner that: (1) prevents the carriage of any unauthorized person, and any unauthorized explosive, incendiary, and other destructive substance or item in cargo onboard an aircraft, (2) prevents unescorted access by persons other than an authorized aircraft operator employee or agent, or persons authorized by the airport operator or host government."  49 C.F.R. § 1544.205(c)(relating to the acceptance and screening of cargo);

- o   "ensure that cargo is screened using a physical examination or non-intrusive method of assessing whether cargo poses a threat to transportation security, as provided in its security program. Such methods may include TSA-approved x-ray systems, explosive detection systems, explosives trace detection, explosives detection canine teams certified by TSA, or a physical search together with manifest verification, or other method approved by TSA."  49 C.F.R. § 1544.205(g)(2)(relating to the acceptance and screening of cargo);

- o "verify that the chain of custody measures for the screened cargo are intact prior to loading such cargo on aircraft or [] ensure that the cargo is re-screened in accordance with this chapter." 49 C.F.R. § 1544.205(g)(4)(relating to the acceptance and screening of cargo);

- o "use the measures in its security program . . . to inspect the individual or property." 49 C.F.R. § 1544.207(c)(relating to the screening of individuals and property);

- o "use . . . in its security program to perform the following control functions with respect to each aircraft operation: (a) prevent unauthorized access to areas controlled by the aircraft operator under an exclusive area agreement," (b) prevent unauthorized access to each aircraft," 49 C.F.R. § 1544.225 (relating to the acceptance and screening of cargo);

- o have "each individual who performs certain functions related to the transportation, dispatch, or security of cargo for transport on a passenger aircraft or all-cargo aircraft," and "each individual the aircraft operator authorizes to screen cargo or to supervise the screening of cargo under [49 C.F.R.] § 1544.205" "successfully complete a security threat assessment or comparable security threat assessment" 49 C.F.R. § 1544.228 (relating to access to cargo and cargo screening); and

- o ensure that "[n]o aircraft operator may use any direct or contractor employee to perform any security-related duties to meet the requirements of its security program unless that individual has received training as specified in its security program" 49 C.F.R. § 1544.235 (relating to training and knowledge for individuals with security-related duties).

120.    FedEx Express is recognized as a full all-cargo aircraft operator that was required to execute (and comply with) a FACAOSSP with the TSA and other government agencies.

39

121.   Although the FACAOSSP regulations establish standardized requirements that all aircraft operators operating full all-cargo programs must meet, they do not provide details of how these requirements must be met, because such details are Sensitive Security Information under 49 CFR part 1520 and are contained in security programs that are not publicly available. TSA Final Rule, Air Cargo Security Requirements, 49 C.F.R. § 1540, *et seq*., 71 Fed. Reg. 30478, 30484 (May 26, 2006).

122.   FedEx Express notifies employees that:

> [a] complete copy of the FACAOSSP is maintained and readily available at FedEx's principal place of business located at 3620 Hacks Cross Road, Memphis, TN 38125 in accordance with Chapter 1 Section 1.2.B of the FACAOSSP. The FACAOSSP is considered Sensitive Security Information and has been restricted to FedEx Express Security Personnel Only.

123.   In its security awareness training program, FedEx acknowledges that: "[t]he TSA requires that each person interfacing with packages moving to, from, or over the U.S. be trained on these security measures."

124.   Aircraft operators like FedEx "must use the procedures, facilities, and equipment described in its security program to prevent or deter the carriage of any unauthorized persons, and any unauthorized explosives, incendiaries, and other destructive substances or items in cargo onboard an aircraft."  49 C.F.R. § 1544.205(a).

40

125. "TSA's air cargo security programs are designed to protect persons and property traveling by air against the introduction of any unauthorized person, explosive, incendiary, or destructive substance or item into cargo onboard an aircraft," and "regulated entities must ensure that all of their authorized representatives comply with the security programs."

### 3.    Air Cargo Advance Screening (ACAS) Program

126. The Air Cargo Advance Screening (ACAS) pilot program was a program put in place on October 24, 2012 by the U.S. Customs and Border Protection (CBP), under authority derived from the Trade Act of 2002, and the TSA, under authority derived from the ATSA, in response to the attempt by terrorists in Yemen to place explosives hidden in printer ink cartridges on board cargo aircraft bound for the United States.  75 Fed. Reg. 65006 (10-24-2012).

127. While CBP and TSA, which are jointly responsible for securing inbound air cargo for the United States, had historically viewed the introduction of explosive devices contained in cargo shipments to be the primary threat to passenger aircraft, "the October 2010 Yemen incident demonstrated that all-cargo aircraft are also a significant target of IED attack." 19 C.F.R. § 122.48b; 83 Fed. Reg. 27380, 27385 (June 12, 2018).

128. Designed to enhance air cargo supply chain security, the ACAS pilot was a risk-based approach that allowed CBP and TSA to receive from participants

41

specified advance security filing cargo data as a means to target certain cargo for additional physical screening before the cargo was loaded onto U.S.-bound aircraft. 82 Fed. Reg. 34319 (July 24, 2017).

129.   With the issuance of an Interim Final Rule (IFR) in June 2018, the ACAS program became mandatory. In announcing the IFR, CBP stated that it was amending its regulations to implement a mandatory ACAS program in order "[t]o address ongoing aviation security threats." June 2018 U.S. Customs ACAS Interim Final Rule, 83 Fed. Reg. 27380; 19 C.F.R. § 122.48b.

130.   According to CBP, "DHS has received specific, classified intelligence that certain terrorist organizations seek to exploit vulnerabilities in international air cargo security to cause damage to infrastructure, injury, or loss of life in the United States or onboard aircraft."  83 Fed. Reg. 27380 at 27381; 19 C.F.R. § 122.48b.

131.   In light of past attempts by terrorists to exploit these vulnerabilities by placing explosive devices aboard aircraft destined to the United States, "a more systematic and targeted approach to identify high-risk cargo" was required.  83 Fed. Reg. 27380 at 27381; 19 C.F.R. § 122.48b.

132.   Moreover, "[s]ince terrorists continue to seek out and develop innovative ways to thwart security measures, it is essential that CBP and TSA adapt their policies and use shared intelligence to address these evolving terrorist threats."  83 Fed. Reg. 27380 at 27385; 19 C.F.R. § 122.48b.

133.   Under the mandatory ACAS Program, all U.S.-bound aircraft carrying commercial cargo are required to transmit specified advance cargo data for air cargo transported onboard U.S.-bound aircraft before loading it onto the aircraft. 83 Fed. Reg. 27380 at 27385; 19 C.F.R. § 122.48b.

134.   The purpose of the program is to allow heightened intelligence gathering.

135.   The specified cargo data elements for inbound air cargo that a U.S.-bound air carrier such as FedEx must present to CBP include:

- o   Airport of arrival

- o   Airport of origin

- o   Scheduled date of arrival

- o   Total quantity based on the smallest external packing unit

- o   Total weight

- o   Precise description of the cargo

- o   Shipper name and address

- o   Consignee name and address

19 C.F.R. § 122.48a(d)(1).

136.   This information must be provided: (a) no later than the time of the departure of the aircraft for the United States, in the case of aircraft departing from any foreign port or place in North America, including locations in Mexico, Central

America, South America (from north of the Equator only), the Caribbean, and Bermuda; and (b) no later than 4 hours prior to the arrival of the aircraft in the United States, in the case of aircraft departing from any other foreign area. 19 C.F.R. § 122.48a(b).

137. These enhanced regulations were required in order to give CBP adequate time to identify high-risk cargo (e.g., unauthorized weapons, explosives, chemical and/or biological weapons, weapons of mass destruction (WMD), or other destructive substances or items) before that cargo is already en route to the United States. ACAS IFR, 83 Fed. Reg. 27380 at 27381, 27385; 19 C.F.R. § 122.48b. As CBP and TSA previously determined, "in order to best identify high-risk air cargo, it is essential to perform a risk assessment earlier in the air cargo supply chain, prior to the aircraft's departure." 83 Fed. Reg. 27380 at 27381.

### 4. TSA 100 Percent Screening Requirement

138. On August 3, 2007, pursuant to the passage of the Implementing the 9/11 Commission Recommendations Act, DHS was required "to screen 100 percent of all cargo transported on passenger aircraft "at a level of security commensurate with the level of security of passenger checked baggage." 49 U.S.C. § 44901(g)(1), (2). "The impact of the 100 percent screening requirement is that all cargo must be screened at the piece level by TSA approved methods prior to being loaded onto a passenger aircraft."

139. The law applies to all cargo tendered to airlines at a United States origin for carriage on passenger flights, domestic or international.

140. Screening was further defined as:

> *a physical examination or non-intrusive methods of assessing whether cargo poses a threat to transportation security*. Methods of screening include x-ray systems, explosives detection systems, explosives trace detection, explosives detection canine teams certified by the Transportation Security Administration, or a physical search together with manifest verification. *The Administrator may approve additional methods to ensure that the cargo does not pose a threat to transportation security and to assist in meeting the requirements of this subsection*.

49 U.S.C. § 44901(g)(5)(emphasis added).

141. This mandate affected all shippers (like FedEx) whose air cargo moves on passenger airlines.

### 5. TSA Certified Cargo Screening Facility (CCSF)

142. FedEx also stands in the shoes of the TSA through its operation of several certified cargo screening facilities (CCSFs) at the following airports: Atlanta, GA; Chicago, IL; Los Angeles, CA; Miami, FL; and Seattle, WA.

143. A CCSF is "a facility certified by TSA to screen air cargo in accordance with 49 C.F.R. § 1549," and is required to "carry out TSA's statutory and regulatory authority," through a security program designed in part to "inspect, maintain, and test the security of facilities, equipment, and systems," and "ensure

45

the adequacy of security measures for the transportation of passengers and cargo."

49 C.F.R. §§ 1540.5, 1549.3.

144. Once accepted as a CCSF, FedEx was required to adhere to increased TSA-directed security standards.

145. FedEx acknowledged and provided guarantees to customers, including government customers, about its CCSFs' compliance with TSA requirements:

> Facilities that are certified to participate are designated as CCSFs *must adhere to strict, TSA-mandated security standards that apply to the facility itself (for example, physical access controls, perimeter security); facility personnel; processes relevant to the transportation, handling and storage of cargo; and information technology security*. Each facility is certified individually by the TSA.
>
> ***
>
> Because air cargo must be scanned at the piece level to comply with the law, *shipments tendered on skids and shrink-wrapped must be taken apart so individual pieces can be screened.* Airlines lack space/facilities to "de-palletize," screen, and re-configure these shipments, but CCSFs are designed to handle all of these activities and to maintain the integrity of the product as well.
>
> *After scanning cargo, CCSFs will be able to tender it directly to a passenger air carrier or freight forwarder.*
>
> *Air cargo screened at a CCSF will not be re-screened and possibly damaged or compromised at the airport. Pre-screened cargo goes straight to the front of the line.*

(emphasis added).

146. Further, FedEx certified that since it uses both cargo and passenger aircraft to transport cargo, "[a]ll cargo brought to [its] CCSFs regardless of its contents, will be screened."

147. Ultimately, CCSFs were expected to stand in the shoes of the TSA and cargo screened or inspected at CCSF facilities was given a gold star.

### 6. TSA Sanctions for TSA Security Violations by Cargo Carriers

148. Pursuant to the ATSA, TSA may assess civil penalties for the violation of a TSA requirement. 49 C.F.R. § 1503.401.

149. TSA imposes civil monetary penalties of between $11,186 to $32,666 (per violation) on aircraft operators, indirect air carriers, and CCSFs for security violations. 49 C.F.R. § 1503.401.

150. To determine the penalties, TSA issued an enforcement sanction guidance policy.

151. Under these TSA rules, the TSA may impose a penalty for security violations by carriers (like FedEx) for the following types of violations:

| Aircraft Operators | Indirect Air Carriers and CCSFs |
|---|---|
| Failure to carry out security program (covers all violations of security program requirements; general | Failure to comply with the TSA-approved security program (general violation to be used if a more specific violation is not given) |
| Failure to comply with a security requirement pertaining to the acceptance, control, or screening of cargo | Failure to transport cargo in locked or closely-monitored vehicle (includes CCSF chain-of-custody violations) |

47

|  | Failure to comply with cargo-acceptance requirements <br><br> Failure to comply with any requirement related to the screening or inspection of cargo |
| --- | --- |
| Failure to prevent unauthorized access to secured area or to aircraft | Failure to control access to cargo by unauthorized persons |
| Failure to comply with criminal history records check requirements | Failure to comply with the requirement to submit complete STAs according to 49 C.F.R. § 1548.16 |
| Failure to train or maintain training records | Failure to retain or produce training records <br><br> Failure to provide required training |

### 7.    TSA Chain of Custody Requirements

152.   Aircraft operators are required to "verify that the chain of custody measures for the screened cargo are intact prior to loading such cargo on aircraft," 49 C.F.R. § 1544.205(g)(4), through its security program that "(1) prevents the carriage of any unauthorized person, and any unauthorized explosive, incendiary, and other destructive substance or item in cargo onboard an aircraft, (2) prevents unescorted access by persons other than an authorized aircraft operator employee or agent, or persons authorized by the airport operator or host government."  49 C.F.R. § 1544.205(c).

48

153. As discussed, TSA not only regulates passenger air carriers but also indirect air carriers, all-cargo carriers, and freight forwarders.

154. An indirect air carrier:

> refers to any person or entity within the United States, not in possession of a Federal Aviation Administration air carrier operating certificate, which undertakes to engage indirectly in air transportation of property and uses for all or any part of such transportation the services of an air carrier. Each indirect air carrier must adopt and carry out a security program that meets current TSA requirements and is renewed annually.

155. An all-cargo air carrier is "an air carrier holding an all-cargo air transportation certification . . . authorizing the transportation of aircraft in interstate air transportation of only property or only mail, or both." 49 C.F.R. § 204.2(a).

156. A freight forwarder is "a person engaged in the business of dispatching shipments in foreign commerce between the United States, its territories or possessions, and foreign countries, and handling the formalities incident to such shipments, on behalf of other persons." 19 C.F.R. § 111.1.

157. FedEx Express acts in the capacity of an indirect air carrier, an all-cargo carrier, and a freight forwarder.

158. Indirect air carriers, all cargo carriers, and freight forwarders "must verify that the chain of custody measures for the screened cargo are intact prior to loading such cargo on aircraft or must ensure that the cargo is re-screened in

49

accordance with this chapter." 49 C.F.R. § 1544.205(g)(4)(relating to the acceptance and screening of cargo).

159. TSA has established methods and procedures in screening, inspection, authorized personnel, and secure area accessibility "to prevent and deter unauthorized access to cargo while stored or in transit between facilities prior to loading onboard aircraft."

160. TSA heavily relies on these all-cargo and indirect air carriers (like FedEx) to properly screen and inspect cargo because "TSA does not have full visibility over their efforts to screen air cargo."

161. Because "a large proportion of the cargo shipped to the United States does not originate from the last-point-of-departure airports and is often carried on multiple legs using both passenger and all-cargo aircraft before being loaded onto a U.S.-bound flight [a]ddressing potential threats requires security measures along the cargo supply chain, with particular attention to ensuring that risk-based evaluation and physical screening of shipments are conducted using techniques and technologies that comply with statutory and regulatory requirements."

162. Moreover, as early as 2009, the DHS Inspector General (citing a 2007 Congressional Research Service aviation report) pointed out that cargo crimes unveiled potential weaknesses in air cargo security and were largely committed either by or with the assistance of cargo workers—leading to the conclusion that

increased security measures such as conducting more stringent or frequent background checks of material (i.e., cargo) handlers and transporters (like FedEx) and enhanced physical security of cargo operations would likely improve the capability to detect criminal activity in cargo operations.

### a.   FedEx Chain of Custody

163.   FedEx has two freight-transporting programs, otherwise known as "supply chains": FedEx Express Freight and FedEx Freight. The two programs "share freight-packaging guidelines and requirements with some exceptions."

164.   The difference in FedEx Express Freight and FedEx Freight is how FedEx transports the freight.  FedEx Express Freight uses aircraft in the chain of custody to transport the cargo while FedEx Freight uses only trucks in the chain of custody to transport the cargo.



165.   FedEx is required to ensure cargo is secure through either chain of custody.  Once the cargo enters the supply chain of custody, FedEx must preserve the integrity of the cargo.

166.    To comply with TSA regulations to screen cargo, ensure that it has not been tampered with and is secure before air or ground transport, FedEx acknowledges its obligations that "screening [ ] be performed after the acceptance of the cargo, but prior to the transport and loading of the cargo onboard the aircraft for the first leg." 49 C.F.R. §§ 1544.205(c), 1544.207.

167.    The significance of the carrier's (FedEx's) obligation to take the care needed to screen and secure the package *before* it enters the supply chain cannot be overemphasized.

168.    About 75% of all air cargo by weight travels on what are called bulk pallets.  FedEx cargo may be either palletized (secured on a pallet) or non-palletized (loose items, such as boxes or containers, that have not been secured to a pallet).

169.    TSA does not yet have the technology to screen bulk pallets and must rely upon cargo transporters of bulk pallets (like FedEx) to ensure that cargo is secure throughout the entire chain of custody.

170.    More specifically, TSA has not approved any air cargo security devices "for the screening of palletized or containerized cargo."  Instead, "[] screening must be done on individual cargo items since available technologies, especially detection systems, can only accommodate objects slightly more than 3

feet wide and about 8 feet long, far too small for large cargo items, much less cargo containers and pallets."

171. "The lack of an approved technology for screening pallets leaves the [aviation] industry dependent on work-around solutions, largely involving the off-airport screening of cargo coupled with approved supply-chain security measures to prevent tampering after the item is screened by CCSP procedures."

### 8. TSA Requirements on Airport Access Control

#### a. SIDA Secure Areas

172. Both TSA and the FBI consider one of aviation security's most pressing concerns to be the insider threat—"the threat of aviation workers who exploit their access privileges to secure areas of an airport for personal gain or to inflict damage."

173. TSA and the FBI broadly define the insider threat to include threats to "all aspects of aviation security, including passenger checkpoint, baggage, cargo screening, access controls, perimeter security, and off-airport aviation related operations and activities, among other things."

174. To address these threats, ATSA requirements provide that aircraft operators operating under a FACAOSSP (such as FedEx), as described above, "must use the procedures in its security program to control cargo that it accepts for transport on an aircraft in a manner that … [p]revents unescorted access by

*persons other than an authorized aircraft operator employee or agent, or persons*

*authorized by the airport operator or host government*"  (emphasis added).  49

C.F.R. §§ 1544.202, 1544.205(c)(2), 1544.225, 1544.228, 1544.235.

175.    More specifically, each aircraft operator must use the procedures,

facilities, and equipment described in its security program to:

> (a) *"[p]revent unauthorized access to areas controlled by the aircraft operator under an exclusive area agreement* in accordance with §1542.111 of this chapter";
>
> (b) "*[p]revent unauthorized access to each aircraft*";
>
> \*\*\*
>
> (d) [w]hen operating under a full program or a full all-cargo program, *prevent unauthorized access to the operational area of the aircraft while loading or unloading cargo*."

49 C.F.R. §1544.225 (emphasis added).

176.    An "exclusive area agreement," in turn, is an agreement between an

aircraft operator that has a security program as described above and an airport

operator under which the aircraft operator "assumes responsibility for specified

security measures for all or portions of the secured area, AOA, or SIDA, including

access points, as provided in 49 C.F.R. § 1542.201, § 1542.203, or § 1542.205." 49

C.F.R. § 1542.111(a).

177.    A SIDA, or Security Identification Display Area, means a portion of

an airport, specified in the airport security program, in which security measures are

carried out. This area includes the secured area and may include other areas of the airport. 49 C.F.R. § 1540.5.

178.   Any airport operations area that is regularly used to load cargo on, or unload cargo from, an aircraft and is operated by FACAOSSP must be SIDA; must establish and carry out measures to prevent the unauthorized presence and movement of individuals in the SIDA; and must do the following:

> (1) Establish and carry out a personnel identification system described under 49 C.F.R. § 1542.211.
>
> (2) Subject each individual to a criminal history records check as described in 49 C.F.R. § 1542.209 before authorizing unescorted access to the SIDA.
>
> (3) Train each individual before granting unescorted access to the SIDA, as required in 49 C.F.R. § 1542.213(b).

49 C.F.R. § 1542.205.

179.   The SIDA secure area must only allow for access through a control system that:

> (1) Ensure(s) that only those individuals authorized to have unescorted access to the secured area are able to gain entry;
>
> (2) Ensure(s) that an individual is immediately denied entry to a secured area when that person's access authority for that area is withdrawn; and
>
> (3) Provide(s) a means to differentiate between individuals authorized to have access to an entire

> secured area and individuals authorized access to only a particular portion of a secured area.

49 C.F.R. § 1542.207.

180. Once in the SIDA secure area, SIDA cleared persons must "continuously display [] the identification medium issued to that individual on the outermost garment above waist level or [be] under escort." 49 C.F.R. § 1542.211.

181. If an escort is required, procedures must be established and implemented to:

> (1) ensure that only individuals with unescorted access authority are permitted to escort;
>
> (2) ensure that the escorted individuals are continuously accompanied or monitored while within the secured area or SIDA in a manner sufficient to identify whether the escorted individual is engaged in activities other than those for which escorted access was granted, and to take action in accordance with the airport security program.

49 C.F.R. § 1542.211(e).

182. TSA regulations address the critical need to ensure the physical security of SIDAs by setting forth vetting and identification requirements, including security threat assessments and exclusive area personnel identification systems for all TSA-regulated aviation entities.

56

**b. SIDA Badge Clearance for Security Threat Assessment**

183. TSA regulations require that, before an aircraft operator operating under a FACAOSSP, pursuant to 49 C.F.R. §1544.101(h), (like FedEx) authorizes an individual to have unescorted access to cargo that will be transported on an air carrier, the "individual must successfully complete a security threat assessment or comparable security threat assessment described in part 1540 subpart C of this chapter." 49 C.F.R. § 1544.101(h), 49 C.F.R. §1544.228(a), (b).

184. Part 1540 of subpart C, in turn, requires each aircraft operator to ensure that all cargo personnel in the United States and all individuals with unescorted access to cargo undergo a security threat assessment (STA), and to submit to TSA an STA application for each applicant. 49 C.F.R. § 1540.203(a), (c).

185. A STA requires that each applicant authenticate his/her identity through the submission, review, and retention of copies of two forms of identification, and after completion of the form, requires that the applicant date and sign the form. 49 C.F.R. § 1540.203 (b)(1)(i), (c), (d).

186. Without an approved STA, the regulations unequivocally state that "you may not be granted authorization to have unescorted access to air cargo subject to TSA security requirements." 49 C.F.R. § 1540.203 (b)(2)(viii).

187.    To ensure that only persons with SIDA clearance have unescorted access to SIDAs, "[e]ach aircraft operator must establish and carry out a personnel identification system for identification media that are airport-approved, or identification media that are issued for use in an exclusive area." 49 C.F.R. §1544.231(a).

188.    Among other things, the personnel identification system must include:

> (1) "Procedures to ensure that each individual in the secured area or SIDA continuously displays the identification medium issued to that individual on the outermost garment above waist level or is under escort."

> (2) "Procedures to ensure accountability through … [a]uditing the system at a minimum of once a year, or sooner, as necessary to ensure the integrity and accountability of all identification media."

49 C.F.R. §1544.231(a).

189.    Compliance with these identification or "badging" requirements is critical given "the potential for misuse of SIDA badges in the United States," as identified by reports that terrorist organizations have used airline workers to carry out attacks in other countries.  TSA, since its inception, "has focused on the security of SIDAs by requiring vetting of individuals seeking unescorted access to this and other sensitive areas of the airport, and by setting standards for the physical security of SIDAs" because "terrorist organizations have used aviation sector insiders to carry out attacks."

### c.    FedEx Access Control/SIDA Policies

190.    FedEx has written guidelines on personnel access control and SIDA security requirements that appear consistent with TSA requirements, including its TSA-approved FACAOSSP.

191.    For example, FedEx classified the ramp (or loading dock) located at the Dayton International Airport (DAY)—known as DAYR—as a SIDA secure area.

192.    Accordingly, FedEx instructed employees:

> TSA rules state that all employees working within the SIDA area must have a SIDA badge. However, the rules do allow for employees who do not have SIDA badges to be escorted within the SIDA area by an employee who does have a SIDA badge.

193.    On information and belief, FedEx's TSA-approved FACAOSSP required that any individual without SIDA clearance must be accompanied in the SIDA area by an individual with SIDA clearance and escorting privileges.

194.    More specifically, on information and belief, FedEx's TSA-approved FACAOSSP provides that the following rules apply to an individual who passed a STA and has a SIDA badge:

> o    All individuals displaying the appropriate SIDA identification media (SIDA ID badge) will be allowed unescorted access to all portions of the FedEx Express hub/ramp or station, as designated by their manager.

o   All individuals traveling within the FedEx Express hub/ramp or station must display the appropriate SIDA ID badge at all times. (This includes vendors, temporary employees, and employees of any other FedEx company).

o   SIDA ID badges are to be worn on the outermost layer of clothing and above the waist.

o   It is the responsibility of all FedEx employees to challenge anyone not displaying a proper SIDA ID badge. Should he/she not have a valid SIDA ID badge in his/her possession, report the individual to a manager, GSC, or FedEx Express Security immediately. Non-FedEx employees with only a valid Airport SIDA ID badge must also be reported to management or FedEx Express Security when on the property.

o   SIDA ID badges are not to be loaned to or borrowed by another person for any reason.

o   When a valid SIDA ID is not present: Ask the individual if he/she has a valid SIDA ID badge, and if so, advise the individual to display it on the upper torso of his/her outermost garment.

195.   FedEx's TSA-approved FACAOSSP provides, on information and belief, that the following rules apply to an individual who does not have a SIDA badge:

o   Employees displaying the appropriate SIDA ID badge must escort unbadged individuals inside the FedEx Express hub ramp or station at all times.

o   All persons being escorted will be required to present a government-issued photo identification card and be issued a VISITOR ESCORT REQUIRED temporary pass. They must also be given an approved escort vest and armband to be worn at all times while on FedEx Express property (unless they are a member/guest of executive management).

60

> o    The escort must maintain positive control of all personnel under his/her supervision, including continuous visual contact. The escort will ensure that the individual engages only in those activities for which his/her escorted access was granted.
>
> o    In the event of separation from the individuals, the escort will immediately notify a manager, GSC, or FedEx Security.

196. In short, consistent with FedEx's TSA-approved FACAOSSP based on information and belief, FedEx requires that every person with access to a SIDA secure area "must either display the appropriate SIDA ID badge(s) authorizing him or her to have unescorted access to the SIDA or ensure he or she is escorted by an individual with unescorted access authorization."

197. In January 2018, in a widely distributed memorandum to FedEx employees, FedEx executive regional managers across the United States, including for the central, western, southern, and eastern regions, and at the Memphis, Tennessee hub, acknowledged that:

> o    Because FedEx handles shipments that travel by air, its facilities must comply with TSA regulations—and a higher level of security that applies to all FedEx Express ramps, stations and all FedEx Express locations where FedEx Express shipments are accepted.

198. In addition to always wearing their FedEx Express ID Badge, all employees were instructed to:

> o    Challenge anyone on FedEx property – even if the individual is known to the FedEx employee – if the

individual is not wearing a FedEx ID Badge in plain sight on the outer garment, above the waist.

o Ensure all doors – including overhead doors – are locked or attended when not actively in use.

o Report any problems with doors, locks, gates or perimeter fences around the facility to management for immediate attention.

o If they work at a secure, gated location, stop their vehicle after entering or exiting the vehicle gate to let the gate close completely behind them to prevent unauthorized vehicles or individuals from entering the property.

o Any time cargo is transported, ensure that the vehicle used is locked or sealed.

o Anywhere shipments are accepted, ensure that Indirect Air Carrier (IAC) procedures are followed.

o Ensure that all persons who have a FedEx-issued badge with unescorted access to FedEx air cargo have an active Security Threat Assessment (STA) or acceptable qualifier on file.

o Report any suspicious activity, abandoned items or improperly badged employees/visitors to a member of FedEx management or Security immediately.

### 9.    TSA Requirements on Screening and Inspecting Cargo

199.  Pursuant to 49 C.F.R. § 1544.205(b) and the aircraft operator's

FACAOSSP, before loading cargo on its aircraft, an aircraft operator (like FedEx)

"must ensure that cargo is screened and inspected for any unauthorized person, and

any unauthorized explosive, incendiary, and other destructive substance or item as provided in the aircraft operator's security program and 49 C.F.R. §1544.207." 49 C.F.R. §§ 1544.202, 1544.205(b), 1544.225, 1544.228, 1544.235.

200.  In amending the regulations to include the requirements set out in 49 C.F.R. § 1544.205, TSA indicated that such requirements were "necessary to prevent and deter the introduction of stowaway hijackers, explosive devices, or other threats into cargo." TSA Final Rule, Air Cargo Security Requirements, 49 C.F.R. § 1540, *et seq*., 71 Fed. Reg. 30478, 30498 (May 26, 2006).

201.  TSA regulations relating to the screening of individuals and property provide that "[e]ach aircraft operator must use the measures in its security program and in subpart E of this part to inspect the individual or property." 49 C.F.R. § 1544.207(c).

202.  The terms "inspect", and "screen" are not interchangeable. Generally, "screening" means the systematic evaluation of property (or persons) to assess whether it poses a threat to security.  "Inspection," which is interpreted by the TSA as a subset of screening, is "a method of conducting such an evaluation, but is not the only method."  TSA Final Rule, Air Cargo Security Requirements, 49 C.F.R. § 1540, *et seq*., 71 Fed. Reg. 30478, 30484 (May 26, 2006).

203.  After the 2010 Yemen incident, TSA took steps to increase the percentage of in-bound air cargo that is screened.  Effective May 1, 2010, TSA

63

"require[d] air carriers to screen a certain percentage of shrink-wrapped and banded in-bound cargo and 100 percent of in-bound cargo that is not shrink-wrapped or banded," on passenger aircraft. Yet, "[d]etails on TSA's screening requirements are Sensitive Security Information," and were not publicly discussed in the Congressional statement.

204. Aircraft operators must comply with the procedures for screening incorporated in their security programs.

205. The statute anticipated that there may be instances when an air cargo carrier must cease the transit of cargo or refuse to accept it and allowed for rules for permissive and mandatory refusal to transport passengers and property. 49 U.S.C. § 44902(b); *Delta Air Lines, Inc. v. C. A. B.*, 543 F.2d 247 (D.C. Cir. 1976) (an air cargo carrier may refuse transport of cargo "whether there has been a determination that some particular freight for some specific reason present peril to a safe flight.").

### a. FedEx Screening/Inspection

206. Following issuance of the May 26, 2006 final rule amending and strengthening the air cargo security requirements under the ATSA, FedEx stated that, "[a]s a TSA-approved Indirect Air Carrier (IAC), FedEx Trade Networks will comply with all TSA security regulations," and advised shippers "that all cargo tendered for air transport is subject to inspection."

207. FedEx has communicated to its employees, partners, and customers how it screens and inspects cargo.

208. To comply with TSA-required regulations and consistent with its TSA-approved FACAOSSP, FedEx acknowledged its obligations:

> To comply with the Transportation Security Administration (TSA) procedures to ensure there are no unauthorized persons, weapons, explosive, incendiaries, and other destructive devices, items, or substances present, a cargo screening MUST BE performed and documented on any SINGLE piece of cargo that weighs over 150 pounds (68 kilograms) by the FedEx Express point of acceptance location (defined as the first FedEx Express location where the cargo is handled and hereinto referred as "location(s)" in the remainder of the document).
>
> This screening must be performed after the acceptance of the cargo, but prior to transport and loading the cargo onboard the aircraft for the first air leg (includes flights to, from, and within the U.S., as well as flights from a non-U.S. location to a non-U.S. location when over flying [sic] the U.S.).

(emphasis in original).

209. As a result of the 2010 Yemen security incident and TSA's related revisions to screening cargo, FedEx issued an alert to personnel in May 1, 2011, which on information and belief is consistent with its TSA-approved FACAOSSP, requiring:

All FedEx Express U.S. and International single pieces of cargo over 150 pounds will be required to either be:

- o    Banded to a skid on all sides with heavy-duty metal or break-resistant plastic banding material prior to the acceptance of the shipment by FedEx Express OR

- o    Contained within a hardened container (plywood, metal) that has exterior clamps or locking devices (nails, screws, or glue are not sufficient).

210.    FedEx defines securing a package by banding this way: the securing of cargo "with either 2 metal straps or unbreakable plastic straps applied in both directions" (i.e., crisscross) and as shown by FedEx's visual depiction of banding below, which on information and belief is consistent with its TSA-approved FACAOSSP:

Starting May 1, 2011 individual pieces over 150 lbs should be banded to the pallet base with either 2 metal straps or unbreakable plastic straps applied in both directions as shown in the examples below (including the Express Freight Box).
Hardened Transit Cases/Containers made of plywood, Metal or Plastic that are not banded should have exterior locks or clamps (glue, nails and screws are not sufficient)

 





211.   FedEx's representations (above) are consistent with the testimony of GAO Director (Homeland Security and Justice Issues) Stephen Lord: "Banded cargo is cargo with heavy duty metal, plastic, or nylon bands that secure all sides of the cargo shipment or secure the cargo shipment to a skid."

212.   FedEx has acknowledged its obligations with respect to banding cargo: "[s]hipments accepted without banding cannot be banded by FedEx Express without prior cargo screening for the shipment to be classified as exempt.  Cargo nets and covers do not meet the criteria for banded."

213.   To ensure that it was accountable for its compliance with TSA cargo screening and inspection requirements, FedEx has maintained a cargo screening

log that requires all point-of-acceptance locations "to document the screening of all non-exempt single pieces of cargo that weigh over 150 pounds or any non-exempt cargo that an exempt screening justification was obtained."

214.  Also, on or around May 1, 2011, FedEx managers notified FedEx personnel about the new requirement to screen and inspect cargo that weighed over 150 pounds.

215.  Cross banding, locking, and clamping communicates that the cargo has been properly screened and is safe to be loaded onto aircraft.

### 10.  TSA Seal and Lock Truck Cargo Hold Requirements

216.  Indirect air carriers, like FedEx, "consolidate cargo from many shippers and deliver it to air [cargo or passenger] carriers," and the TSA requires that such "indirect air carriers' trucking employees, or authorized representatives, transport the cargo in locked, sealed or monitored trucks to the airlines for air shipment."

217.  In addition, TSA requires truck cargo door trailers to be locked or sealed on pickup and delivery routes (PUDs), as FedEx has acknowledged in internal documents:

> In accordance with Transportation Security Administration (TSA) Regulations, all trailers transporting air cargo must be sealed or locked including all access points of soft-sided or hard-sided trailers. Locks and/or seals must be used; however, when using seals, a 30-day log must be kept on file and furnished to the TSA upon request.

49 C.F.R. §§ 1544.205(c).

218.   A seal is a closure device that, if broken, would alert the driver to an unauthorized opening or tampering with a container or cargo and is intended to assist in the secure transport of cargo.  Seals typically require tools to open or must be cut.  Typically, seals are used on trucks that travel on long haul routes between hubs but can also be used for shorter routes like PUDs.

219.   Locks are distinct from seals and typically require a key to open. Typically, locks are used on trucks traveling on daily pick-up and delivery routes.

### a.   FedEx's Seal/Lock Policies

220.   FedEx has a written policy that is consistent with the TSA required seal and lock requirements, and issued truck alert bulletins to FedEx personnel as early as September 2002, acknowledging:

> The use of trailer seals is a vital part of FedEx Express trucking operations.  Using numbered seals will help ensure that FedEx provides protection to our customer's shipments against loss or tampering during transit.  Proper seal control can help ensure trailers are not opened in transit. In order for FedEx to keep track of these seal numbers, it is important that each employee follow proper procedures for the use of trailer seals.

221.   A 2014 FedEx truck alert bulletin reiterates the TSA requirement:

> In accordance with Transportation Security Administration (TSA) Regulations, all trailers transporting air cargo must be sealed or locked including all access points of soft-sided or hard-sided trailers.  Locks and/or seals must be used;

70

> however, when using seals, a 30-day log must be
> kept on file and furnished to the TSA upon request.

222.  FedEx depicted images of truck-trailer access points that must be sealed and how a proper seal or lock should appear to be consistent with TSA requirements:

 

223.  Further, in FedEx's contract with USPS, FedEx certified that:

> [it] will continue to verify all security seals on surface
> transportation prior to leaving our facility, as we have
> done since 2001.  This will be a physical inspection of
> security seals on each trailer upon receipt by FedEx. . . .
> The FedEx ramp manager at each ramp will ensure that
> all security seals are verified and logged by ramp staff.
> The process involves verifying the integrity of the seal on
> the back of the trailer and noting it on the Truck Dispatch
> Report paperwork.

224.  As early as 2011 at DAYR (the SIDA secure ramp), FedEx managers acknowledged TSA seal and lock requirements in an email to regional transport drivers (RTDs): "[p]lease make sure if you are running a shuttle or long haul route

that you have a seal on your trailer and it is logged with the TCA [truck control agent] or RA [ramp agent] that prepared your trip paperwork. This is a TSA requirement which we are starting immediately."

225. Again, as recently as February 2018, DAYR management acknowledged these continuing TSA requirements in an interoffice memorandum to RTDs, stating:

> The RTD expectations included, checking seals on trucks arriving at the ramp, making sure the cargo hold door is secured, the use of seals or locks:
>
> o    All trailers that depart from the stations / ramp and RT must have a FedEx seal. RTD's – you must verify this is being done and that the correct seal number is entered on your TRIP paperwork.
>
> o    When a route arrives to the ramp or Ramp, we need to verify the seal number entered in TRIPS. Any discrepancies must be documented and communicated to the appropriate Manager.
>
> o    PUD routes and USOPS BULK pickup routes must have their cargo door secured by a padlock at all times. NO EXCEPTIONS to this.

226. Yet, as alleged in this Complaint, despite FedEx policies on paper— demonstrating that FedEx knew and understood these various TSA security requirements—in practice, FedEx employees failed to comply with such requirements, with the knowledge and approval of management.

72

## IV.    FEDEX GOVERNMENT CONTRACTS

### A.    FedEx Contracts with the United States

227.    FedEx is one of the largest contractors to the federal government. It was the 50th largest government contractor in 2012; the 64th in 2013; the 54th in 2014; the 85th in 2015-2016; and the 90th in 2017.

228.    FedEx's two largest prime contracts are with the United States Postal Service (USPS) and the United States Department of Defense (DOD).  The combined payout to FedEx by the United States is expected to be at least $13 billion.  FedEx executed contracts with numerous other federal agencies.

229.    FedEx's contract with USPS, which began in April 2013 for a term of 7 years, is worth an estimated $10.5 billion, or roughly $1.5 billion annually, and was extended to September 29, 2024.

230.    FedEx's contract with DOD, which began in April 2017 for a 5-year term, has a total estimated value of over $2.3 billion.

### 1.    FedEx-USPS $10.5 Billion Contract

231.    On January 10, 2001, USPS and FedEx Express entered into two non-exclusive, 7-year service contracts: one for domestic air transportation network services to deliver the USPS's Express, Priority, and First Class mail ("Transportation Agreement") for an agreed upon price, and the other for the placement of FedEx drop boxes at USPS locations.

232.   FedEx announced that the agreement would generate $6.3 billion in revenue for FedEx.

233.   Pursuant to the Transportation Agreement, FedEx agreed that it "shall substantially comply with all laws, orders or regulations that may be applicable to the performance of the FedEx Services and shall obtain and keep current all licenses, permits and authorizations from all governmental agencies and authorities necessary for the performance of the FedEx Services."

234.   FedEx further certified that it "shall be liable to USPS for all Losses, to the extent such Losses arise out of, result from, or are in connection with:

- o   any breach by FedEx of any of the terms of this Agreement;

- o   any breach of any representation or warranty made by FedEx in this Agreement, or any other certificate or document delivered by FedEx pursuant to this Agreement [];

- o   any failure by FedEx to perform or comply with any of its covenants or obligations under this Agreement . . . .

235.   The agreement further defines "losses" as "the aggregate of any and all payments for claims, liabilities, suits, actions, proceedings, demands, charges, damages, impositions, assessments, levies, duties, losses, diminution in value, costs, or expenses . . . ."

74

236. Related to the Transportation Agreement, the USPS Postal Inspection Service ("USPSPIS") and FedEx, on September 13, 2001—only two days after the 9/11 terrorist attacks—signed a five-page document entitled Investigative/Security Protocol and Guidelines ("Protocol"). The Protocol set forth USPSPIS's requirements for U.S. Mail Investigations and mail security during FedEx's transport of U.S. Mail, with "mail" broadly defined to include "any item that is tendered to FedEx Express by USPS for transport, pursuant to the terms of the Transportation Agreement."

237. The Protocol further provided that where "FedEx Express has reason to believe that mail contains dangerous and injurious contents (including hazmat) that pose potential danger to FedEx Express employees, equipment, products or facilities, FedEx Express may take actions necessary to secure the item and minimize the risk."

238. Finally, FedEx certified that it would "notify the Inspection Service of all investigative and security issues involving the mails in the custody of FedEx Express."

239. The parties agreed to modify the Transportation Agreement to include the Protocol in its entirety.

240. On December 13, 2001, USPS and FedEx executed an Addendum to the Transportation Agreement ("Addendum") due to the USPS's immediate need

for the transportation of mail over and above the Minimum Guaranteed Volumes listed in the Transportation Agreement.

241. On April 3, 2002 and April 26, 2002, USPS and FedEx entered into the First Amendment to the Addendum and the Second Amendment to the Addendum.

242. On August 29, 2002 and December 4, 2002, USPS and FedEx entered into the Second Addendum to the Agreement and the First Amendment to the Second Addendum, which addressed (and reiterated) the obligations of both parties through June 1, 2003.

243. On January 9, 2003, FedEx and USPS executed an Addendum to the Protocol, pursuant to which FedEx agreed to comply with the following more specific security requirements:

> 3.a) *FedEx must meet all applicable FAA, and local airport authority requirements regarding airport security. FedEx will be in compliance with rules, regulations, or laws in effect or promulgated by the FAA, local airports, or other agencies concerning aviation security*.
>
> b) FedEx will safeguard U.S. Mail against theft, damage or destruction while in transit. *FedEx must have a system in place to deter unauthorized personnel from having access to the mail while it is in its possession*.
>
> 4.a) FedEx will permit USPSPIS access to all its facilities containing U.S. Mail to conduct security surveys and criminal investigations. See Postal

76

> Service Administrative Support Manual 273.113. If security deficiencies are identified by U.S. Postal Service Postal Inspection Service, after such a survey, the parties will work together to quickly resolve all such deficiencies.
>
> 4.b) ***FedEx will provide all security measures necessary to prevent unauthorized access to the mail***.

(emphasis added).

244. On January 30, 2003, USPS and FedEx entered into the Third Addendum to the Agreement, which addressed (and reiterated) the obligations of both parties through May 30, 2004.

245. On June 4, 2003, USPS and FedEx entered into the First Amendment to the Third Addendum.

246. On November 21, 2003 and December 8, 2003, USPS and FedEx entered into the Second Amendment to the Third Addendum and the Third Amendment to the Third Addendum.

247. On March 16, 2004, USPS and FedEx entered into the Fourth Addendum, which extended the Interim Period beyond November 30, 2004.

248. In June 2004, USPS awarded FedEx a contract to provide date-certain international delivery service for the USPS's Global Express Guaranteed (GXG) service. The contract took effect July 1, 2004 and replaced prior agreements with another commercial carrier, DHL Worldwide Express.

249.    On August 1, 2006, FedEx Express and USPS announced a new

agreement for domestic air transportation of mail through 2013.  This contract

replaced the final two years of the original 7-year Transportation Agreement for

airport-to-airport delivery of mail within the United States and was expected to

generate about $8 billion in revenue for FedEx Express over the life of the seven-

year term.

250.    On April 23, 2013, USPS awarded FedEx Express a new seven-year

Air Cargo Network contract for the provision of airport-to-airport transportation of

USPS First Class Mail, Priority Mail Express, and Priority Mail within the United

States.  This contract began in October 2013, after the previous contract expired at

the end of September 2013, and was scheduled to run through 2020, until it was

extended to 2024.

251.    Based on estimated volumes, the Air Cargo Network contract was

valued at approximately $10.5 billion over the seven-year term.

252.    In its November 6, 2012 response to USPS's Request for Proposal

("RFP") for the Air Cargo Network contract, FedEx made the following

representations:

> **5.0 Security Plan:** Through FedEx's extensive
> human-intelligence network, we are keenly
> qualified not only to recognize, but to be proactive
> in addressing potentially dangerous activity.
> ***FedEx has a very robust security organization***

*that takes every reasonable precaution to protect the mail*.

*5.2 Implementation, Administration, and Maintenance Activities***:** The FedEx security plan combines our stringent corporate policies with the Postal Service security policies *to ensure the highest levels of security for all mail transported under this contract*.

*5.3 Conformance with Federal Aviation Administration (FAA), Transportation Security Administration (TSA), and Local Airport Authority*:  *FedEx compiles with all security requirements* for personnel, facilities, and program security as stated in the RFP.  *We are cognizant of the FAA, TSA, and local airport authority rules and will continually work with these organizations to ensure compliance with the regulations.  Our security plan follows the vision of TSA's Office of Security Policy and Industry Engagement Air Cargo Division [otherwise known as the Full All-Cargo Aircraft Operator Security Plan, required by 49 C.F.R. 1544] for a layered solution designed to protect against security breaches, by using a combination of process along with information and technology-based solution, while preserving the integrity of the mail supply chain against threats to air cargo security*.

(emphasis added).

253.   In the April 23, 2013 USPS Air Cargo Network Contract Award and Statement of Work, FedEx agreed to the following contractual requirements:

Services Provided: The aviation supplier shall provide sufficient resources to efficiently and effectively take possession, sort (if necessary), transport, scan, load, and

deliver all mail to the designated destination Service Points specified by the Postal Service in Attachments 2-4.

Services Provided: The aviation supplier will be expected to:

Ensure that the necessary facility support and administrative functions are performed.

Ensure the security of all mail.

The aviation supplier will stage mail in a secure area while in its possession.

Personnel Screening: In general, the Postal Service accepts air carrier security program requirements set forth by the Transportation Security Administration (TSA).

Permits and Responsibilities: The aviation supplier is responsible, without additional expense to the Postal Service, for obtaining any necessary licenses and permits, and for complying with any applicable federal, state, and municipal laws, codes, and regulations in connection with the performance of the contract.

Protection of the Mail (Non-Highway): The aviation supplier must protect and safeguard the mail from loss, theft, or damage while it is in the aviation supplier's custody or control and prevent unauthorized persons from having access to the mail.

Other Compliance Requirements: The aviation supplier will comply with all applicable Federal, State, and local laws, executive orders, rules and regulations applicable to its performance under this contract.

Third Party Governmental Delays: If, during the term of this contract, a governmental entity with subject matter

jurisdiction enacts laws, promulgates regulations, or issues orders mandating that the aviation supplier screen mail dispatched for transportation by aircraft within the United States for bombs, explosives, or other hazardous materials, and aviation supplier does not have a method for otherwise complying at no additional cost to the Postal Service, either party may, at no cost to the other party, suspend performance under the contract during the period in which such screening is actually required to be accomplished.

254. On February 23, 2017, the parties entered into an Amendment to the 2013 Agreement whereby the initial renewal period provided in the Agreement was exercised in part and the Agreement's period of performance was extended through September 29, 2024. This contract was worth an estimated $1.5 billion a year to FedEx Express.

255. FedEx Ground ships low-weight packages domestically and to Puerto Rico, Guam, U.S. Virgin Islands, all U.S. territories, and P.O. boxes and military APO (Army Post Office), FPO (Fleet Post Office), and DPO (Diplomatic Postal Office) USPS facilities, which then perform final delivery of the package by USPS postal carriers, pursuant to another agreement known as the FedEx SmartPost program.

256. FedEx made numerous representations and certifications in the security program, known as the Full All-Cargo Aircraft Operator Standard Security Plan (FACAOSSP), FedEx submitted to TSA as required pursuant to 49 C.F.R. § 1542.101.

257.   FedEx acknowledged and certified its compliance with the FACAOSSP in every SEC 10-K Annual Report submitted to investors since at least 2010.

258.   In particular, FedEx notified the investing public that because FedEx was required to adhere to strict security rules, compliance with FACAOSSP may impose material costs:

> The TSA requires FedEx Express to comply with a Full All-Cargo Aircraft Operator Standard Security Plan, which contains evolving and strict security requirements. These requirements are not static but change periodically as the result of regulatory and legislative requirements, **imposing additional security costs** and creating a level of uncertainty for our operations. It is reasonably possible that these rules or other future security requirements could impose material costs on us.

(emphasis added).

## 2.   FedEx-DOD (NGDS) $2.3 Billion Contract

259.   On April 26, 2017, the Department of Defense (DOD) awarded FedEx a 5-year indefinite-delivery/indefinite-quantity, fixed-price next generation delivery service contract ("NGDS Contract") to provide express small package delivery services for international shipments and express and ground small package delivery services for domestic shipments.

260.   The NGDS contract vehicle is a Best-In-Class (BIC) solution designed by the Office of Management and Budget (OMB), for small package

82

delivery services. This solution, which was established and is administered by DOD's U.S. Transportation Command (USTRANSCOM), streamlines the acquisition of delivery services and leverages the Federal Government's buying power to achieve the best possible pricing and discounts.

261. Services provided under the NGDS contract include time-definite, door-to-door pickup and delivery, transportation, timely and accurate in-transit visibility, and customs clearance processing (if applicable).

262. The contract period runs from October 1, 2017 through September 30, 2022 and is worth a total estimated value of $2,351,165,436.

263. In July 2017, the OMB issued a policy Memorandum mandating that all Federal agencies use the DOD's government-wide contract to meet their global air and ground small package delivery services. Agencies were further instructed to transition to the new contract immediately upon availability on October 1, 2017.

### 3. FedEx-DOD (CRAF) $7.9 Billion Contract

264. The Civil Reserve Air Fleet (CRAF) was established in 1952 by Presidential direction to help meet DOD emergency airlift requirements. The CRAF fleet is comprised of U.S.-registered civil transport aircraft that possess the range, payload, speed, and configuration to perform DOD missions and that are committed voluntarily to DOD for use during emergencies.

265. To participate in the CRAF, the air carrier (such as FedEx) must agree to commit aircraft, aircrews, management personnel, and all maintenance and support services needed to sustain operations for the duration of the emergency.

266. In exchange for these commitments, CRAF participants receive no direct compensation, but have exclusive, guaranteed access to DOD's peacetime passenger and cargo airlift business through DOD's CRAF Charter Airlift Services contract. This access is in proportion to the numbers and types of aircraft the carrier commits to the CRAF. Peacetime airlift contracts for the movement of passengers and cargo are thus awarded only to CRAF-participating air carriers.

267. The CRAF is an essential component of the nation's strategic mobility forces, representing more than 90 percent of DOD's long-range international passenger airlift capability and one-third of its long-range international cargo airlift capability.

268. Although most peacetime requirements are for passenger airlift, cargo carriers (like FedEx) also rely on the DOD's peacetime business as a major source of revenue.

269. CRAF aircraft are grouped into five segments based on aircraft capabilities and DOD contingency requirements. One of those five segments is the Long-Range International (LRI), which supports DOD's global operations.

84

270.   CRAF participants (like FedEx) are able to bid on most peacetime cargo business because their fleets include B-747's, the predominate aircraft DOD uses for peacetime cargo missions.

271.   If CRAF is activated, DOD has full authority to use aircraft committed to the CRAF as needed to fulfill air movements. Although CRAF aircraft are not formally designated as state aircraft, civil aircraft operating contract airlift missions are eligible for designation as state aircraft because "the entire capacity of [such DOD contract aircraft] has been reserved for the exclusive use of US military authorities and is being 'used in military … services.'"

272.   The DOD's CRAF contracts are with FedEx Charter Programs, which leads a consortium (the "FedEx Team Arrangement") of airline carriers that provide various services, including passenger airlift services. The CRAF contracts thus include cargo airlift services provided by FedEx Charters as well as work performed by others (e.g., passenger airlift services provided by passenger airlines).

273.   For purposes of the CRAF contracts, the FedEx contracting entity, "Federal Express Charter Programs," or "FedEx Team," is the d/b/a for FedEx Express.

274.   The United States military contracts awarded to the Federal Express Charter Programs Team Arrangement since 2007 is approximately $7,950,118,986.

85

275. These DOD/CRAF-FedEx contracts include:

o September 29, 2017: USTRANSCOM awarded 12 indefinite-delivery/indefinite-quantity (IDIQ) fixed price contracts with economic price adjustment modifications to 24 companies, including FedEx Team (American Airlines Inc., Atlas Air Inc., FedEx Charters, and Polar Air Cargo Worldwide Inc.). The total value of the FedEx Team's contract (HTC711-17-D-CC11 P00007) was $570,631,234 and extended through September 30, 2018.

o October 1, 2016: USTRANSCOM awarded a $2.6 billion Master Indefinite-Delivery/Indefinite Quantity (IDIQ) for full plane passenger and cargo airlift services in support of the CRAF to the FedEx Team and the Patriot Team for a term to extend through September 30, 2018. Of the $2.6 billion combined current value, $1.3B was awarded to the FedEx Team.

o September 23, 2016: USTRANSCOM awarded a $164,990,397 IDIQ contract (HTC711-17-D-CC11) to FedEx Team to provide international airlift services and to extend to September 30, 2017.

o May 26, 2015: USTRANSCOM awarded ten (10) contract modifications, with total cumulative face value of $114,851,105, to extend services through December 31, 2015 under various IDIQ international airlift services contracts, including FedEx Team's contract (modification P000005 to previously awarded contract HTC711-15-D-CC01).

o October 1, 2014: USTRANSCOM awarded to three teams, including FedEx Team (HTC711-15-D-CC01) and six individual airlines nine (9) IDIQ, fixed-price with economic price adjustment contracts for international airlift services. The total cumulative face value of the contracts was $441,000,000.

o July 15, 2014: USTRANSCOM awarded FedEx Team an estimated $57,810,843 modification to previously awarded

86

HTC711-13-D-CC02, bringing the total cumulative face value of that contract to $1,176,792,312.

- o November 12, 2013: USTRANSCOM awarded FedEx Team a $145,223,956 contract modification to previously awarded HTC711-13-D-CC02 for international airlift services.

- o December 22, 2011: USTRANSCOM awarded FedEx Team a $693,634,631 firm fixed price contract for international airlift services with a minimum guarantee of $268,207,111.

- o September 1, 2009: USTRANSCOM awarded FedEx Team an estimated $1,510,516,838 firm fixed-price contract for international airlift services with a minimum guarantee of $222,565,273. Team members included: Air Transport International, Atlas Air, Inc., Continental Airlines, Inc., Federal Express Corporation, Omni Air International, Inc., and Polar Air Cargo Worldwide, Inc. Work will be performed at worldwide locations, and is expected to be completed September 2010. GovPartners Government Contracting News, International Airlift Contract Awards Announced, September 21, 2009.

## B.    FedEx Contracts with the States

276.   FedEx Services, as agent for FedEx Express, and FedEx Ground entered into a Western States Contracting Alliance (WSCA) Master Price Agreement for Small Package Delivery Services covering inbound and outbound intrastate, interstate domestic express, ground and international services, with several states.

277.   The Western States Contracting Alliance (WSCA) is an arm of the National Association of State Procurement Officials (NASPO), Inc. that offers a means by which participating states may join together in cooperative multi-State

contracting, thereby helping them to achieve cost-effective and efficient acquisition of quality products and services.

278. Although the WSCA is a cooperative group contracting consortium for state government departments, institutions, agencies, and political subdivisions (e.g., colleges, school districts, counties, cities, etc.) for the states of Alaska, Arizona, California, Colorado, Hawaii, Idaho, Minnesota, Montana, Nevada, New Mexico, Oregon, South Dakota, Utah, Washington, and Wyoming, other states and their political subdivisions are also eligible to participate in WSCA contracts.

279. States may become "Participating States," and thus purchase from the WSCA Master Price Agreement with FedEx, by executing a Participating Addendum.

280. In addition to the 15 WSCA-member states, Delaware, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Missouri, New Hampshire, North Carolina, North Dakota, Oklahoma, Rhode Island, South Carolina, Tennessee, West Virginia, and Wisconsin, are all Participating States in the contract with FedEx.

281. The Request for Proposal (RFP) standard contract terms and conditions contain a provision stating that "[a]ny and all supplies, services and equipment offered and furnished shall comply fully with all applicable Federal and State laws and regulations."

88

282.   The RFP's Instructions and General Provisions further provide that, "[b]y submitting a bid or offer, the bidder/offerer warrants that the bidder/offeror and any and all supplies, services equipment, and construction purchased by the State shall comply fully with all applicable Federal and State laws and regulations, including applicable licensure and certification requirements."

283.   The contract incorporates by reference "[a]ll other governmental laws, regulations, or actions applicable to the goods and/or services authorized by this contract."

## V.   **FEDEX FRAUDULENT SCHEME**

284.   FedEx knowingly made false representations and certifications to the government to procure billions of dollars in government contracts.

285.   FedEx solicited federal and state contracts with numerous agencies (included but not limited to the DOD and USPS), certifying that it would:

- o   meet all applicable FAA, and local airport authority requirements regarding airport security;
- o   be in compliance with rules, regulations, or laws in effect or promulgated by the FAA, local airports, or other agencies concerning aviation security;
- o   have a system in place to deter unauthorized personnel from having access to the mail while [the mail] is in [FedEx] possession; and
- o   provide all security measures necessary to prevent unauthorized access to the mail.

286.   FedEx first executed the contracts at issue in 2001 and executed addendums and extensions in subsequent years.  Each time, FedEx reiterated the

89

same certifications to guarantee security and comply with all government statutes and regulations.

287. FedEx certified time and again that its personnel, facilities, and security program complied with all security requirements "for a layered solution designed to protect against security breaches."

288. FedEx again certified its compliance with security requirements in its Full All-Cargo Aircraft Operator Standard Security Plan (FACAOSSP) and all subsequent amendments and extensions of that Plan.

289. Numerous federal and state agencies awarded FedEx contracts that totaled billions of dollars based on these contractual certifications and representations.

290. FedEx made these guarantees and certifications to the Department of Defense when it was awarded billions of dollars in contracts to provide the United States military with its aircraft, aircrews, personnel, and support services to support DOD missions.

291. However, FedEx knowingly breached these important security requirements as a matter of course. FedEx knew with each certification it made— at the outset and during contract extensions—that it was not complying with security requirements, despite its written policies acknowledging TSA

requirements; but it continued to make false certifications and representations in order to be awarded the contracts.

292. Under USPS and DOD contracts (for example), FedEx routinely shipped cargo that was accessible to individuals who did not have proper security clearances, not properly screened or inspected for explosives or stowaways, placed on trucks without a secure seal or lock, and vulnerable to attack.

293. FedEx was well-aware of TSA requirements and was regularly reminded by onsite TSA Agents of these requirements. In September 2018, TSA Agent 6 made the following observations to FedEx management during an on-site inspection at DAYR (a SIDA secure area):

- o   With regard to screening cargo: "Obviously there are some exceptions where you don't have to screen. If it's banded on all sides. If it is a vessel of some sort and there's no way someone could get in or out."

- o   He asked whether all employees and contractors had a SIDA badge.

- o   He warned of TSA concerns regarding potential terrorist threats.

294. Yet, in thousands of instances, FedEx has allowed individuals unauthorized access to DAYR (a SIDA secure area), in violation of TSA

91

regulations that prohibit the unauthorized access of individuals who do not have the required security (or SIDA) clearance.  49 C.F.R. § 1544.202(2).  Violations have included contractors with criminal histories and individuals who worked unescorted for months at DAYR without ever receiving SIDA clearance.

295.   FedEx also failed to screen, inspect, or prevent "the carriage of any unauthorized person, and any unauthorized explosive, incendiary, and other destructive substance or item in cargo onboard an aircraft" in thousands of instances at DAYR (a SIDA secure area) involving inbound and outbound cargo from within and outside the United States.  49 C.F.R. § 1544.202(1).

296.   FedEx further violated federal security regulations by failing to secure trucks transporting government cargo with appropriate seals and locks, leaving cargo vulnerable and accessible to the public.

297.   Numerous additional security breaches occurred in and around DAYR, which left cargo bound for aircraft and USPS mail, exposed to tampering.

298.   Cargo shipped to and from military bases were also vulnerable to attack because of FedEx's serious security violations.

299.   These same cargo security breaches occurred at other FedEx air carrier ramps, such as the Memphis International Airport – the largest hub in the FedEx network, the Indianapolis International Airport—the second largest hub in the FedEx network, and the Cincinnati Airport.

300. Since at least 2012, these security breaches have left cargo, which FedEx transported on flights to or from at least 45 states and 35 different countries, vulnerable to attack.

301. FedEx has committed these systemic security breaches knowing that it was making false representations of compliance at the time FedEx entered and re-entered contracts with the government and signed certifications; and, with (at least) reckless disregard of federal security requirements designed to protect the United States and Americans from terrorism.

302. These security violations have occurred at a time when heightened concern for threats on our country's national security has increased.

303. As recently as November 2018, the GAO alarmingly warned: [a]ir carriers transport billions of pounds of cargo into the United States from foreign airports each year, and the threat posed by terrorists attempting to conceal explosive devices in air cargo shipments remains significant, according to the TSA."

304. Based on fraudulent representations and a fraudulent course of conduct, FedEx procured billions of dollars in Federal and State government contracts.

93

## A.      Unauthorized Access to (SIDA) Secure Areas

305.   FedEx knowingly allowed FedEx employees, contractors, and temporary workers unauthorized access to DAYR (a SIDA secure area), which had a TSA heightened security designation and processed a high volume of sensitive cargo, in violation of TSA regulations that prohibit the unauthorized access of individuals who do not have the required security clearance.  49 C.F.R. §§ 1540.5, 1544.202(2), 1544.205(c), 1544.225, 1544.228, 1544.235.

306.   A Security Identification Display Area (SIDA) is a special security area designated by an airport operator and required to comply with FAA, TSA, and Federal Acquisition Regulation (FAR) requirements.  49 C.F.R. § 1540.5.  It is so designated because it is an area in which the airport or aircraft operator has assumed responsibility for affording heightened security and protected access for cargo or aircraft.

307.   TSA requires that only individuals who have SIDA clearance (and wear SIDA badges) are allowed to be in a SIDA area unescorted.  49 C.F.R. § 1542.205.  Conversely, individuals who do not have SIDA clearance (as shown, in part, by their failure to have a security ID or badge) must be escorted by individuals with SIDA clearance and escorting privileges.  This rule applies to individuals who are either FedEx employees or contractors of FedEx. 49 C.F.R. §

94

1542.211 ("only individuals with unescorted access authority are permitted to escort").

308.   In order to obtain SIDA clearance (and a SIDA badge), TSA requires that an individual must pass a security threat assessment, submit valid forms of identification and submit to a background check. 49 C.F.R. § 1540.203.

309.   Further, aircraft operators or airport users have been required after the September 11, 2001 attacks to ensure that its employees and contractors do not have unescorted access to SIDA secure areas unless the individual has undergone a fingerprint-based criminal history records checks (CHRC) to determine whether the individual had any disqualifying criminal offense, as defined by the regulations.  49 C.F.R. § 1542.209.

310.   An aircraft operator means "a person who uses, causes to be used, or authorizes to be used an aircraft . . . for the purpose of air navigation."  49 C.F.R. § 1540.5.  An airport user is "any person other than an aircraft operator subject to § 1544.229 [CHRC] of this chapter making a certification under this section."  49 C.F.R. § 1542.209.  FedEx is an aircraft operator and its personnel are airport users, operating one of the largest air cargo fleets in the world.

311.   Disqualifying criminal offenses to obtain SIDA clearance include convictions in any jurisdiction over the past 10 years for forgery, crimes involving air navigation and air and transportation safety, making threats, crimes involving

95

assault and rape, weapons offenses, felonies involving persons and property, and conspiracy to commit these same acts.  49 C.F.R. § 1542.209(d).

312.   SIDA security clearance is required to ensure that unauthorized persons do not have access to cargo that will be shipped on aircraft or by ground transport across the United States or internationally.

313.   Normally, sensitive areas of a United States commercial airport and flight ramps are designated as SIDA secure and require that individuals who are unescorted first be trained, pass a security exam, and have their backgrounds investigated.  49 C.F.R. §§ 1544.202(2), 1544.205(c), 1544.205(g)(4), 1544.225, 1544.228, 1544.235.

314.   "TSA estimates that there are approximately 1.4 million aviation workers with access to SIDAs . . . ."  U.S. DHS, TSA, "SIDA Airport Security: Fiscal Year 2017 Report to Congress," 2-6-2018.

315.   DAYR is classified as a SIDA secure area, which is required to comply with FAA, TSA, and FAR requirements.  49 C.F.R. § 1540.5.

316.   FedEx is aware that individuals working or present in a SIDA secure area must properly display a SIDA badge or be escorted by a responsible individual who has a SIDA badge (and SIDA clearance) and escorting privileges.

317.   For example, to work at or have access to DAYR (a SIDA secure area) through badge-secured entry ways, an individual is required to either wear a

96

SIDA badge or be escorted by a responsible individual who has a SIDA badge and escorting privileges.

318.  Indeed, FedEx employees or contractors may be required to obtain several security clearances.  First, an employee or contractor must satisfy a FedEx background check and wear at all times a FedEx badge.  Second, to obtain SIDA clearance, the individual is required to submit to the SIDA clearance process and obtain a SIDA badge before being allowed to work or appear unescorted at SIDA designated areas such as DAYR.  Further, individuals who have access to USPS mail and cargo may also need to obtain USPS clearance.

319.  USPS clearance requirements are similar to SIDA clearance requirements.  FedEx is required to ensure that individuals undergo certain pre-employment screening activities, including criminal records checks for the past five years for felonies or serious criminal charges (e.g., murder, rape, robbery, burglary, physical assaults, weapons violations, or drug charges).

320.  The security threat in allowing unauthorized individuals access to SIDA secure areas is compounded by FedEx's further failure to ensure that cargo has been inspected, screened, and secured before transport, as will be described further in this Complaint.  Unsecure cargo is vulnerable to tampering by unauthorized individuals and increases the risk that an individual may stowaway or plant an explosive device in cargo.

321. FedEx certified to the United States that it would comply with the regulatory requirements that its employees and contractors have CHRCs before having unescorted access to SIDA secure areas and more particularly, certified that each individual:

- o   Has not been convicted of a felony criminal violation in the past five (5) years;

- o   Has not been convicted of serious criminal charges (e.g. murder, rape, robbery, burglary, physical assaults, weapons violations, or drug charges [felony or misdemeanor]); and

- o   Is not on parole for or probation for any felony or serious criminal charges.

322. There is ample evidence that FedEx corporate-level executives and managers who were overseeing the boots-on-the-ground (i.e., FedEx drivers, ramp workers, forklift operators, aircraft mechanics, cleaners, construction workers) knew and understood the significance of the TSA requirements surrounding SIDA secure areas and access.  However, in practice, FedEx treated these requirements with (at least) reckless disregard.

323. FedEx acknowledged its understanding of these requirements, despite its non-compliance with them:

> Individuals who have been convicted of any of the 28 prohibited crimes within the most recent 10 years are not permitted to have unescorted access to the display area.  Without SIDA clearance an employee would be unable to enter the SIDA

98

> unescorted. . . . ***Note – if the airport is considered all SIDA (meaning that the entire airport property is within the display area), the individual would immediately be placed on a 90-day PLOA to find a job at a different location***.

(emphasis added).

324. FedEx further acknowledged that these requirements applied to its vendors.

325. Yet, in thousands of instances at DAYR (a SIDA secure area) alone, FedEx employees, contractors, and temporary workers were allowed unauthorized access, in violation of TSA regulations that prohibit the unauthorized access of individuals who do not have the required security or SIDA clearance. 49 C.F.R. § 1544.202(2). Violations occurred over the course of a thousand days and included contractors with criminal histories and individuals who worked for months at DAYR (a SIDA secure area) without ever obtaining SIDA clearance.

326. On information and belief, similar SIDA clearance violations occurred at the Indianapolis hub—FedEx's second largest hub in the United States.

327. At least over one hundred FedEx employees at DAYR (a SIDA secure area) accessed the area without the proper SIDA clearance (or an escort) for several years and continuing. These security violations have been pervasive and significant as these examples show:

> o   At least 85 of these 100+ employees were unauthorized and working unescorted at DAYR for 20 or more days;

- At least 60 of these 100+ employees were unauthorized and working unescorted at DAYR for 40 or more days;

- At least 40 of these 100+ employees were unauthorized and working unescorted at DAYR for 70 or more days;

- At least 15 of these 100+ employees were unauthorized and working unescorted at DAYR for 100 or more days;

- In one instance, a FedEx ramp agent was unauthorized and working unescorted at DAYR for at least 125 days;

- At least 14 employees who were unauthorized at DAYR were managers and, in at least 4 of these 14 instances, the managers themselves failed to receive SIDA clearance for over 30 days;

- At least 2 employees who were unauthorized at DAYR were aircraft mechanics, who had direct access to aircraft; at least one aircraft mechanic worked at the SIDA ramp while using another aircraft mechanic's SIDA badge;

- Since as early as 2013, FedEx allowed virtually all new FedEx material handlers to begin work unescorted before they had SIDA clearance. (According to FedEx, a material handler "provides safe and efficient operation of equipment used for the movement of packages/documents/heavyweight, dangerous goods and ULDS (Unit Load Device System). To assist in the buildup/breakdown of pallets containing heavyweight freight";

- The requirements that escorted individuals present a government-issued photo identification card, be issued a VISITOR ESCORT REQUIRED temporary pass, and wear an approved escort vest or armband at all times while on FedEx Express property, have been disregarded as a matter of course;

- FedEx Manager 8 received two DAY SIDA badges – one specific to his work for Company A that operates out of DAYR and the other specific to his FedEx responsibilities – and routinely leaves one of these two DAY SIDA badges on a

100

corkboard ("the truck key board"). His spare SIDA badge is in plain sight and accessible to any passersby.

328. At least an additional 90 FedEx non-DAYR employees from other FedEx locations had unauthorized and unescorted access to DAYR (a secure SIDA area). To the extent any of these employees had SIDA clearance at another FedEx location, such clearance is not transferrable to other locations.

329. At least another 150 individuals who were unauthorized and working unescorted at DAYR were contractors, including temporary workers.

330. In thousands of instances, FedEx allowed individuals (employees, managers, contractors, temporary workers) who did not have SIDA clearance to work or pass through SIDA secure locations unescorted.

331. Over 60 percent of all individuals who worked at DAYR (a SIDA secure area) since 2012 were unauthorized and working unescorted for all or part of their time working at DAYR.

332. FedEx had plenty of written policies that (on their face) appeared to demonstrate that FedEx was complying with SIDA security requirements and demonstrated FedEx's knowledge of such requirements. Yet, in practice, FedEx management showed a near total (and reckless) disregard for compliance.

333. In one earlier example, on June 27, 2012, an unescorted FedEx Contractor 27 who did not have SIDA clearance (or a SIDA badge) was working at DAYR (a SIDA secure area) with the knowledge of on-duty FedEx Manager 10.

101

Manager 10 had been aware for several months prior to that date that FedEx Contractor 27 was working unescorted without SIDA clearance.  Also, on June 27, the interior front office door was left unlocked, allowing any passersby to walk off the street and onto the ramp—and, at one point, Manager 10 was seen in the front office with the door wide open.

334.   Yet, on that same date (June 27, 2012), a FedEx-issued memo instructed all FedEx Express managers to:

- o   Immediately challenge all unauthorized or unbadged individuals;

- o   Ensure all access control protocols are strictly enforced including but not limited to escort policies for visitors, vendors, and non-SIDA badged personnel.

335.   Further evidence of management knowledge of widespread failure to comply with regulatory and contractual requirements governing SIDA clearance can be found in FedEx actions before and during TSA inspections, dating as far back as 2012 to the present.

336.   In one earlier incident in April 2012, DAYR management became aware that TSA would conduct an unannounced on-site inspection.

337.   On April 5, 2012, emails from FedEx DAYR Manager 3 and Manager 23, which were sent to at least one DAYR Senior Manager and DAYR FedEx ramp agents, were posted on the employee community bulletin board that disclosed the details of how TSA Agent 6 planned to conduct a ramp inspection so that

FedEx employees had notice and would appear compliant with security requirements.

338. FedEx DAYR Manager 3 instructed staff to wear their SIDA badges during the unannounced inspection and be sure to escort any individuals who did not have a SIDA badge. He warned that "if this isn't done, FedEx could face a large fine."

339. On September 7, 2012, during another TSA inspection, FedEx Manager 10 uncharacteristically required an escort to accompany Contractor 29 who did not have SIDA clearance. Two months later, that same FedEx contractor was performing work on the ramp unescorted and still without SIDA clearance. Without the watchful eye of a TSA Agent, FedEx Manager 10 had allowed the same contractor to have unescorted access to the aircraft mechanics room where aircraft parts were stored and remarked that the contractor could continue to have unescorted access even without SIDA clearance. On November 23, 2012, less than one week later, the same Contractor 29 and another Contractor 34, who, on information and belief, was a convicted felon, accessed the aircraft mechanics room unescorted.

340. At or around the beginning of June 2013, DAYR management hired new cleaners (Contractors 11, 13, and 26) for DAYR (a SIDA secure area) and allowed them to work unescorted and without SIDA clearance. On June 5, 2013,

103

when confronted by FedEx Employee 30 who asked whether the cleaners should be escorted by a FedEx employee with SIDA clearance, FedEx Manager 10 responded, "No, we're going to go ahead and let them roll right now, but they are getting SIDA [because] . . . I don't want to . . . chase people out of here [when the TSA agent comes]." At least one of those new cleaners (Contractor 26) did not appear to receive SIDA clearance until over a year later (around August 2014), and also had access to USPS mail during that entire time frame.

341. On July 18, 2013, when two TSA Agents arrived unannounced at DAYR (a SIDA secure area), FedEx DAYR Manager 3 and Manager 10 intentionally delayed the TSA Agents' entry into DAYR (a SIDA secure area) to allow time to find an escort for a contractor (a cleaner) who had been working unescorted and without SIDA clearance. FedEx employees then removed the cleaner from DAYR while the TSA inspection was ongoing. FedEx DAYR Manager 3 also hid a FedEx engineer who did not have SIDA clearance (or a SIDA badge) in a room and closed the door so he could not be seen by the TSA Agent.

342. Yet, on December 4, 2013, FedEx Regional President and Executive Vice President for U.S. Domestic and U.S. International 28 acknowledged the significance of complying with SIDA security requirements: "Challenge anyone who is not wearing the proper identification. Safety and security go hand in hand

104

and many of you are our first line of defense in preventing unauthorized access to our facilities."

343. On May 16, 2014, that same FedEx Regional President and Executive Vice President for U.S. Domestic and U.S. International 28 alerted FedEx employees to the likelihood of unannounced TSA inspections:

> I have several things on my mind this month, the most important of which is the safety and security of our workplace. We all share the responsibility for ensuring our operations and our facilities are secure, and that we comply with all regulatory requirements. We expect the Transportation Security Administration to increase the frequency of its security inspections at our package handling locations. During these unannounced inspections, the TSA Auditors will look for opportunities to test our security procedures and see if we are adhering to our security requirements. ***Inspectors will examine ID badges to verify the photo on the badge matches the wearer and the expiration date is valid. Properly wear and display the FedEx ID when in our facilities, even office areas, and especially SIDA areas, and challenge anyone who isn't; even if you know them.*** That may sound over the top, but it goes back to what I just said about adhering to our security requirements. We'll only get this right if we hold each other accountable. ***Inspectors have been known to gain facility access through unsecured entrances like back doors and malfunctioning or unprotected vehicle gates. In some instances, they've tried to gain access by scaling a perimeter fence or finding an opening.*** Keep overhead doors and building entrances and exits locked when not in use, and immediately tell your manager about any problems with doors, locks, gates or perimeter

fences around your facility. We've had reports of inspectors try to sneak aboard unattended aircraft. Unless an unattended aircraft is being guarded by a FedEx employee or designated representative, close all the doors and withdrawal all of the equipment from the aircraft silhouette. Last month, our Vice President of Security, Mark Hogan, sent all of the locations a list of security reminders to be posted on bulletin boards. Please pay attention to those. The inspection process is a vital layer of security to help protect you, our customers and the general public, and our assets to exposure to criminal threat. In addition to the obvious benefits of a secure workplace, your active role in watching for suspicious activity in challenging intruders will help us remain compliant with ongoing regulatory requirements.

(emphasis added).

344. In July 2014, in a FedEx newsletter, employees were reminded to be compliant during another TSA inspection:

Many of you may have noticed the TSA inspectors here the last few weeks; they are doing training and ID checks.  Remember, you must wear your SIDA badge on your outermost garment and above the waist.  Also, CHALLENGE everyone for ID who comes in the building.

We need to make sure our company vehicles are always secure and our company facilities are secure. Always challenge anyone not displaying proper identification in our facilities and notify a manager immediately of anyone suspicious. ***The TSA will be testing us soon enough, as usual, let's pass with flying colors***.

(emphasis added).

106

345.    These instructions, however, were only abided and monitored by FedEx management in anticipation of TSA inspections.  During normal business operations, FedEx management acted in reckless disregard of the TSA regulations and knowingly chose not to enforce them.  Yet, FedEx was reminded often by TSA of these requirements, so FedEx was well aware of the significance to TSA of compliance.

346.    During a recent TSA inspection on September 7, 2018, TSA Agent 6 reiterated that preventing unauthorized access by individuals remains a high priority for TSA enforcement efforts.  Agent 6 questioned FedEx management on site about whether everyone with access to DAYR had SIDA clearance and SIDA badges and whether all individuals at the ramp (DAYR) that day were FedEx employees.

347.    On September 13, 2018, FedEx Manager 32 was observing contractors entering and exiting DAYR (a SIDA secure area) and commented that he was "watching out for the TSA":  "They've [TSA] been around . . . on guard. They're testing us right now. But they haven't . . . we ain't got busted yet." Despite FedEx Employee 30 pointing out to Manager 32 that there were so few contractors at DAYR who had a SIDA badge, Manager 32 responded: "They [TSA Agents] tried" to get access to DAYR directly through the front door for visitors but were stopped by contractors in the waiting area so "that worked out."

348. Yet, despite knowing that there was widespread noncompliance, the only remedial action FedEx management took in response to TSA was to admonish employees only during or in anticipation of a TSA inspection. For FedEx management, noncompliance was the status quo.

349. For example, on September 20, 2018, only 13 days after the on-site TSA inspection by TSA Agent 6, four carts of USPS mail that FedEx was transporting pursuant to its USPS contract was left unattended and accessible to 3 unescorted (and unauthorized) FedEx contractors (painters) who did not have SIDA clearance (or badges).

350. Time and again, TSA made clear during on-site inspections that it was critical for FedEx to ensure that unauthorized individuals at DAYR did not have unescorted access to the SIDA secure ramp and that everyone was required to wear their SIDA badges in plain view.

351. FedEx management responded to these warnings by fraudulently reassuring TSA that FedEx was compliant with the requirement to allow only individuals with SIDA clearance unescorted access to DAYR (a SIDA secure area).

352. In a FedEx memo, dated February 21, 2018, FedEx acknowledged that unescorted individuals without SIDA clearance should not gain access to SIDA secure areas: "Every employee is expected to follow SIDA requirements

regarding the use of FedEx ID PROXY Card entry to the facility.  ID Badges must be displayed at all times.  If someone's badge is not displayed, you must challenge them."

353.   Notwithstanding FedEx's repeated acknowledgements of the regulations and reasons for TSA inspections, there are thousands of incidents covering every month since 2012 where unauthorized individuals routinely had unescorted access to DAYR (a SIDA secure area) in plain view of FedEx management.

354.   FedEx's knowing and continuing disregard for SIDA clearance requirements has been demonstrated as recently as January 2019 and has included individuals who are contract and temporary workers such as cleaners, construction workers, and others who did not have SIDA clearance during the time they had unescorted access to DAYR (a SIDA secure area).  FedEx allowed these individuals to have unhindered access to cargo, aircraft, and the ramp, to open warehouse doors containing cargo, and walk throughout the aircraft cargo hubs.

355.   In several instances, FedEx knowingly allowed individuals who should have been denied SIDA clearance because of disqualifying criminal offenses to continue to have unescorted access to DAYR (a SIDA secure area), cargo, and aircraft. 49 C.F.R. § 1542.209.

356.   These violations occurred despite FedEx certifications to the United States that it would comply with the regulatory requirement that its employees and contractors have CHRCs before having unescorted access to SIDA secure areas.

357.   FedEx also knowingly has failed to ensure that new hires receive SIDA clearance (and SIDA badges) before allowing them unescorted access to DAYR (a SIDA secure area), cargo and air carriers.

358.   New hires pose heightened safety risks because their intent is unknown, and the need for compliance with security requirements is even greater with new hires, as FedEx knew:

> New Hires: We recognize that operational needs sometimes require new hires to start work prior to getting their SIDA clearance. ***However, as a SIDA best practice, Human Resources and Security suggests that new hires should not be scheduled to work in the SIDA area until they have received their SIDA clearance.***

(emphasis added).

359.   Throughout 2018 and 2019, FedEx allowed numerous new hires including contractors and construction workers unescorted access (for weeks or months at a time) to DAYR (a SIDA secure area), cargo and air carriers before they had obtained SIDA clearance (or a SIDA badge).

### 1.   Examples of Unauthorized Individuals

360.   Below are individual examples of employees whom FedEx knowingly allowed unescorted access to DAYR (a SIDA secure area) without proper

clearance (or SIDA badges) at risk to national security, in violation of regulatory requirements, and contrary to its contractual obligations and certifications.

    ○    **Unauthorized Employee 20**

361. Beginning September 2014, FedEx Employee 20 was working unescorted at DAYR (a SIDA secure area) sorting mail for over 100 days before he received SIDA clearance. Yet, during these 100 days, FedEx provided Employee 20 with a FedEx ID card that allowed him 24/7 unrestricted access to DAYR (a SIDA secure area).

362. In March 2015, he was arrested on drug charges and for the reckless operation of a motor vehicle. On information and belief, FedEx fired him after his arrest.

363. On information and belief, around April 3, 2015, with his charges still outstanding, FedEx rehired Employee 20. Despite Employee 20's criminal record, Employee 20 retained his SIDA badge and continued to have access to DAYR (a SIDA secure area), cargo, and air carriers.

    ○    **Unauthorized Employee 14**

364. On or about June 10, 2015, FedEx hired Employee 14, a registered sex offender who should have been ineligible for SIDA and USPS clearance.

365. On or about July 8, 2015, FedEx provided Employee 14 with a FedEx ID card that allowed him 24/7 unrestricted access to DAYR (a SIDA secure area).

111

366.   Within one month of receiving his FedEx ID card, Employee 14 was driving a tug to aircraft unescorted, and could have accessed aircraft without authorization and without an escort through August 2015.  (In aviation, a special vehicle called a tug is used during an airport procedure in which an aircraft is pushed backwards away from an airport gate).

367.   FedEx allowed Employee 14 unescorted access to DAYR (a SIDA secure area), cargo, and air carriers.

368.   On or around the end of September 2015 – over 90 days after Employee 14 was hired, FedEx terminated his employment because of his prior criminal conviction, on information and belief.

369.   FedEx knowingly allowed Employee 14 to have unescorted access to DAYR (a SIDA secure area), cargo, and aircraft during his several months of employment, in violation of 49 C.F.R. §§ 1544.225, 1544.228.

   o   **Unauthorized Employee 12**

370.   FedEx knowingly allowed Employee 12 to work as a material handler at DAYR (a SIDA secure area) unescorted for 94 days, from around January 24, 2017 to April 28, 2017, including during the time period after which FedEx knew she failed the training test portion of the SIDA clearance process on April 20, 2017.

371.   On the same day that Employee 12 failed the SIDA test, she was driving a tug unescorted at DAYR (a SIDA secure area).

372.   FedEx knowingly allowed Employee 12 to have unescorted access to DAYR (a SIDA secure area), cargo, and aircraft for several months, in violation of 49 C.F.R. § 1542.209.

o   **Unauthorized Employee 9**

373.   FedEx hired Employee 9 on or about August 17, 2015.  He did not obtain SIDA clearance (or his SIDA badge) until at least November 11, 2015—86 days after he began work unescorted at DAYR (a SIDA secure area) with access to cargo and air carriers.

374.   On October 22, 2015, Employee 9 was seen standing outside the aircraft without authorization or an escort and could have easily boarded the aircraft.

375.   Further, three months after he received his SIDA clearance, Employee 9 still had not completed his USPS clearance paperwork; yet, he was permitted unauthorized access to USPS mail.

376.   In February 2016, TSA cited FedEx for failing to conduct a sufficient background check on Employee 9 and required that FedEx submit additional information to obtain proper SIDA clearance for him.  Yet, FedEx allowed Employee 9 to continue to work unescorted at DAYR (a SIDA secure area).

377.  For at least 3 months, FedEx knowingly allowed Employee 9 to have unescorted access to DAYR (a SIDA secure area), cargo, and air carriers, and for at least 6 months, FedEx knowingly allowed Employee 9 to have unescorted access to USPS mail.

378.  On at least one occasion during this time, FedEx management had been unable to locate the whereabouts of Employee 9.  Yet, FedEx continued to allow him unescorted access.

379.  FedEx knowingly allowed Employee 9 to have unescorted access to DAYR (a SIDA secure area), cargo, and aircraft for several months, in violation of 49 C.F.R. § 1542.209.

o    **Unauthorized Contractors 25, 35, 36**

380.  Four new temporary material handlers who began work around December 14, 2015, never received SIDA clearances (or SIDA badges), yet were allowed unescorted access to DAYR (a SIDA secure area), cargo and air carriers.

381.  On information and belief, they also did not receive the General Awareness Security training as required by TSA.

382.  FedEx knowingly allowed Contractors 25, 35, and 36 to have unescorted access to DAYR (a SIDA secure area), cargo, and aircraft during their periods of employment, in violation of 49 C.F.R. § 1542.209.

114

383.   During 2018 and 2019, there are hundreds of instances of FedEx contractors roaming DAYR (a SIDA secure area) without any SIDA clearance or escort.

384.   All too often new hires also failed to receive the required training before being granted unescorted access to DAYR (a SIDA secure area), as required by 49 C.F.R. § 1542.213(b).

o   **Unauthorized Contractor 27**

385.   FedEx Contractor 27 was a contractor who cleaned DAYR (a SIDA secure area) unescorted and without SIDA clearance (or a SIDA badge).  On the evening of July 19, 2012, because of an anticipated TSA inspection the following day, FedEx Manager 10 told Contractor 27 to not appear at DAYR for work during the TSA inspection to avoid detection by TSA.

386.   FedEx knowingly allowed Contractor 27 to have unescorted access to DAYR (a SIDA secure area), cargo, and aircraft, in violation of 49 C.F.R. § 1542.209.

o   **Unauthorized Employee No. 21**

387.   FedEx Employee 21 started work as a manager at DAYR (a SIDA secure area) on or about October 22, 2013.  He did not have SIDA clearance (or a SIDA badge) until nearly two months later on December 17, 2013.  Yet, he acted

115

in the capacity as a manager and was not escorted by a SIDA cleared employee during that entire time.

388.   Manager 21 was well aware that he was violating TSA requirements. During one TSA inspection during this period, he made sure that another FedEx SIDA cleared employee with escorting privileges escorted him to avoid detection by the TSA Agent: "Don't go nowhere . . . hold on. . . you're my escort."  Once FedEx Manager 21 received his SIDA badge, he remarked to FedEx Employee 30: "Now I don't have to worry about the TSA showing up and not having a [SIDA] badge."

389.   FedEx knowingly allowed Employee 21 to have unescorted access to DAYR (a SIDA secure area), cargo, and aircraft for almost two months, in violation of 49 C.F.R. § 1542.209.

o    **Unauthorized Employee 31**

390.   FedEx Employee 31 began working for FedEx at DAYR (a SIDA secure area) around February 2013.  Employee 31 did not have USPS security clearance.

391.   In August 2013, over 5 months after FedEx Employee 31 began work, FedEx notified him that his USPS security clearance was denied, and he was no longer authorized to perform functions that gave him access to mail.  FedEx Employee 31 had a prior criminal conviction less than five years earlier (in

116

2010)—he pled guilty to disorderly conduct after having been initially charged with domestic violence. At that time, FedEx was obligated to "immediately den[y] [FedEx Employee 31] entry to a secured area when that person's access authority for that area is withdrawn." 49 C.F.R. § 1542.207.

392.   Yet, FedEx Employee 31 continued to work at DAYR (a SIDA secure area), accessing USPS mail until around October 1, 2013, at which time he received a USPS security clearance.

393.   Around April 2014, FedEx Employee 31 obtained a new part-time position as a FedEx ramp transport driver (RTD), transporting cargo.

394.   But a few days later, FedEx Employee 31 was arrested in Ohio on charges of felony assault, kidnapping and rape. He had an outstanding arrest warrant and eventually turned himself in.

395.   Once he was arrested, FedEx fired him. However, FedEx knowingly allowed Employee 31 to have unescorted access to DAYR (a SIDA secure area), cargo, aircraft, and mail for over a year, in violation of 49 C.F.R. § 1542.209.

o   **Unauthorized Access of the DAYR Customs Cage**

396.   At DAYR, there is also an area where cargo that requires U.S. Customs review or approval is housed ("the Customs cage").

397.   The Customs cage is an area of DAYR that is enclosed by a fence and has a ceiling, with signage at the entrance to the cage: "US CUSTOMS IN-BOND

117

CAGE, Authorized Personnel Only." (The term "in-bond" refers to an import shipment that is entering the U.S. with a destination beyond the port of entry and that must be cleared by U.S. Customs through a tracking process). Cargo housed in the Customs cage at DAYR is held until U.S. Customs' statutory and regulatory requirements can be met.

398. Only individuals who are authorized to have a key to a door/gate at the Customs cage, such as the International Document Agents (IDAs) or possibly FedEx managers, should have access the Customs cage.

399. On numerous occasions, unauthorized individuals—including individuals who did not have SIDA clearance—walked in and out of the Customs cage with unfettered access to cargo housed there.

400. For example, on March 23, 2016, an unescorted contractor (Contactor 15) without SIDA clearance worked alone at DAYR with unfettered access to the Customs cage for at least four hours and, at least at one point, entered the unlocked Customs cage.

401. More recently, on February 7, 2019, FedEx allowed unescorted contractors without SIDA clearance access to an open, unsupervised Customs cage. The contractors used a cone to keep a nearby door (which was otherwise inaccessible without a FedEx employee ID badge) propped open—allowing more passersby to access the Customs cage.

402. FedEx knowingly allowed these contractors to have unescorted access to a Customs cage, which required authorized access, and to DAYR (a SIDA secure area), cargo, and aircraft, in violation of 49 C.F.R. § 1542.209.

### B. Unsecure Cargo

403. FedEx knowingly transported cargo across the United States and internationally on trucks and airplanes without proper inspection, screening or securing to ensure that there were no unauthorized persons, weapons, explosives, incendiaries, and other destructive devices, items, or substances present. 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

404. TSA established chain of custody requirements to ensure cargo is safe and secure from tampering along the chain of custody from origination to final destination. 49 C.F.R. § 1544.205(g)(4). The purpose of screening, inspection and securing cargo with cross bands, locks or clamps (as appropriate) is to maintain the integrity of the secure cargo at each stop along the route to final destination. FedEx is well aware of this.

405. Beginning on May 1, 2011, FedEx was required to screen, inspect and secure (i.e., crossbanding, locks, or clamps, as appropriate) cargo that was over 150 pounds (the "150+ pound cargo requirement").

406. To comply with this "150+ pound cargo" requirement, FedEx must weigh (or re-weigh) any unsecure cargo to confirm its weight.

119

407. Often, FedEx cargo will be accompanied by packaging slips that identify the "pickup weight", i.e., the weight identified by the customer. Rather than rely upon the customer's notation, FedEx must weigh or re-weigh unsecured cargo to determine if it meets the 150+ pound cargo requirement. Indeed, numerous examples of unsecure cargo resulted from FedEx's failure to re-weigh unsecured cargo that exceeded 150 pounds but was identified by the customer as less than 150 pounds. The pervasive problem of unsecure cargo stemmed from FedEx's profit driven priorities, irrespective of national security requirements.

408. If 150+ pound cargo is secure (i.e., properly crossbanded or locked/clamped), FedEx can allow the cargo to be moved along in the chain of custody for transport.

409. Under TSA regulations and FedEx contracts, if cargo weight exceeds 150 pounds, and the cargo is not crossbanded, locked or clamped (i.e., unsecure), FedEx must screen, inspect, and properly secure the cargo with crossing banding before allowing the cargo to continue along in the chain of custody during transport. 49 C.F.R. §§ 1544.205(b), 1544.207(c).

410. FedEx knowingly and consistently failed to weigh or reweigh cargo to confirm whether it exceeded the 150+ pound cargo requirement that triggered FedEx requirements to screen, inspect and secure the cargo before transport—instead, too often relying upon the customer's (often incorrect) weight

representation on the standard FedEx form—in violation of federal requirements and FedEx's contractual obligations. 49 C.F.R. §§ 1544.205(b), 1544.207(c).

411.  On paper, FedEx has policies to inspect, screen and secure cargo that exceeds 150 pounds.  There are plenty of internal written materials to suggest that FedEx was acutely aware of the seriousness of the national security requirements governing the screening, inspection and securing of cargo for transport.  FedEx has also acknowledged its obligations in notifications sent to customers and on its own website.

412.  Further, FedEx is required to document its inspection and screening of cargo on package inquiry reports and cargo screening forms.  FedEx, however, has routinely ignored these requirements.

413.  FedEx has given short shrift to the requirements that became effective on May 1, 2011.

414.  Cargo security became less of a priority for FedEx, instead considered a nuisance and an unnecessary expense.  FedEx Material Handler 33 captured the mindset when he said he was "too busy" to do the banding part of his job on October 24, 2014.

415.  On September 30, 2011, FedEx Manager 10 also complained that FedEx employees were too busy that evening to "TSA band cargo" and said it "didn't need to happen."

416. According to a remark made by FedEx International Document Agent (IDA) 18 on December 6, 2012, IDA 18 had earlier expressed his concern to FedEx Manager 10 that FedEx did not have the manpower or equipment to properly inspect and secure freight before it was transported on an aircraft.

417. As shown throughout this Complaint, FedEx was not providing the necessary support to its employees to ensure that FedEx could (or would agree to) comply with the 2011 TSA cross banding requirements for securing cargo.

418. On July 27, 2017, FedEx Manager 7 was informed about a skid that needed TSA cross banding and responded, "we're sending that sucker tonight [on a flight]," because staff at FedEx were too busy to get it done. Despite knowing that the cargo needed to be inspected and secured with cross-banding, Manager 7 never made any attempt to inspect or properly secure the cargo before the cargo made its way onto aircraft.

419. However, FedEx internal documents show FedEx's knowledge that "[t]o comply with the Transportation Security Administration (TSA) procedures to ensure there are no unauthorized persons, weapons, explosive, incendiaries, and other destructive devices, items, or substances present, a cargo screening MUST BE performed and documented on any SINGLE piece of cargo that weighs over 150 pounds….after the acceptance of the cargo, but prior to the transport and loading of the cargo onboard aircraft."

122

420. Further, FedEx management expressed concern that there was a lack of training, oversight and enforcement of the requirements.

421. On December 11, 2012, FedEx DAYR Manager 3 expressed concern that the FedEx sales force "d[oesn't] know anything about TSA banding requirements," while also noting that "the TSA is not a rule we could bend or break." Manager 3 further described that FedEx should decline to transport cargo that has not been properly cross banded at the point of origin—recognizing that FedEx has the right of refusal if cargo is not properly secured, as an alternative to having FedEx performing the work itself.

422. Instead, FedEx has chosen to accept and transport unsecure cargo in the name of expediency and avoiding costs it doesn't want to bear or pass onto the customer. This business decision violates contractual and federal requirements to properly inspect, screen and secure cargo to ensure that there are no unauthorized persons, weapons, explosives, incendiaries, and other destructive devices, items, or substances present. 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

423. Further, FedEx is well aware that the purpose of inspection and screening is to prevent tampering, stowaways, or the planting of explosive devices in cargo that could be transported on an aircraft or a cargo vehicle.

424. FedEx acknowledged its understanding of the requirements that became effective on May 1, 2011. Its own internal written policies, which have

123

consistently not been followed, state that once cargo over 150 pounds is screened

and inspected, FedEx is required to ensure that the cargo meets the following

requirements before transporting the cargo for domestic shipment:

- o    "Band[] to a skid **on all sides** with heavy-duty metal or break-resistant plastic banding material" OR
- o    "Contain[] within a hardened container (plywood, metal) that has exterior clamps or locking devices (nails, screws, or glue are not sufficient).

(emphasis added).

425.    The TSA requirement to "band on all sides" was explained to FedEx

personnel in training materials and by management as "TSA cross banding" or

"TSA crisscross banding," just as the FedEx images in this Complaint show.

426.    The TSA requirement to "band on all sides" or "cross band" cargo

was reinforced by TSA inspectors when conducting on-site inspections of FedEx.

On a September 7, 2018 inspection of DAYR (a SIDA secure area), TSA Agent 6,

after reminding FedEx of the importance of cross banding, remarked that:

"Obviously there are some exceptions where you don't have to screen.  If it's

banded on all sides"—meaning that screening (i.e., opening of cargo and peering

inside) does not need to occur if the package has arrived at DAYR (a SIDA secure

area) having already been cross banded.

427.    As FedEx has further recognized, "[s]hipments accepted [from the

customer] without banding cannot be banded by FedEx Express without prior

124

cargo screening for the shipment to be classified as exempt.  Cargo nets and covers do not meet the criteria for banded."

428.    FedEx management has consistently ignored screening, inspecting and securing (i.e., crossbanding, locks or clamps) cargo while nevertheless acknowledging their understanding of the national security requirements.  Some examples are provided below.

429.    In July 2017, FedEx Employee 30 notified FedEx Manager 22 that cargo over 150 pounds and about to be transported on a flight was not cross banded, and Manager 2 laughed in response: "just send it [the cargo].  You don't have to come to us [management] every night for this."

430.    In December 2018, FedEx International Document Agent (IDA) 37 failed in an attempt to properly crossband a 300-pound piece of cargo that had not been inspected by management—"I can't get it"—allowing the cargo to be transported without proper screening, inspection and securing.

431.    Further evidence of FedEx management knowledge of widespread failure to comply with regulatory and contractual requirements governing the screening, inspection and security of cargo (i.e., crossbanding, locks or clamps) can be found in FedEx actions before and during TSA inspections, as described throughout this Complaint.

432. In July 2017, FedEx Employee 16, who had been employed by FedEx for two years, misunderstood that screening, inspection and cross banding was required for cargo that was:

- o Going on a flight,

- o Over 150 pounds, and

- o Large enough for a person to fit inside.

433. TSA requires cargo that meets the 150+ pound cargo requirement to be secured by cross-banding without regard to whether it appears (subjectively) to the naked eye that an individual is large enough to fit inside.

434. Yet, that same month (July 2017), Employee 16's practice changed at the direction of FedEx management, which anticipated a TSA inspection the following day, and Employee 16 began crossbanding cargo over 150 pounds rather than simply "eyeballing" the cargo to see if it could fit a stowaway.

435. On July 24, 2017, FedEx Manager 7 announced to FedEx employees at DAYR (a SIDA secure area): "make sure that if you bring heavyweight back tomorrow for the flight that it is cross banded. TSA is going to be here tomorrow."

436. That same day, FedEx Manager 7 also directed FedEx Employee 30 to conceal any inbound cargo that would expose TSA security violations: "just tonight, when [TSA Agent]'s here, don't come up and tell me that we don't have anything cross banded. You can kind of look at me and give me a signal . . . don't

126

say anything in front of him," and further stated, "if you want to send me a text and tell me it's coming in, because I can look at that and he [TSA Agent] won't ever know anything about it.  I can be out there, and I can be looking at it as you get back and we can take care of it that way and just me and you will be the only two that will ever know."

437.   FedEx so routinely failed to properly screen, inspect and secure cargo over 150 pounds that customers were often unaware of TSA's May 2011 banding requirement imposed on FedEx.  To reiterate, if customers provided unsecured cargo to FedEx, it was FedEx's obligation to either (a) require the customer to properly secure the cargo (with crossbanding, seal or lock), or (b) take on the responsibility for securing the cargo before transport.

438.   In January 2016, FedEx Manager 8 stated, "…because that's [banding] a requirement of the TSA on us (FedEx), not on the customer. So we don't charge them [the customer] on the TSA (banding)."

439.   FedEx, of course, was free to make a business decision to absorb the cost of securing cargo or to pass along the cost (or securing) to the customer.  And, it appears it was FedEx's policy (on paper) to pass along the cost of securing cargo to the customer.  However, since FedEx routinely ignored TSA's crossbanding requirements, the customers were largely in the dark about the requirement altogether.

440.   In one example, on May 14, 2014, a long-time FedEx commercial customer Company B, which was asked by FedEx Employee 30 to crossband cargo before FedEx acceptance of the cargo, remarked: "I'll tell you, as many times as we have flown these things around the world, you're the first person [at FedEx] to ask for it [banding] around."

441.   FedEx management was well aware that if it accepted cargo from a customer, which was not properly secured (i.e., crossbanded, locked, or clamped, as appropriate), FedEx was required to screen, inspect and properly secure the cargo itself.

442.   In one example in November 2014, in exchanges between FedEx Employee 30 and FedEx DAYR Senior Manager 19, Manager 19 acknowledged that:

- o   TSA guidelines require cross banding or banding on all sides of cargo;

- o   If a customer does not properly band cargo, then it is FedEx's responsibility;

- o   If the cargo arrives without cross banding, FedEx is required to inspect and screen the cargo before properly cross banding it, stating "if it's not crisscrossed, we have to inspect it";

- o   Admitted that "it's FedEx's responsibility to make sure the banding meets the TSA guidelines."

443.   Yet, FedEx enforcement of TSA requirements was rare.  For instance, only months earlier, on May 2, 2014, FedEx Manager 10 told FedEx Employee 30

128

that Employee 30 didn't have to inspect and band a 200 pound cardboard box on a skid, casually telling Employee 30 that he had "nothing to worry about" while chastising him for trying to get the customer to change its habit and submit properly secured cargo for shipment.

444.   FedEx was knowingly violating TSA requirements in order to avoid the hassle and cost of screening, inspecting and securing cargo and the consequences of passing the perceived hassle or cost to its customers (i.e., keep the customers happy and avoid damaging customer relationships).

445.   Yet, in doing so, FedEx was knowingly failing to enforce TSA requirements to inspect, screen and secure cargo to prevent unauthorized persons, weapons, explosives, incendiaries, and other destructive devices, items, or substances from being hidden in the cargo.  49 C.F.R. §§ 1544.202, 1544.205, 1544.207.  Its conduct violated federal regulations and its contractual obligations and posed significant risks to public safety and national security.  In short, FedEx prioritized profits over national security.

446.   FedEx failed to inspect, screen and properly secure thousands of pieces of cargo that weighed more than 150 pounds and were flown on thousands of flights across the United States and around the world.

447.   Cargo security violations occurred as both outbound and inbound violations.

448.   Outbound cargo shipments are picked up by FedEx drivers at DAYR (a SIDA secure area) (for example) and shipped across the country and throughout the world.  Thousands of outbound cargo security violations originated from DAYR and were placed on trucks and aircraft that had stops and layovers and destinations in other cities and countries.

449.   Inbound cargo shipments arrive at DAYR (a SIDA secure area), having originated in other cities or countries.  Cargo arriving at DAYR from other cities and countries without having been properly inspected, screened or secured (i.e., crossbanded, clamped, or locked) is evidence that FedEx screening, inspection and banding failures are occurring at FedEx locations throughout the world.

450.   Cargo skids routinely arrive at DAYR (a SIDA secure area) from Memphis, Tennessee and Indianapolis, Indiana—the first and second largest FedEx hubs in the world—without having been properly screened, inspected, or secured (i.e., banded, clamped, or locked) by FedEx.

451.   Cargo skids also arrive at DAYR (a SIDA secure area) from outside the United States without having been properly screened, inspected, or secured (i.e., banded, clamped, or locked) by FedEx.

452.   FedEx is also responsible to ship cargo to and from military bases, including these:

- o   Wright Patterson Air Force Base (Dayton, Ohio)

- o   Andrews Air Force Base (Maryland/DC area)

- o   Eglin Air Force Base (Western Florida)

- o   Cannon Air Force Base (Curry County, New Mexico)

- o   Davis-Monthan Air Force Base (Tucson, Arizona)

- o   Nellis Air Force Base (Southern Nevada)

- o   McGuire Air Force Base (Burlington County, New Jersey)

- o   Lackland Air Force Base (Bexar County, Texas)

- o   Royal Air Force Base (United Kingdom)

- o   Naval Air Station (North Island Halsey Field/San Diego, CA)

- o   128th Air Refueling Wing (Milwaukee, WI)

- o   Fort Campbell (Kentucky/Tennessee border)

- o   National Reconnaissance Office (Chantilly, VA)

- o   March Air Reserve Base (Riverside County, CA)

- o   U.S. Army Tank Plant (Lima, Ohio)

- o   Aberdeen Proving Grounds (Aberdeen, MD)

- o   White Sands Missile Range (southern New Mexico)

- o   178th Wing, Ohio Air National Guard (Springfield, OH)

- o   Defense Intelligence Agency (Washington, DC)

- o   Tobyhanna Army Depot (Tobyhanna, PA)

- o McChord Air Force Base (Pierce County, WA)

- o Randolph Air Force Base (Universal City, TX)

- o Offut Air Force Base (Sarpy County, NE)

- o Picatinny Arsenal (Morris County, NJ)

- o Tyndall Air Force Base (Panama City, FL)

- o Spangdahlem Air Base (Germany)

- o Cape Canaveral Air Force Station

- o National Aeronautics and Space Administration (NASA)

- o Los Alamos National Lab for Department of Energy

453. Despite the United States' reliance upon and trust in FedEx security measures, FedEx fails to properly screen, inspect, and secure cargo (i.e., through banding, clamps, or locks) that is being delivered to and from all of these military bases identified above.

### 1. Examples of Unsecure Cargo Shipped to and from Military Bases

454. The below are examples where FedEx cargo arrived at DAYR (a SIDA secure area) for shipment to or from military bases without proper screening, inspection or securing (i.e., without crossbands, locks, or clamps), in violation of TSA security requirements. Many of these examples are plywood containers fastened only by nails, screws, staples, or glue.

132

o **Unsecure Cargo Example**

455.   On December 4, 2018, FedEx cargo weighing 235 pounds arrived at DAYR (a SIDA secure area), after being flown from Texas (Flight No. 0621) to Memphis and then flown from Memphis to Dayton (Flight No. 1474), with a final destination at the Wright Patterson Air Force Base.  When the cargo arrived at DAYR, it was not secure at all.  Upon examination, the cargo was a large cardboard box held together only with tape—no bands, locks or clamps, and was easily accessible by a passerby.  Further, a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid.  FedEx did not properly screen, inspect or secure the cargo before delivering the cargo to the military base, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

o **Unsecure Cargo Example**

456.   On February 6, 2018, FedEx cargo picked up from Wright Patterson Air Force Base weighing 1,050 pounds and containing Boeing aircraft parts left DAYR (a SIDA secure area) by FedEx truck to Indianapolis and was flown on Flight 1750 to Los Angeles.  The cargo was unsecure while on the truck (i.e., no banding, lock or clamps).  Upon examination, the top of the skid in which the cargo was placed was readily opened, allowing the cargo to be easily accessible by any passerby.  Further, a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid.  FedEx did not properly screen, inspect or secure

133

the military base cargo before it was driven to Indianapolis and flown on a flight, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

- o **Unsecure Cargo Example**

457.   On March 22, 2016, FedEx cargo weighing 385 pounds arrived at DAYR (a SIDA secure area) from Cannon Air Force Base, after layovers (including in Memphis) with a final destination at an aircraft parts company (Company C).  When the cargo (wooden box) arrived, it was not secure at all. Upon examination, the cargo was held together only by screws and nails, allowing the cargo to be easily accessible by any passerby.  Further, a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid.  FedEx did not properly screen, inspect or secure the cargo before it left a military base, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

- o **Unsecure Cargo Example**

458.   On September 28, 2018, FedEx cargo weighing 330 pounds arrived at DAYR (a SIDA secure area), originating from the U.S. Army Corps of Engineers with a final destination of Wright Patterson Air Force Base.  When the cargo arrived at DAYR, it was not secure at all.  Upon examination, the cargo was a large cardboard box, held together only with tape—no bands, locks or clamps, and easily accessible by a passerby.  Further, a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid.  FedEx did not properly screen,

134

inspect or secure the cargo, with a final destination at a military base, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

o    **Unsecure Cargo Example**

459.   On July 11, 2013, six pieces of FedEx cargo, collectively weighing 1,096 pounds, arrived at DAYR (a SIDA secure area), after originating at the Naval Air Station North Island (Halsey Field) in San Diego, California with a final destination of an aviation company (Company D) in Vandalia, Ohio.  Cargo relating to the aviation company often contain particularly sensitive materials, including shipping parts for generators or engines that power fighter jets used by the military.  This particular cargo included wooden boxes secured only by screws (and, one of the pieces had a single band) and easily accessible by a passerby. FedEx did not properly screen, inspect or secure this military cargo, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

460.   As recently as April 5, 2019, seven pieces of cargo, collectively weighing 1,057 pounds, arrived at DAYR after two flights and a layover at the largest FedEx Express hub in the world (Memphis, TN) contained in cardboard boxes with no banding or screws, and with lids that could easily be lifted to allow the placement of an explosive device or a stowaway.  FedEx did not properly screen, inspect or secure the cargo, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

461.   As these examples demonstrate, cargo is being handled during layovers in other FedEx hubs like Indianapolis and Memphis yet arriving at DAYR (a SIDA secure area), with a place of origin or destination at government and military bases, without having been properly inspected, screened and secured to prevent tampering.  This is particularly troubling—and heightens the national security concerns of the allegations in this case—because Indianapolis and Memphis are the largest FedEx hubs in the world with millions of pieces of cargo passing through those hubs every day—and, because certain cargo originates from or is shipped to government and military bases.

462.   The below is an example where FedEx (inbound) cargo arrived at DAYR from locations outside the United States without proper screening, inspection or securing (i.e., without crossbands, locks, or clamps), in violation of TSA security requirements.  The cargo in these examples are insufficiently secured because they are plywood containers fastened only by nails, screws, staples, or glue.

- o   **Unsecure Cargo Example**

463.   On June 13, 2018, FedEx cargo weighing 269 pounds arrived at DAYR (a SIDA secure area), originating in Singapore.  When the cargo arrived, it was not secure at all.  Upon examination, the cargo was a large cardboard box, held together only with tape—no bands, locks or clamps—and the box appeared

136

damaged. It was readily accessible to a passerby and a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid. FedEx did not properly screen, inspect or secure the cargo, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

       o      **Unsecure Cargo Example**

464. On January 24, 2018, FedEx cargo weighing 190 pounds arrived at DAYR (a SIDA secure area), having originated in Japan. The cargo contained aircraft parts destined for a commercial supplier of electrical and mechanical components and systems for aircraft engines (Company E). When the cargo arrived at DAYR, it was secured only with a single band. It was readily accessible to a passerby and a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid. FedEx did not properly screen, inspect or secure the cargo, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

     **2.**    **Example of Unsecure Cargo Shipped on Passenger Flight**

465. The below is an example of FedEx cargo not properly screened, inspected or secured before being transported on a passenger flight, in violation of TSA regulations that require 100 percent screening, inspection and securing of cargo transported on passenger planes—its primary purpose to detect and avoid the danger of "the use of cargo to introduce an explosive device onboard a passenger

137

aircraft." TSA Final Rule, Air Cargo Security Requirements, 49 C.F.R. § 1540, *et seq.*, 71 Fed. Reg. 30478, 30479 (May 26, 2006).

466.   On December 18, 2017, FedEx cargo weighing at least 220 pounds was on board an American Airlines flight from Chicago O'Hare International Airport to Paris Charles De Gaulle airport with at least 100 passengers.  The cargo was a large box secured only with screws.  A stowaway could have easily fit in the cargo and escaped from inside the cargo without aid.  FedEx did not properly screen, inspect or secure the cargo, in violation of 49 C.F.R. § 1540, *et seq*.

### 3.   Examples of Unsecure Cargo Shipped from a FedEx TSA-Certified Cargo Screening Facility

467.   The below are examples where FedEx shipped cargo from one or more of its TSA Certified Cargo Screening Facility (CCSF) facilities, which were not properly inspected, screened, or secured.  These examples are particularly troubling because FedEx was required to adhere to increased TSA-directed security standards at these facilities.

468.   As a CCSF, the following applied to FedEx:

Adhere to strict, TSA-mandated security standards that apply to the facility itself (for example, physical access controls, perimeter security); facility personnel; processes relevant to the transportation, handling and storage of cargo; and information technology security.

Because air cargo must be scanned at the piece level to comply with the law, shipments tendered on skids and shrink-wrapped must be taken apart so individual pieces

138

can be screened. Airlines lack space/facilities to "de-palletize," screen, and re-configure these shipments, but CCSFs are designed to handle all of these activities and to maintain the integrity of the product as well.

After scanning cargo, CCSFs will be able to tender it directly to a passenger air carrier or freight forwarder.

Air cargo screened at a CCSF will not be re-screened and possibly damaged or compromised at the airport. Pre-screened cargo goes straight to the front of the line.

o  **Unsecure Cargo Example**

469.  On February 27, 2015, FedEx shipped Company D's aviation cargo weighing 151 pounds from its Atlanta CCSF facility to DAYR (a SIDA secure area) for final delivery to Wright Patterson Airforce Base in Ohio.  The cargo was a wooden box secured only by nails without banding, locks or clamps.  Further, a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid.  FedEx did not properly screen, inspect or secure the cargo at the CCSF facility before delivering the cargo to a military base, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

o  **Unsecure Cargo Example**

470.  On February 10, 2017, FedEx shipped cargo that weighed 796 pounds, originated at its Atlanta CCSF facility, with a layover at DAYR (a SIDA secure area), and a final destination of Wright Patterson Air Force Base.   The cargo was large, secured only by screws and was easily accessible by a passerby.

139

Further, a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid.  FedEx did not properly screen, inspect or secure the cargo at the CCSF facility before delivering the cargo to a military base, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

o **Unsecure Cargo Example**

471.   On April 17, 2018, FedEx shipped cargo that weighed 190 pounds, originated at its Atlanta CCSF facility, with a layover at DAYR (a SIDA secure area), and a final destination of Wright Patterson Airforce Base in Ohio.  The cargo was large, secured only by screws, and was easily accessible by a passerby.  Further, a stowaway could have easily fit in the cargo and escaped from inside the cargo without aid.  FedEx did not properly screen, inspect or secure the cargo at the CCSF facility before delivering the cargo to a military base, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

472.   As recently as April 4, 2019, FedEx shipped cargo from Robins Air Force Base (in Georgia) that weighed 740 pounds through its Atlanta CCSF facility, with layovers at its Indianapolis hub and DAYR, with a final destination of an equipment testing facility in Beavercreek, Ohio.  The large-sized cargo was secured only by nails, and in at least one corner of the crate, the nails had wriggled themselves out during transit, demonstrating why nails fail to properly secure cargo.  As such, the cargo was easily accessible to a passerby and a stowaway

140

could have easily fit in the cargo and escaped from inside the cargo without aid. FedEx did not properly screen, inspect or secure the cargo at the CCSF facility before delivering the cargo to a military base, in violation of 49 C.F.R. §§ 1544.202, 1544.205, 1544.207.

o   **Unsecure Cargo Example**

473.   On August 14, 2013, FedEx Employee 30 requested long-time customer Company H—a machine tool parts company for shops and factories—to cross-band cargo that weighed more than 150 pounds, in accordance with TSA requirements.  Company H resisted, saying that FedEx almost never required Company H to secure the cargo with cross-banding.  Nevertheless, Company H followed FedEx Employee 30's instructions in this one instance but also logged a complaint against FedEx Employee 30.

474.   In reaction to the complaint, FedEx Employee 30 reported what he learned to FedEx management, i.e., that FedEx drivers who regularly picked up cargo from Company H for transport were not complying with TSA requirements to ensure that cargo was secure before transport.

475.   Employee 30's direct supervisor FedEx Manager 10 privately agreed that failing to ensure that cargo was securely cross-banded was a TSA violation and that Employee 30 had taken appropriate action to ensure the cargo was secure: "We're taking this for [transport on] an aircraft.  If it [the cargo] comes in and

wasn't caught on the other side (inbound) that's something they have to deal with…it's a Corporate thing.  We have TSA [Agents] that are very strong over here (at DAYR)..we're on an airport.  If the other RT's [Route Drivers] are not [cross-banding?]…we [at DAYR] are."  FedEx Manager 10 acknowledged that management should follow-up with other FedEx drivers to ensure they are enforcing the TSA requirements to securely cross-band packages.

476.   DAYR FedEx Manager 3 and FedEx DAYR Senior Manager 19 were also made aware of the concerns reported by FedEx Employee 30 on August 14, 2013—that neither FedEx nor its customers were ensuring that cargo met TSA security requirements.

477.   Yet, after raising this issue in response to the complaint from Company H, Employee 30 was placed on investigation suspension, on August 15, 2013.  The following day, on August 16, 2013, without explanation, Employee 30 was asked to return to work.  According to FedEx Manager 10, FedEx DAYR Senior Manager 19 and Human Resources directed that Employee 30 be brought back to work immediately.

478.   A similar incident occurred on November 20, 2014, after FedEx Employee 30 informed another regular customer—a drive technology firm (Company F) in Troy, Ohio that it was not turning over secure cargo to FedEx, as required by TSA.  In response, DAYR Senior Manager 19 threatened to fire FedEx

Employee 30 and he received OLCC counseling. (FedEx uses a counseling system known to employees as Online Compliment and Counseling, or OLCC, as a way to document a conversation between employees and managers).

479. Numerous FedEx managers were put on notice about the concerns about unsecure cargo raised by Employee 30, including DAYR Senior Manager 19, FedEx Employee 21, FedEx Manager 22, FedEx Manager 8, and Sales Executive for Business Development 2. During these discussions, the following admissions of FedEx managers or executives were made:

480. "[FedEx Manager 8] said we can still accept freight without TSA banding as long as we band it."

481. "[FedEx Manager 8] said at the end of the day we are just going to do all the TSA banding at the ramp."

482. FedEx DAYR Senior Manager 19 continued, "It's kind of like 2 different things there. They [FedEx] don't want to confuse the customer. So, TSA banding is our responsibility not the customers"

483. Despite these repeated acknowledgements from FedEx management that it was FedEx's responsibility to ensure that cargo was properly secure before transport, in accordance with TSA requirements, FedEx did not properly screen, inspect or secure the cargo, in violation of 49 C.F.R. § 1540, et seq.

143

### 4. Unsecure Cargo Carrying Radioactive Materials

484. FedEx accepted for transport radioactive materials, known as "radioactive yellow III," in a manner that was not compliant with federal regulations, putting its drivers and other at serious risk of harm.

485. The U.S. Department of Transportation ("DOT") and the U.S. Nuclear Regulatory Commission ("NRC") memorandum of understanding governs the transport of radioactive materials and was codified at 49 C.F.R. § 171, *et seq*. and 10 C.F.R. § 71, *et seq*. USPS issued additional regulatory guidance that complements DOT and NRC provisions.

486. Those regulations define maximum radiation limits for the collective transportation of radioactive cargo in a non-exclusive carrier or transport vehicle such as FedEx Express trucks and all cargo aircraft. 49 C.F.R. § 173.421, *et seq*.

487. The regulations further require the use of "Dangerous Goods Shipper's Declaration or Dangerous Goods Declaration," detailing the amount and type of radioactive contents and the placarding of transport vehicles to reflect that the vehicle is carrying radioactive or hazardous materials. 49 C.F.R. § 172.200, *et seq*., 49 C.F.R. § 172.300, *et seq*., 49 C.F.R. § 172.400, *et seq*.

488. FedEx accepted large quantities of radioactive and hazardous materials in excess of the DOT and NRC regulatory limits for transport in single vehicles that were unfit to transport such dangerous materials.

144

**5.      Failure to Report Required Cargo Data Before Flight Onboarding**

489.   Under the mandatory Advance Cargo Air Screening (ACAS) Program, all United States-bound aircraft carrying commercial cargo (like FedEx) are required to transmit specified advance cargo data for air cargo transported onboard U.S.-bound aircraft before loading cargo onto the aircraft.  83 Fed. Reg. at 27385; 19 C.F.R. § 122.48b.  The specified cargo data elements for inbound air cargo that a U.S.-bound air carrier such as FedEx must present to CBP and TSA are set forth explicitly in federal regulations:

- o      Airport of arrival

- o      Airport of origin

- o      Scheduled date of arrival

- o      Total quantity based on the smallest external packing unit

- o      Total weight

- o      Precise description of the cargo

- o      Shipper name and address

- o      Consignee name and address

19 C.F.R. § 122.48a(d)(1).

490.   On information and belief, FedEx has violated its disclosure and reporting obligations mandated by the June 2018 requirements of the Air Cargo

145

Advance Screening (ACAS) regulations. 83 Fed. Reg. 27380 (June 12, 2018), 19 C.F.R. § 122.48b.

### C. Truck Seal and Lock Violations

491. Aircraft operators are required to "verify that the chain of custody measures for the screened cargo are intact prior to loading such cargo on aircraft," 49 C.F.R. § 1544.205(g)(4), through its security program. 49 C.F.R. § 1544.205(c).

492. Further, since at least 2009, TSA has required that cargo be transported in "locked, sealed or monitored trucks to the airlines for air shipment." 49 C.F.R. §§ 1544.205(g)(4), 1544.205(c). Those locked or sealed trucks transporting cargo are also referenced as "cargo holds."

493. A truck lock is distinct from a seal, and typically requires a key to open. Typically, locks are used on trucks traveling on daily pick-up and delivery routes (PUD routes).

494. A seal is another tool used in supply chain security programs for a shipping container. An indicative seal demonstrates if the cargo hold that was sealed has been tampered with. It can easily be broken since its function is to demonstrate entry, not deter it. A barrier seal both provides evidence of tampering and can deter theft or tampering because it is harder to remove.

495. A monitored truck is one where an individual has "eyes on" at all times as the measure of security.

496. TSA expected that cargo would be transported by truck or trailer or stored on a ramp "prior to loading such cargo on aircraft" and that the cargo would remain securely intact at each juncture during the chain of custody, i.e., whether by truck, trailer, ramp, hub, or air carrier. 49 C.F.R. § 1544.205(g)(4).

497. On or about May 2011, beginning at the time of the cargo screening and securing requirements, FedEx management acknowledged TSA's requirement: "[p]lease make sure if you are running a shuttle or long-haul route that you have a seal on your trailer . . . This is a TSA requirement which we are starting immediately."

498. To ensure that screened cargo remain intact during the chain of custody, FedEx continued to acknowledge that "all trailers transporting air cargo must be sealed or locked," as shown by an internal FedEx alert in November 2014.

499. Yet, despite its knowledge of the TSA requirement that cargo be transported securely in locked, sealed or monitored trucks, FedEx routinely ignored the requirement and covered up its non-compliance during TSA inspections. FedEx has consistently failed to purchase, maintain, and replace the necessary secure locks. As a result, unsecure cargo has been left vulnerable and accessible to passersby—including individuals who did not have SIDA clearance.

FedEx's numerous security violations (i.e., allowing individuals unauthorized access and failing to secure cargo or trucks) have compounded and heightened the risk to national security from this additional violation.

500.   FedEx written policies deceptively appeared compliant with TSA requirements.  For example, in September 18, 2017, FedEx employees who operate FedEx Express vehicles were asked to read the below memo and certify compliance with the requirements:

> Our top priority at FedEx Express is the safety and security of employees, our vehicles, and customers' shipments.
>
> Everyone must always adhere to Vehicle and Package Security Requirements.
>
> We cannot leave vehicles unlocked/unattended.
>
> We cannot leave customer shipments unattended.
>
> Employee Safety and Security is the #1 priority.  The potential theft of a FedEx asset may pose a threat to the health and well-being of FedEx employees and the general public.
>
> Before taking possession of a FedEx vehicle and upon returning the vehicle at the end of the work day, drivers must complete proper Pre-Trip and Post-Trip Inspections of equipment to ensure that all locking and latching mechanisms are functioning properly.
>
> If an employee discovers a malfunctioning lock or latch on a vehicle door, immediately notify a member of management.

> Our customers trust us to safeguard their shipments while in our possession. Any time cargo is being transported, it must be in a locked and/or sealed conveyance to protect customer shipments against loss or tampering.
>
> At all times, vehicles must be completely secured when unattended. This includes removing keys from the ignition and vehicle during pickup and delivery, meal breaks and potential non-operation events, such as vehicle breakdown, ensuring customer freight or other valuables are not in plain view, securing all windows and locking all vehicle doors.

501. However, as with other federal requirements relating to authorized access and securing cargo, FedEx management did not enforce TSA's truck seal and lock requirements except during a TSA inspection.

502. For example, knowing that a TSA inspection was about to occur on or around July 17, 2013, FedEx Manager 10 warned staff: "Please ensure you have either a lock or seal when backing up to docks Thursday PM. TSA will be monitoring our procedures tomorrow. If you do not have a seal or a lock it will not be a good thing."

503. On or around December 5, 2013, after advance notice by TSA Agent 6 of a truck seal and lock inspection, FedEx Manager 10 warned FedEx DAYR staff, "He's [TSA Agent] going to watch the trucks back up and make sure they have seals the next 2 days."

504. On or about July 25, 2017, during another TSA inspection, a TSA Agent instructed FedEx Employee 16 to track and record the truck seals as they

149

returned to DAYR (a SIDA secure area) to provide accountability and to detect whether there were any seal breaches.  FedEx Truck Control Agent (TCA) 1 separately remarked (while laughing) to Employee 30 that only one of 8 drivers on the pick-up and delivery routes (PUD) properly seal their trucks.  (A FedEx Truck Control Agent tracks inbound and outbound truck routes, coordinates vehicle movement, and coordinates the flow of vehicle information for managers and employees to plan offload, onload and departure.)

505.    FedEx TCA 1 further pointed out that the TSA Agent wanted FedEx to verify that each truck seal was accounted for and securely locked away.  In fact, according to TCA 1, the truck seals were not properly secured and instead were piled in a big box underneath a desk, accessible to any passerby (including individuals without SIDA clearance).

506.    Further, according to FedEx Manager 7, TSA required that "all freight has to be sealed…another pain in the ass the government is putting on us." Manager 7 further acknowledged that, to protect the cargo from tampering, TSA required that there be "eyes on the freight" (i.e., monitored) during the period when cargo is transported from DAYA (a FedEx station at DAY) to DAYR (a SIDA secure area), which is a short distance from DAYA.  In response to the TSA Agent's inquiry, Manager 7 assured the TSA Agent that "for the most part," FedEx is monitoring the freight, as required.  However, this was a false statement, as

150

FedEx routinely failed to monitor cargo during periods of transport from DAYA to DAYR when cargo holds – the cans in which cargo is transported – are not sealed.

507. Despite ever-increasing security risks and terrorism threats, FedEx has continued to act in reckless disregard of truck seal and lock requirements, except to the extent that TSA is breathing down its back. When TSA is not looking over FedEx's shoulder, it immediately reverts to non-compliance with TSA requirements and its contractual obligations.

508. In January 2018 (perhaps in response to some security alert), DAYR managers asked FedEx employees for the first time in as many as 6 years if they had working locks for their truck and trailer doors and the response was an overwhelming "no." According to FedEx Ramp Transport Driver 17: "this is [only] the second time we've done it [ordered the required locks and keys for ALL FedEx truck cargo holds] in probably six years."

509. In response to the use of FedEx in Austin, Texas by a serial bomber, in March 2018, TSA had increased its vigilance overseeing FedEx's compliance with TSA security requirements, according to FedEx Manager 32. On May 3, 2018, FedEx Employee 30 attended a meeting with Manager 32 during which vehicle security was discussed. Manager 32 warned FedEx employees that TSA was conducting spot checks of its compliance with truck seal and lock requirements: "the TSA is putting packages into unlocked vehicles to see how far

151

they go through the FedEx system.  The TSA wants to know if the packages [on unlocked trucks] will get back to the airport."  He further stated that "the TSA is leaving packages on the belt loaders to see what FedEx does . . . will the package go on the plane."  FedEx had to provide this instruction because prior to this anticipated TSA inspection, FedEx had not been compliant with these requirements.

510.  Again, in November 2018, FedEx Managing Director of Aviation Security 24 circulated a memo to all FedEx Express U.S. Management acknowledging the significance of TSA requirements:

- o Security and safety are the collective responsibility of all FedEx team members.  As we approach the Thanksgiving holiday on November 22, 2018, it is important that we maintain heightened vigilance with respect to security surrounding all of our operations.

                              ***

- o In the coming days, we ask that you instruct your teams to review all security policies and procedures, as well as the TSA security directives that are in effect with special focus and attention on the following:

- o Emphasize adherence to on-road vehicle security protocols to include the locking of all doors on unattended vehicles containing packages

- o Review truck and trailer security measures with appropriate team members

- o Account for all FedEx vehicles on a daily basis

- o Secure all freight that remains in stations and ramps

152

511.    However, despite TSA's increased vigilance and FedEx's knowledge that compliance with truck seal and lock requirements are important measures to guard against the risk of terrorism, FedEx trucks transporting cargo for air carriers continue to be routinely unsealed, unlocked and accessible by passersby, including individuals who roam unescorted without SIDA clearance (or a SIDA badge).

512.    As recently as January 7, 2019, FedEx Manager 32 admitted that "[r]ight now, we are not fully in compliance [with the security of truck keys]. We haven't been fully in compliance with what we need to do." FedEx has to become compliant "only because the TSA is tightening our wrench on that area. We need to make sure everything is secure. It's not FedEx, it's the TSA, it's TSA driven."

513.    As recently as 2019, there are at least 2 areas (below) in which FedEx has failed to ensure the safety and security of its truck keys, heightening the security risk to FedEx trucks. These same FedEx trucks transport cargo to ramps and hubs where the cargo is then loaded onto planes and passenger flights and are vulnerable to sabotage. Further, these violations of TSA requirements are inconsistent with FedEx representations in its TSA certified FACAOSSP.

514.    First, FedEx stores its truck keys at DAYR (a SIDA secure area) in a key keeper system with little to no oversight. Duplicate keys can be found in a "lockbox" that is kept unlocked and unsupervised. FedEx Manager 32 recognizes

153

that allowing unsecured access to FedEx truck keys that transport cargo constitutes a "major security policy violation."

515. Second, FedEx is aware that its drivers (without approval) create and keep duplicate sets of truck keys for which they are not accountable to FedEx or anyone.

### 1. Examples of Truck Seal and Lock Violations

516. The following are examples where FedEx has failed to safeguard the chain of custody for cargo prior to its loading on aircraft—by transport in "locked, sealed or monitored trucks to the airlines for air shipment," in violation of 49 C.F.R. § 1544.205(c).

517. FedEx trailers and trucks that routinely back up to DAYR (a SIDA secure area) to load and unload cargo have no visible seal or lock to secure the vehicle and are not monitored. These failures occur routinely and in plain sight of FedEx managers.

o **Truck Seal and Lock Violation Example**

518. On October 21, 2014, FedEx Manager 21 was able to kick open an unsealed and unlocked trailer door of a FedEx truck full of cargo after it backed up to DAYR (a SIDA secure area)—transporting cargo from a car manufacturing plant in Ohio (Company G) that itself was only secured by tape. When the FedEx truck arrived at DAYR, the truck had not been secure on its route at all. The

manager at DAYR did not take any corrective action.  While in transit, the truck was easily accessible to a passerby.  FedEx did not properly ensure that the cargo was secure during the chain of custody or transported in a locked, sealed or monitored truck, in violation of 49 C.F.R. § 1544.205(c).

o      **Truck Seal and Lock Violation Example**

519.   Again, on May 5, 2015, FedEx Manager 21 watched an unsealed and unlocked FedEx trailer full of cargo back up to DAYR (a SIDA secure area). When the trailer arrived at DAYR, the trailer had not been secure during its route at all. The manager did not take any corrective action.  The unsealed and unlocked trailer full of cargo then was transported to its next destinations on flights.  During all times, the trailer full of cargo was accessible to any passersby, including any unauthorized individuals who were unescorted without SIDA clearance.  FedEx did not properly ensure that the cargo was secure during the chain of custody or transported in a locked, sealed or monitored truck, in violation of 49 C.F.R. § 1544.205(c).

o      **Truck Seal and Lock Violation Example**

520.   On July 15, 2015, FedEx Manager 21 drove an unsealed and unlocked 28-foot FedEx tractor trailer full of freight from an automotive manufacturing plant in Ohio (Company G) to DAYR (a SIDA secure area). When the trailer arrived at

DAYR, the trailer had not been secure for its route at all.  While in transit, the trailer was easily accessible to a passerby.

521.    FedEx did not properly ensure that the cargo on the trailer was secure during the chain of custody or transported in a locked, sealed or monitored truck, in violation of 49 C.F.R. § 1544.205(c).

    o    **Truck Seal and Lock Violation Example**

522.    On December 1, 2017, another FedEx Manager 22 drove an unsealed and unlocked FedEx trailer full of cargo from an automotive manufacturing plant in Ohio (Company G) to DAYR (a SIDA secure area).  The unsealed and unlocked trailer full of cargo then sat overnight (unmonitored) at  DAYR until the cargo was transported to the Indianapolis ramp the next morning to its next destinations on flights.  During all times, the trailer full of cargo was accessible to any passersby, including any unauthorized individuals who were unescorted without SIDA clearance.  FedEx did not properly ensure that the cargo was secure during the chain of custody or transported in a locked, sealed or monitored truck, in violation of 49 C.F.R. § 1544.205(c).

    o    **Truck Seal and Lock Continuing Violation Example**

523.    For the past several years, every Friday, cargo is loaded onto a FedEx trailer, which sits unsealed, unlocked and unmonitored until 9:00 a.m. on Saturday morning, when the cargo is next transported to the FedEx Indianapolis hub to its

destination on flights.  During this time, the trailer is accessible to any passersby, including unauthorized individuals who are unescorted at DAYR (a SIDA secure area) without SIDA clearance.  Further, there are times when the trailer is susceptible to being latched to a truck and driven off-site by any passerby because it is not properly secured (i.e., no tractor staged in front nor secured with a kingpin lock to prevent unauthorized hookups).  There have also been instances when a trailer full of freight from the FedEx Indianapolis hub has sat overnight at DAYR (a SIDA secure area) on a Saturday evening unsecured and unmonitored while FedEx management acknowledged the security violation but failed to correct it.  FedEx does not properly ensure that the cargo is secure during the chain of custody or transported in a locked, sealed or monitored truck, in violation of 49 C.F.R. § 1544.205(c).

524.   Since at least 2012, these same violations have occurred in at least a thousand instances and involve trucks and trailers that transport cargo along daily pick-up and delivery routes, and to/from DAYR and Indianapolis—FedEx's second largest hub—and are examples of a more systemic problem of national security violations that put the nation's cargo transport system at high security risk.

**D.   Fraudulent Use of Security Delay Codes**

525.   In the aftermath of the September 11, 2001 terrorist attacks, Government buildings increased security measures, including the measures related

to the acceptance of packages and cargo from commercial air cargo carriers like FedEx. Due to increased security, the timely delivery of packages and cargo by commercial carriers like FedEx became more challenging. As a result, FedEx began to use a "Security Delay Exception Code" to reflect instances when FedEx was unable to timely deliver cargo to Government recipients due to increased security measures at particular buildings, i.e., exempting FedEx from timely delivery contractual requirements. Nearly 18 years later, FedEx is fraudulently using the "Security Delay Exception Code" to make untimely deliveries to Government recipients while failing to properly refund monies back to the agencies under the "FedEx Money Back Guarantee."

526. Nearly 18 years after "9/11", heightened security processes have subsided or become routine procedures for entering government locations. Yet, FedEx continues to use the "Security Delay Exception Code" in order to excuse its own failures to deliver packages by the specified commitment time and to avoid the obligation to reimburse government customers under the "FedEx Money Back Guarantee."

527. For example, FedEx managers have instructed FedEx route drivers to use the "Security Delay Exception Code" for shipments to military bases like Wright Patterson Air Force Base, so that FedEx drivers can deliver shipments past

the commitment time without FedEx having to pay the "FedEx Money Back Guarantee."

528.   Government customers that have paid for timely FedEx deliveries are not receiving refunds under the "FedEx Money Back Guarantee" policy when FedEx exempts late deliveries by use of a "Security Delay Exception Code."

529.   FedEx's misuse of the "Security Delay Exception Code" has affected at least hundreds of Government shipments.

530.   Further, FedEx has actual knowledge that its improper use of the "Security Delay Exception Code" is material to the Government's decision to pay claims.  On May 3, 2011, FedEx agreed to pay the United States $8 million to settle False Claims Act allegations relating to this same conduct.  Yet, its fraudulent scheme persists.

**E.     Reports by FedEx Employees Corroborate Relator's Allegations**

531.    Reports by current and former FedEx employees corroborate Relator's allegations since at least 2008.

532.   Current and former employees of FedEx—managers, aircraft mechanics, operations handlers at airport ramps, package and material handlers, engineers, and drivers —in FedEx's corporate offices, regional offices and ramps across the country —have corroborated Relator's allegations since as early as 2008:

- Company doesn't really train people, they just throw you in and hope for the best.  (Package Handler in Lewisberry, PA - May 2018)

- Wasn't really trained, management always was on the intercom rushing us. Everything is based on numbers.  (Dock Worker - May 2018)

- They don't care to train. And they will take full advantage of you. I did great on my first day, so they decided to give me 9 trucks to fill while others had 2-3 trucks to fill. And would send everyone home while you're still backed up on packages while the drivers stare at you.  (May 2018)

- Quit pushing so much for speed and push a little more for quality.  (Part Time Package Handler in Colfax, NC - May 2018)

- Enforce the rules. Some employees get away with murder. (Current Material Handler - January 2018)

- Huge physical work load. Staffing is all over the place. Sometimes not enough people on shift. Constantly feel overloaded by work due to company piling on more freight, packages, and trucks than the location and staff can handle. . . . The less you know how to do, the easier your job is, you have less responsibility, and it doesn't seem to negatively affect your pay either. Assuming more responsibility within your job role does not increase your pay or raises, it's the other way around, if you take on more duties and responsibilities and mess up, it affects your review and pay. Employees

160

reluctant on taking initiative so they don't make mistakes and get in trouble. Shifts are constantly chaotic and stressful. (Ramp in Calgary, AB (Canada) - July 2017)

- FedEx is not always safe and the employees (management included) do not practice safe work methods.  Be a role model. Safety and regulations start at the top. (Airport Ramp Operations Material Handler in Denver, CO - May 2017)

- NOBODY FOLLOWED POLICY!!!! (stepped on boxes, sorted incorrectly, drug use, etc.)  Quit. For your own sakes get out of there. That also goes for the employees. It is absolutely unacceptable that a corporation would allow a facility to get to such a point. I am incredibly disappointed in how my experience at FedEx went. Especially because they have such a good reputation. I can only assume that this is a problem facility, but FedEx as a corporation should be ashamed.  (Package Handler in Henderson, CO - January 2017)

- I have been told to do some extremely shady things to save managements butt, but it will and always does bite you back.  (Courier in Alexandria, VA - January 2017)

- HR department only functions to cover up all the horrible things management does each night-Company is at EXTREME risk of litigation

161

because of all the corruption-Corporate does not care about any of these things because they are too focused on mergers and acquisitions (Part Time Package Handler in Indianapolis, IN - September 2016)

- Management is more about numbers that engineering gives them than their employees. They can be non-responsive at times. DG can't be done in enough time because the manager wants the trucks to pull out earlier. Stop being overly reliant on numbers. Give DG Specialists more time to do their job.  (Dangerous Goods Specialist in Romulus, MI - September 2016)

- They do not care about quality- only quantity- which is why Customs is constantly threatening to return to paper submission for FDA shipments and a lot of extra paperwork is now needed for USGR. In fact, if Customs looked into shipments more they would see that customers are constantly providing tariffs with lower duty to save money. Accuracy is not a factor at all here. (Senior Express Clearance Operations Import Coordinator - May 2016)

- This is a company that talks about safety all the time, but really just expects you to do whatever it takes to get the job done.  Quality over quantity. Don't make me choose between loading boxes carefully and getting my package per hour rate up to your standards. It's very difficult to do both perfectly. (Package Handler - April 2016)

162

- Management and trainers are very focused on numbers and productivity and not so focused on their people. "Get those package-per-hour rates up" and "don't waste company time," are the only messages I receive.  (Package Handler - April 2016)

- Sometimes, it seems they value quantity far more than quality. When we load trailers, we sometimes get overloaded and you can easily get written up for not meeting their goals for the day. Normally, hitting the goal is handling and scanning 1 box every 7 seconds. (Package Handler in Grove City, OH - January 2016)

- No structure...very unorganized and not informative of companies' policies and procedures verbally.  (DOT Driver - December 2015)

- Poor management didn't care about employees, safety hazards everywhere, employee negligence on packages were overwhelming, and high employee turnover rates. (Package Handler in Memphis, TN - April 2015)

- No respect from management, you're just a rat in a cubicle, pushed to over work, favoritism, they will have you doing illegal activities, no respect for foreign shippers, disorganized, no recognition. (Senior ECO Import Agent in Newark, NJ - February 2015)

163

- They have cut costs to make the company more profitable but have cut back on a lot of training to do so (Ramp Agent in Fort Lauderdale, FL - September 2014)

- Packages of all shapes and sizes coming at you a million miles a minute, managers barking at you like a drill sergeant that you're not moving fast enough (Package Handler Part-time in Saint Paul, MN - July 2014)

- OK place to work. Has been going downhill since 9/11. The management and staff are spread very thin. The recent buyout has combined jobs or even left many uncovered so we are all responsible for doing more. (Industrial Engineer in New York, NY - October 2013)

- FedEx has a habit of understaffing to hit operational metrics but never shows its employees the truth about if their operation is making or losing money. (Operations Manager - June 2013)

- An environment where safety and honesty are punished. (Driver in Williston, VT - July 2012)

- Management is only concerned with quotas and rankings. I have never felt fully trained to do my various tasks at work, actually, all of my training has come AFTER being written up for doing a job wrong that I was untrained to do. (Material Package Handler in Albuquerque, NM - August 2010)

164

- This Co. has gone from being a place that once held strong to the PSP philosophy (people, service, profit), now it's all about the profit and keeping Wallstreet happy. Stop cutting manpower back to levels that are UNSAFE!!! (Senior Aircraft Mechanic in Memphis, TN - June 2008)

### F.     FedEx Knew that Compliance with TSA Requirements Was Material to the Government's Decision to Pay Claims Under the Contracts

533.   Defendants knew that compliance with TSA requirements was material to the Government's decision to pay claims under the contracts because these requirements went to the essence of the Government's bargain for which it was paying claims.

534.   FedEx contractually guaranteed and certified that they would adhere to national security requirements when transporting government cargo on trucks and planes—often to and from secure military facilities such as the Wright Patterson Air Force Base in Dayton, Ohio and Andrews Air Force Base in Prince George's County, Maryland.  Defendants knew that these promises and certifications went to the heart of the benefit of the bargain with the Government to ensure that cargo was properly screened, inspected and secured, that individuals with access to Government cargo had appropriate security clearances, and that trucks carrying cargo were secure and free from risk of tampering.  Instead, FedEx

165

knowingly ignored national security requirements, making the United States vulnerable to terrorist attacks.

535.   The allegations show that Defendants were well-aware of the statutory and regulatory requirements set forth in this Complaint and that FedEx knew that these violations of TSA requirements and its contractual obligations, were material to the Government's decision to pay claims under the contracts.

536.   The Government made clear the seriousness of compliance with TSA requirements at issue in this Complaint because it conducted regular TSA inspections to check for compliance with these same requirements.  Troublingly, FedEx hid its non-compliance from TSA during inspections.

537.   Further, the Government made clear the seriousness of compliance with TSA security requirements through its evaluation reports.  As recently as 2009, the TSA Inspector General issued a report of vulnerabilities in the enforcement of TSA requirements specific to air cargo.  Through its evaluation, TSA-IG published its concerns with the following violations.

538.   During the first three quarters of fiscal year 2008, TSA had conducted 6,767 cargo security inspections, of which 2,031 inspections, or 30 percent of all inspections, disclosed 2,640 air cargo security violations relating to the accessing, handling, or transporting of air cargo by air cargo employees or their representatives.  The violations were broken down as follows:

166

- o 254 violations related to access controls, including gaining unescorted access to air cargo at regulated facilities

- o 731 violations related to security threat assessments involving employees or authorized representatives who had not undergone the necessary background checks

- o 1,655 violations related to security training and testing requirements

539. Defendants' violations were material, leading to serious breaches of national security, and not merely technical or minor infractions of rules. Defendants' violations were made with actual knowledge of the seriousness of their violations.

540. Further, the Government could not have known of (or discovered) FedEx's systemic and ongoing violations of TSA requirements in the absence of a whistleblower with inside knowledge of the fraudulent practices alleged in this Complaint. The Government had no visibility into how FedEx was failing to comply with TSA requirements, particularly where FedEx thwarted TSA's efforts to uncover these areas of non-compliance.

541. In short, there is ample evidence to show that Defendants knew (and should have known) that their violations had the natural tendency to influence the government's decision to pay the claims under Federal and State contracts worth billions of dollars and that any reasonable person would attach importance to Defendants' choice of actions.

167

## VI.   UNLAWFUL RETALIATION

542.   Relator repeatedly and consistently informed management of concerns related directly to the allegations set forth in the Complaint.  Relator was troubled that Defendants were engaged in unlawful practices that posed ongoing national security risks.  Relator also feared job security and the legal propriety of Defendants' actions.

543.   Yet, Relator was reprimanded and retaliated against by Defendants when raising concerns related to, and objecting to, Defendants' fraudulent course of conduct alleged in this Complaint.

544.   Defendants retaliated against Relator because of lawful acts by Relator to stop one or more violations of the False Claim Act and lawful acts by Relator in furtherance of an action under 31 U.S.C. § 3730.

545.   For the reasons set forth in this Complaint, Relator is entitled to double the amount of back pay, interest on the back pay and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3730(h) and the various States' retaliation provisions alleged in this Complaint.

## VII.  COUNTS

### COUNT I

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(A)

546.   The allegations in the preceding paragraphs are incorporated by reference.

547.   Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

548.   The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the contractual claims.

549.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

550.   As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT II

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(B)

551.  The allegations in the preceding paragraphs are incorporated by reference.

552.  Defendants knowingly made, used, or caused to be made or used, a false record(s) or statement(s) material to a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(B).

553.  The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the contractual claims.

554.  Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

555.  As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT III

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(C)
### Conspiracy

556. The allegations in the preceding paragraphs are incorporated by reference.

557. Defendants knowingly conspired to commit a statutory violation under 31 U.S.C. § 3729 (a)(1)(C).

558. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed. Defendants' representations were material to the government's decision to pay the contractual claims.

559. Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

560. As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT IV

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(G)

561. The allegations in the preceding paragraphs are incorporated by reference.

562.    Defendants knowingly made, used, or caused to be made or used, a false record or statement materials to an obligation to pay or transmit money or property to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729 (a)(1)(G).

563.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the contractual claims.

564.    Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

565.    As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT V

### California False Claims Act,
### Cal. Gov't Code § 12650, et seq.

566.    The allegations in the preceding paragraphs are incorporated by reference.

567.    Relator also brings this action on behalf of the State of California, against Defendants under the California False Claims Act ("FCA"), Cal. Gov't Code § 12652(c).

568.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

569.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

570.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(3), which creates liability for any person who "conspires to commit a violation of this subdivision."

571.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(7), which creates liability for any

173

person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision."

572. Pursuant to the California FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Cal. Gov't Code § 12651(a).

573. As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT VI

### Delaware False Claims & Reporting Act,
### Del. Code Ann. Tit. 6 § 1201, et seq.

574. The allegations in the preceding paragraphs are incorporated by reference.

575. Relator also brings this action on behalf of the Government of the State of Delaware, against Defendants under the State of Delaware's False Claims and Reporting Act ("FCA"), Del. Code Ann. tit. 6, §§ 1201(a) and 1203(b)(1).

576. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA,

174

Del. Code Ann. tit. 6, §1201(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

577. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(2), which creates liability for any person who "[k]nowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

578. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(3), which creates liability for any person who "conspires to commit a violation of" certain provisions in this section.

579. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

580.  Pursuant to the Delaware FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Del. Code Ann. tit. 6, §1201(a).

581.  As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT VII

### District of Columbia False Claims Act,
### D.C. Code Ann. §§ 2.381.01, et seq.

582.  The allegations in the preceding paragraphs are incorporated by reference.

583.  Relator also brings this action in the name of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.03(b)(1).

584.  Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

585.  Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the

176

provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

586.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(6), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District."

587.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(7), which creates liability for any person who "conspires to commit a violation" of certain provisions of this subsection.

588.    Pursuant to the D.C. FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law.  Defendants are thus liable to the District for

177

statutorily defined damages sustained because of the acts of Defendants and civil penalties. D.C. Code Ann. § 2-381.02(a).

589.    As a result of Defendants' violations, the District has suffered damages in an amount to be determined at trial.

## COUNT VIII

### Florida False Claims Act,
### Fla. Stat. § 68.081, *et seq*.

590.    The allegations in the preceding paragraphs are incorporated by reference.

591.    Relator also brings this action on behalf of the State of Florida, against Defendants under the State of Florida's False Claims Act ("FCA"), Fla. Stat. Ann. §§ 68.082(2) and § 68.083(2).

592.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. Ann. § 68.082(2)(a), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

593.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. Ann. § 68.082(2)(b), creates liability for any person who "[k]nowingly

178

makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

594.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. Ann. § 68.082(2)(c), creates liability for any person who "conspires to commit a violation of this subsection."

595.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. Ann. § 68.082(2)(g), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

596.    Pursuant to the Florida FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Fla. Stat. Ann. § 68.082(2).

597.    As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT IX

### Hawaii False Claims Act,
### Haw. Rev. Stat. §§ 661-21, *et seq*.

598.    The allegations in the preceding paragraphs are incorporated by reference.

599.    Relator also brings this action on behalf of the State of Hawaii and its political subdivisions, against Defendants under the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21(a) and 661-25(a).

600.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(l), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

601.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

602.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(6), which creates

180

liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

603. Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(8), which creates liability for any person "conspires to commit any of the conduct described in this subsection."

604. Pursuant to the Hawaii FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Haw. Rev. Stat. § 661-21(a).

605. As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT X

### Illinois False Claims Act,
### 740 Ill. Comp. Stat. 175/1, *et seq*.

606. The allegations in the preceding paragraphs are incorporated by reference.

181

607. Relator also brings this action on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act ("FCA"), 740 Ill. Comp. Stat. §§ 175/3(a) and 175/4(b).

608. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(A), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

609. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(B), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

610. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(C), which creates liability for any person who "conspires to commit a violation" of certain subparagraphs in this section.

611. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(G), which creates liability for any person

who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

612.   Pursuant to the Illinois FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. 740 Ill. Comp. Stat. 175/3(a).

613.   As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XI

### Indiana False Claims and Whistleblower Protection Act
### Ind. Code Ann.  § 5-11-5.5-1, *et seq.*

614.   The allegations in the preceding paragraphs are incorporated by reference.

615.   Relator also brings this action on behalf of the State of Indiana, against Defendants under the State of Indiana False Claims and Whistleblower Protection Act ("FCA"), Ind. Code Ann.  §§ 5-11-5.5-2(b) and 5-11-5.5-4(a).

616.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind.

183

Code § 5-11-5.5-2(b)(l), creates liability for any person who "knowingly or intentionally presents a false claim to the state for payment or approval."

617. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.5-2(b)(2), creates liability for any person who "knowingly or intentionally makes or uses a false record or statement to obtain payment or approval of a false claim from the state."

618. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.5-2(b)(6), which creates liability for any person who "knowingly or intentionally made or used a false record or statement to avoid an obligation to pay or transmit property to the State of Indiana."

619. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.5-2(b)(7), which creates liability for any person who "conspires with another person to perform an act described" in certain subdivisions.

620. Pursuant to the Indiana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ind. Code §§ 5-11-5.5-2(b) and 5-11-5.5-4(a).

184

621.   As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XII

### Iowa False Claims Act,
### Iowa Code Ann. § 685, *et seq.*

622.   The allegations in the preceding paragraphs are incorporated by reference.

623.   Relator also brings this action on behalf of the State of Iowa, against Defendants under the State of Iowa False Claims Act ("FCA"), Iowa Code Ann. §§ 685.2(1), 685.3(2)a.

624.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code Ann. § 685.2(1)(a), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

625.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code Ann. § 685.2(1)(b), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

185

626. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code Ann. § 685.2(1)(c), which creates liability for any person who "conspires to commit a violation of" certain paragraphs in this section.

627. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code Ann. § 685.2(1)(g), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

628. Pursuant to the Iowa FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Iowa Code Ann. §§ 685.2(1), 685.3(2)a.

629. As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XIII

### Maryland False Claims Act
### MD Code Ann., Gen. Prov. §§ 8-101 - 8-111

630.    The allegations in the preceding paragraphs are incorporated by reference.

631.    Relator also brings this action on behalf of the State of Maryland, against Defendants under the State of Maryland False Claims Act (FCA), MD Code Ann., Gen. Prov. §§ 8-102 and 8-104.

632.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, MD Code Ann., Gen. Prov. §§ 8-102(b)(1), which states that a person may not "[k]nowingly present or cause to be presented a false or fraudulent claim for payment or approval."

633.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, MD Code Ann., Gen. Prov. §§ 8-102(b)(2), which states that a person may not "[k]nowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim."

634.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA,

187

MD Code Ann., Gen. Prov. §§ 8-102(b)(3), which states that a person may not "conspire to commit a violation under this title."

635.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, MD Code Ann., Gen. Prov. §§ 8-102(b)(7), which states that a person may not "[k]nowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to a governmental entity."

636.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, MD Code Ann., Gen. Prov. §§ 8-102(b)(8), which states that a person may not "knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to a governmental entity."

637.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, MD Code Ann., Gen. Prov. §§ 8-102(b)(9), which states that a person may not "knowingly make any other false or fraudulent claim against a governmental entity."

638.   Pursuant to the Maryland FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are

188

liable to the State for treble damages, civil penalties, and all other relief authorized by law. MD Code Ann., Gen. Prov. §§ 8-102 and 8-104.

639. As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XIV

### The Commonwealth of Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5A-5O

640. The allegations in the preceding paragraphs are incorporated by reference.

641. Relator also brings this action on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act ("FCA"), Mass. Ann. Laws ch. 12, §§ 5B and 5C(2).

642. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(1), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

643. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(2), creates liability for any person who

"knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

644. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(3), creates liability for any person who "conspires to commit a violation of this subsection."

645. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(9), which creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof."

646. Pursuant to the Massachusetts FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mass. Ann. Laws ch. 12, § 5B.

647. As a result of Defendants' violations, the Commonwealth has suffered damages in an amount to be determined at trial.

## COUNT XV

### Minnesota False Claims Act,
### Minn. Stat. §§ 15C.01, et seq.

648. The allegations in the preceding paragraphs are incorporated by reference.

649. Relator also brings this action on behalf of the State of Minnesota and its political subdivisions, against Defendants under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

650. Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated each of the following provisions of the Minnesota FCA, Minn. Stat. § 15C.02(a), which create liability for any person who:

"(1) knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

191

(3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim; [or]

…

(7)    knowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or a political subdivision."

651.    Pursuant to the Minnesota FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Minn. Stat. § 15C.01 et seq.

652.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

**COUNT XVI**

**Montana False Claims Act,**
**Mont. Code Ann. § 17-8-401, et seq.**

653.    The allegations in the preceding paragraphs are incorporated by reference.

192

654.   Relator also brings this action on behalf of the State of Montana, against Defendants under the State of Montana False Claims Act ("FCA"), Mont. Code Ann. § 17-8-406(1).

655.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Montana FCA, Mont. Code Ann. § 17-8-403(1), which creates liability for any person who:

> "(a)   knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

> (b)   knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

> (c)   conspires to commit a violation of this subsection (1);

> [or]

>  …

> (g)   knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity."

193

656.   Pursuant to the Montana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mont. Code Ann. § 17-8-403(2).

657.   As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XVII

### Nevada False Claims Act,
### Nev. Rev. Stat. § 357.010, et seq.

658.   The allegations in the preceding paragraphs are incorporated by reference.

659.   Relator also brings this action on behalf of the State of Nevada, against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act ("FCA"), Nev. Rev. Stat. § 357.080(1).

660.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Nevada FCA, Nev. Rev. Stat. § 357.040(l), which create liability for any person who:

> "(a)   Knowingly presents or causes to be presented a false or
>
> fraudulent claim for payment or approval.

(b)     Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.

…

(f)     Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision;

(g)     Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision; or

…

(i)     Conspires to commit any of the acts set forth in this subsection.

661.   Pursuant to the Nevada FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Nev. Rev. Stat. § 357.040(2).

662.   As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XVIII

### New Jersey False Claims Act,
### N.J. Stat. Ann. § 2A:32C-1, et seq.

663. The allegations in the preceding paragraphs are incorporated by reference.

664. Relator also brings this action in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey False Claims Act ("FCA"), N.J. Stat. Ann. § 2A:32C-5.b.

665. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3, which creates liability for any person who:

"a.      Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b.      Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

c.      Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

196

…

g.    Knowingly makes, uses, or causes to be made or used a

false record or statement to conceal, avoid, or decrease an

obligation to pay or transmit money or property to the State."

666.    Pursuant to the New Jersey FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.J. Stat. Ann. § 2A:32C-3.

667.    As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XIX

### New Mexico Fraud Against Taxpayers Act, N.M.S.A. § 44-9-1, et seq.

668.    The allegations in the preceding paragraphs are incorporated by reference.

669.    Relator also brings this action on behalf of the State of New Mexico, against Defendants under the New Mexico Fraud Against Taxpayers Act, N.M. N.M.S.A. §§ 44-9-3(C) and 44-9-5(A).

670.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the

197

New Mexico Fraud Against Taxpayers Act, which create liability for any persons who:

> (1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision or to a contractor, grantee or other recipient of state or political subdivision funds a false or fraudulent claim for payment or approval;

> (2) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

> (3) conspire to defraud the state or a political subdivision by obtaining approval or payment on a false or fraudulent claim;

> (4) conspire to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision;

> …

> (8) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision; or

198

(9) as a beneficiary of an inadvertent submission of a false claim and having subsequently discovered the falsity of the claim, fail to disclose the false claim to the state or political subdivision within a reasonable time after discovery.

671.    Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

672.    As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XX

### New York False Claims Act,
### N.Y. State Fin. Law §§ 187, et seq.

673.    The allegations in the preceding paragraphs are incorporated by reference.

674.    Relator also brings this action on behalf of the State of New York, against Defendants under the State of New York False Claims Act, N.Y. State Fin. Law § 190(2).

675.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated each of the following provisions of the New York FCA, N.Y. State Fin. Law § 189(1), which create liability for any person who:

199

"(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) conspires to commit a violation of paragraph (a), (b),  (d),  (e), (f) or (g) of this subdivision; or

…

(g)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government."

676.   Pursuant to the New York FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State or a local government, as applicable, for treble damages, civil penalties, including consequential damages, which the state or local government sustains because of the act of the person, and all other relief authorized by law. N.Y. State Fin. Law § 189(1).

677.   As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XXI

### North Carolina False Claims Act,
### N.C. Gen. Stat. § 1-605, et seq.

678. The allegations in the preceding paragraphs are incorporated by reference.

679. Relator also brings this action on behalf of the State of North Carolina, against Defendants under the State of North Carolina False Claims Act ("FCA"), N.C. Gen. Stat. § 1-608(b).

680. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the North Carolina FCA, N.C. Gen. Stat. § 1-607(a), which creates liability for any person who:

"(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

…

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or

201

transmit money or property to the State, or knowingly conceals

or knowingly and improperly avoids or decreases an obligation

to pay or transmit money or property to the State."

681. Pursuant to the North Carolina FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.C. Gen. Stat. § 1-607(a).

682. As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XXII

### Rhode Island False Claims Act,
### R.I. Gen. Laws § 9-1.1-1, et seq.

683. The allegations in the preceding paragraphs are incorporated by reference.

684. Relator also brings this action in the name of the State of Rhode Island, against Defendants pursuant to the State of Rhode Island False Claims Act ("FCA"), R.I. Gen. Laws § 9-1.1-4(b).

685. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the

Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a), which creates liability for any person who:

"(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of subdivisions 9-1.1-3(1), (2), (3), (4), (5), (6) or (7); [or]

…

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state…."

686. Pursuant to the Rhode Island FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. R.I. Gen. Laws § 9-1.1-3(a).

687. As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XXIII

### Tennessee False Claims Act,
### TN Code § 4-18-101 (2015), et seq.

688.   The allegations in the preceding paragraphs are incorporated by reference.

689.   Relator also brings this action in the name of the State of Tennessee, against Defendants under the Tennessee False Claims Act ("FCA"), TN Code § 4-18-104(c)(1).

690.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Tennessee FCA, TN Code § 4-18-103(a), which create liability for any person who:

(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

…

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

(8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim; or

(9) Knowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision.

691.   Pursuant to the Tennessee FCA, based on Defendants' material non-

205

disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State or the political subdivision for treble damages, civil penalties, and all other relief authorized by law. TN Code § 4-18-103(a).

692.  As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XXIV

### Vermont False Claims Act,
### 32 V.S.A. § 630-632, et seq.

693.  The allegations in the preceding paragraphs are incorporated by reference.

694.  Relator also brings this action in the name of the State of Vermont, against Defendants under the State of Vermont False Claims Act ("FCA"), 32 V.S.A. § 632(b).

695.  Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Vermont FCA, 32 V.S.A. § 631, which states that no person shall:

"(1)  knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

(2)  knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

206

…

(8)    enter into a written agreement or contract with an official of the State or its agent knowing the information contained therein is false;

(9)    knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State; [or]

(10)  knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

696.    Pursuant to the Vermont FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. 32 V.S.A. § 631(b).

697.    As a result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

## COUNT XXV

### The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, et seq.

698.    The allegations in the preceding paragraphs are incorporated by reference.

207

699.   Relator also brings this action on behalf of the Commonwealth of Virginia, against Defendants under the Virginia Fraud Against Taxpayers Act ("FCA"), Va. Code Ann. § 8.01-216.5(A).

700.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Virginia FCA, Va. Code Ann. § 8.01-216.3(A), which create liability for any person who:

> "1.    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> 2.    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> 3.    Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7;
>
> …
>
> 7.    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth."

701. Pursuant to the Virginia FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the Commonwealth for treble damages, civil penalties, and all other relief authorized by law. Va. Code Ann. § 8.01-216.3(A).

702. As a result of Defendants' violations, the Commonwealth has suffered damages in an amount to be determined at trial.

## COUNT XXVI

### Retaliation of Relator in Violation of False Claims Act
### 31 U.S.C. § 3730(h)

703. The allegations in the preceding paragraphs are incorporated by reference.

704. Relator engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729.

705. Because of Relator's lawful acts, Relator was subjected to retaliation by Defendants at FedEx.

706. Relator was unlawfully retaliated against by FedEx for engaging in protected activity, namely for raising, objecting to and refusing to participate in fraudulent conduct alleged in this Complaint.

707. Defendants' retaliation against Relator was a violation of 31 U.S.C. § 3730(h).

708. As a consequence of FedEx's violation of 31 U.S.C. § 3730(h), Relator suffered damages.

709. Relator is entitled to damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3729(h).

## COUNT XXVII

### Unlawful Retaliation Under California False Claims Act
### Cal. Gov. Code § 12650, et seq.

710. The allegations in the preceding paragraphs are incorporated by reference.

711. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

712. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendant's violations of Cal. Gov. Code § 12651, unlawfully retaliated against Relator.

713. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all relief allowable under Cal. Gov. Code § 12653.

210

## COUNT XXVIII

### Unlawful Retaliation Under Delaware False Claims & Reporting Act
### 6 Del. Code §§ 1201-1211

714. The allegations in the preceding paragraphs are incorporated by reference.

715. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

716. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of 6 Del. Code § 1201, unlawfully retaliated against Relator.

717. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under 6 Del. Code § 1208(a) and (b).

## COUNT XXIX

### Unlawful Retaliation Under Florida False Claims Act
### Fla. Stat. §§ 68.081-68.092

718. The allegations in the preceding paragraphs are incorporated by reference.

211

719. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

720. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action, unlawfully retaliated against Relator.

721. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under Fla. Stat. §§ 68.088 and 112.3187(9).

### COUNT XXX

**Unlawful Retaliation Under Hawaii False Claims Act**
**Haw. Rev. Stat. § 661-21, *et seq*.**

722. The allegations in the preceding paragraphs are incorporated by reference.

723. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

724. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of Haw. Rev. Stat. § 661-21, unlawfully retaliated against Relator.

725. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under H.R.S. § 661-30(a) and (b).

## COUNT XXXI

### Unlawful Retaliation Under Illinois False Claims Act
### 740 ILCS §§ 175/1 to 175/8

726. The allegations in the preceding paragraphs are incorporated by reference.

727. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

728. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of 740 ILCS §§ 175/3, unlawfully retaliated against Relator.

729. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under 740 ILCS 175/4(g)(1) and (2).

## COUNT XXXII

### Unlawful Retaliation Under Indiana False Claims and Whistleblower Protection Act
### Ind. Code Ann. §§ 5-11-5.5-1 - 5-11-5.5-18

730. The allegations in the preceding paragraphs are incorporated by reference.

731. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

732. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of Ind. Code Ann. § 5-11-5.5-2, unlawfully retaliated against Relator.

733. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under Ind. Code Ann. § 5-11-5.5-8.

## COUNT XXXIII

### Unlawful Retaliation Under Iowa False Claims Act
### IA Code Ann. §§ 685.1 through 685.7

734. The allegations in the preceding paragraphs are incorporated by reference.

735.   During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

736.   FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of IA Code Ann. § 685.2, unlawfully retaliated against Relator.

737.   As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under IA Code Ann. §§ 685.3(6)(a) and (b).

## COUNT XXXIV

### Unlawful Retaliation Under Maryland False Claims Act
### MD Code Ann., Gen. Prov. §§ 8-101 to 8-111

738.   The allegations in the preceding paragraphs are incorporated by reference.

739.   During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

740.   FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of Md. Code Ann., Gen. Prov. § 8-102, unlawfully retaliated against Relator.

215

741.  As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under Md. Code Ann., Gen. Prov. § 8-107(a)-(b).

## COUNT XXXV

### Unlawful Retaliation Under Massachusetts False Claims Act
### Mass. Ann. Laws Ch. 12, §§ 5A- 5O

742.  The allegations in the preceding paragraphs are incorporated by reference.

743.  During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

744.  FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of M.G.L.A. 12 § 5B to 5O, unlawfully retaliated against Relator.

745.  As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under M.G.L.A. 12 § 5J.

## COUNT XXXVI

### Unlawful Retaliation Under Minnesota False Claims Act
### M.S.A. § 15C.01, *et seq.*

746.   The allegations in the preceding paragraphs are incorporated by reference.

747.   During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

748.   FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of M.S.A. § 15C.02, unlawfully retaliated against Relator.

749.   As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under M.S.A. § 15C.145.

## COUNT XXXVII

### Unlawful Retaliation Under Montana False Claims Act
### Mont. Code Ann. §§ 17-8-401 to 17-8-416

750.   The allegations in the preceding paragraphs are incorporated by reference.

217

751.   During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

752.   FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of Mont. Code Ann. § 17-8-403, unlawfully retaliated against Relator.

753.   As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under Mont. Code Ann. § 17-8-412.

## COUNT XXXVIII

### Unlawful Retaliation Under Nevada False Claims Act
### Nev. Rev. Stat. §§ 357.010, et seq.

754.   The allegations in the preceding paragraphs are incorporated by reference.

755.   During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

756.   FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and other efforts to stop Defendants' violations of Nev. Rev. Stat. § 357.040, unlawfully retaliated against Relator.

218

757. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under Nev. Rev. Stat. § 357.250.

## COUNT XIX

### Unlawful Retaliation Under New Jersey False Claims Act
### N.J.S.A. §§ 2A:32C-1, *et seq.*

758. The allegations in the preceding paragraphs are incorporated by reference.

759. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

760. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action, unlawfully retaliated against Relator.

761. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under NJSA 2A:32C-10.

## COUNT XL

### Unlawful Retaliation Under New Mexico Fraud Against Taxpayers Act
### N.M.S.A. §§ 44-9-1, *et seq.*

762. The allegations in the preceding paragraphs are incorporated by reference.

219

763. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

764. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action, unlawfully retaliated against Relator.

765. As a direct and proximate result of Defendants' retaliatory actions, Relator suffered damages and is entitled to all allowable relief under N.M.S.A. § 44-9-11.

## COUNT XLI

### Unlawful Retaliation Under New York False Claims Act
### State Finance Law §§ 187 et seq.

766. The allegations in the preceding paragraphs are incorporated by reference.

767. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

768. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and efforts to stop Defendants' violations of State Fin. Law § 189, unlawfully retaliated against Relator.

769.    As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under State Fin. Law § 191.

## COUNT XLII

### Unlawful Retaliation Under North Carolina False Claims Act
### N.C. Gen. Stat. §§ 1-605, et seq.

770.    The allegations in the preceding paragraphs are incorporated by reference.

771.    During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

772.    FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and efforts to stop Defendants' violations of N.C. Gen. Stat. §§ 1-607, unlawfully retaliated against Relator.

773.    As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under N.C.G.S.A. § 1-613.

## COUNT XLIII

### Unlawful Retaliation Under Rhode Island State False Claims Act
### RI Gen. Laws §§ 9-1.1-1, et seq.

221

774. The allegations in the preceding paragraphs are incorporated by reference.

775. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

776. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and efforts to stop Defendants' violations of RI Gen. Laws §§ 9-1.1-3, unlawfully retaliated against Relator.

777. As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under RI Gen. Laws § 9-1.1-4(g).

## COUNT XLIV

### Unlawful Retaliation Under Tennessee False Claims Act
### Tenn. Code Ann. § 4-18-101, et seq.

778. The allegations in the preceding paragraphs are incorporated by reference.

779. During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

780. FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action, unlawfully retaliated against Relator.

222

781.   As a direct and proximate result of Defendants' retaliatory actions, Relator suffered damages and is entitled to all allowable relief under Tenn. Code Ann. § 4-18-105.

## COUNT XLV

### Unlawful Retaliation Under Vermont False Claims Act
### 32 V.S.A. §§ 630-642

782.   The allegations in the preceding paragraphs are incorporated by reference.

783.   During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

784.   FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and efforts to stop Defendants' violations of 32 V.S.A. § 631, unlawfully retaliated against Relator.

785.   As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under 32 V.S.A. § 638.

## COUNT XLVI

### Unlawful Retaliation Under Virginia Fraud Against Taxpayers Act
### VA Code Ann. §§ 8.01-216.1, et seq.

223

786.   The allegations in the preceding paragraphs are incorporated by reference.

787.   During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

788.   FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and efforts to stop Defendants' violations of VA Code Ann. § 8.01-216.3, unlawfully retaliated against Relator.

789.   As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under VA Code Ann. § 8.01-216.8.

## COUNT XLVII

**Unlawful Retaliation Under District of Columbia False Claims Act
DC ST § 2-381.01, *et seq*.**

790.   The allegations in the preceding paragraphs are incorporated by reference.

791.   During and by virtue of Relator's employment with FedEx, Relator obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

792.   FedEx, with actual knowledge of Relator's lawful acts in furtherance of this action and efforts to stop Defendants' violations of DC ST § 2-381.02, unlawfully retaliated against Relator.

793.   As a direct and proximate result of FedEx's retaliatory actions, Relator suffered damages and is entitled to all allowable relief under DC ST § 2-381.04.

WHEREFORE, Relator, on behalf of Relator, the United States, and the States, prays:

(a)   That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of any amount within the applicable statutory ranges, for each violation;

(b)   That the Court enter judgment against Defendants in favor of the States and the Relator in the amount of the damages sustained by the States, trebled as provided for in the State False Claims Acts, plus civil penalties for each violation of each of the States False Claims Acts;

225

(c)     That Relator be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes and proceeds with the action, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(d)     That the Relator be awarded an amount from the proceeds of the action to the States as provided for in the *qui tam* provisions of each of the States False Claims Acts;

(e)     That Relator receive all relief necessary to make Relator whole for Defendants' violations of 31 U.S.C. § 3730(h);

(f)     That Relator receive all relief necessary to make Relator whole for Defendants' violations of each State False Claims Acts' applicable retaliation provisions;

(g)     That judgment be entered against Defendants jointly and severally, in the amounts to be determined at trial; and

226

(h) That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(i) That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Dated: April 2⁄7, 2019                    Respectfully submitted,


_____

Alissa L. DePass
New York Bar No. 4813143
DEPASS LEGAL
11 Broadway, Suite 615
New York, New York 10004
(212) 651-4856
alissa@depasslegal.com


_____

Renée Brooker
(*Pro Hac Vice* pending)
D.C. Bar No. 430159
FINCH MCCRANIE, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
(202) 288-1295
(404) 688-0649 (fax)
reneebrooker@finchmccranie.com


_____

Eva Gunasekera
(*Pro Hac Vice* pending)
D.C. Bar No. 502542
FINCH MCCRANIE, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
(202) 641-3804
(404) 688-0649 (fax)
eva@finchmccranie.com


Michael A. Sullivan
(*Pro Hac Vice* pending)
Georgia Bar No. 691431
FINCH MCCRANIE, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
(404) 658-9070
(404) 688-0649 (fax)
msullivan@finchmccranie.com


***Attorneys for Plaintiff-Relator***